IMPERIUM PATENT WORKS
DARIEN K. WALLACE (State Bar No. 139798)
T. LESTER WALLACE (State Bar No. 159967)
P.O. Box 587
Sunol, California 94586
e-mail: Darien@ImperiumPW.com
Telephone:   925-862-9972
Facsimile:   925-835-5804

Attorneys for Plaintiff and Counterdefendant
ZINUS, INC.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| ZINUS, INC., a California corporation, <br><br> Plaintiff, <br><br> v. <br><br> SIMMONS BEDDING COMPANY, a Delaware corporation, and DREAMWELL, LTD., a limited liability company of Nevada, <br><br> Defendants. | Case No. 07-CV-03012 PVT <br><br> **PLAINTIFF ZINUS, INC.'S CLAIMS CONSTRUCTION BRIEF RE "INSERTING . . . INTO" AND "CONTAINMENT SLEEVE"** |
| DREAMWELL, LTD., a limited liability company of Nevada, <br><br> Counterclaimant, <br><br> v. <br><br> ZINUS, INC., a California corporation, <br><br> Counterdefendant. | Date:      February 19, 2008 <br> Time:      10:00 a.m. <br> Location:  Courtroom 5 <br> Judge:     Hon. Patricia V. Trumbull |

**TABLE OF CONTENTS** **Page**

TABLE OF AUTHORITIES ............................................................. iii

MEMORANDUM OF POINTS AND AUTHORITIES.................................. 1

I.     INTRODUCTION ….................................................................. 1

II.    LEGAL STANDARDS.............................................................. 1

       A.  The Claims ..................................................................... 1

            1.  Ordinary and Customary Meaning....................................... 2

            2.  Courts Do Not Redraft Claims - Courts Only Interpret Claims................. 3

       B.  Specification - Single Best Guide........................................ 3

       C.  Prosecution History......................................................... 4

       D.  Extrinsic Evidence Frowned Upon ...................................... 4

            1.  Rarely, If Ever, Necessary ............................................. 4

            2.  Dictionaries................................................................ 4

III.   APPLICATION OF THE LAW TO THE FACTS................................. 6

       A.  Chart of Proposed Constructions........................................ 6

       B.  The "Containment Sleeve" Term......................................... 6

       C.  The "Inserting . . . Into" Term............................................ 9

       D.  The "Containment Sleeve . . . For Shipment" Recitation Is A

            Means-Plus-Function Recitation.......................................... 12

       E.  Dreamwell's Proposed Construction.................................... 13

            1.  Dreamwell's Proposed Construction................................... 13

            2.  Why Dreamwell's Definition of "Containment Sleeve" Is Wrong........... 13

            3.  Why Dreamwell's Definition of "Inserting . . . Into" Is Wrong............ 15

            4.  Dreamwell's Construction Is Contrived and Reads Limitations

                 Out Of The Claims...................................................... 15

            5.  Dreamwell's Overly Broad Construction Expands the "Inserting" Element

                 Such That The Written Description Requirement Is Violated...................... 16

IV.    THE "RIBBON SHAPED FILM" IN THE MAGNI PATENT........................ 17

# TABLE OF AUTHORITIES

<u>Cases</u>                                                                    <u>Page(s)</u>

*Acumed LLC v. Stryker Corp.*, 483 F.3d 800 (Fed.Cir. 2007) .................................. 5

*Autogiro v. United States*, 181 Ct. Cl. 55, 384 F.2d 391, 115 USPQ 697 (Ct.Cl.

    1967) ...................................................................................................... 1

*Chef America, Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 69 USPQ2d 1857

    (Fed.Cir. 2004) ........................................................................ 2-3, 15

*Chiron Corp. v. Genentech, Inc.*, 363 F.3d 1247, 70 USPQ2d 1321 (Fed. Cir. 2004)     17

*Elektra Instr. v. O.U.R. Scientific Int'l*, 214 F.3d 1302, 54 USPQ2d 1910 (Fed.Cir.

    2000) ...................................................................................................... 2

*Free Motion Fitness, Inc. v. Cybex International, Inc.*, 423 F.3d 1434, 76 USPQ2d

    1432 (Fed.Cir. 2005) ................................................................... 6

*Innova/Pure Water, Inc. v Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 72

    USPQ2d 1001 (Fed.Cir. 2004) ................................................... 1

*Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 21 USPQ2d 1383 (Fed.Cir.

    1992) ...................................................................................................... 2

*Johnson Worldwide Assocs. v. Zebco Corp.*, 175 F.3d 985, 50 USPQ2d 1607

    (Fed.Cir. 1999) ........................................................................... 3

*Kinik Co. v. Int'l Trade Comm'n*, 362 F.3d 1359, 70 USPQ2d 1300 (Fed.Cir. 2004)     4

*Lizardtech, Inc. v. Earth Resource Mapping, Inc.*, 424 F.3d 1336, 76 USPQ2d 1724

    (Fed.Cir. 2005) ........................................................................ 16-17

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980, 34 USPQ2d 1321

    (Fed.Cir. 1995) ........................................................................ 1-2

*Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 71 USPQ2d

    1081 (Fed.Cir. 2004) ................................................................. 4

*N. Telecom v. Samsung*, 215 F.3d 1281, 55 USPQ2d 1065 (Fed.Cir. 2000) .............. 2

*NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 75 USPQ2d 1763 (Fed.Cir.

    2005) ...................................................................................................... 1

*Optical Disc v. Del Mar Avionics*, 208 F.3d 1324, 54 USPQ2d 1289 (Fed.Cir. 2000)     2

*Phillips v. AWH Corp.*, 415 F.3d 1303, 75 USPQ2d 1321 (Fed.Cir. 2005) ............. 2, 4-6

*Quantum Corp. v. Rodime, PLC*, 65 F.3d 1577, 1584 (Fed.Cir. 1995) ................... 3

*Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 48 USPQ2d 1117

     (Fed. Cir. 1998) ................................................. 1

*Rhodia Chimie v. PPG Industries, Inc.*, 402 F.3d 1371, 74 USPQ2d 1321 (Fed.Cir.

     2005) ...................................................... 4

*Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 34 USPQ2d 1673

     (Fed.Cir. 1995) ............................................. 3-4

*TeKnowledge Corp. v Akamai Tech.*, 73 USPQ2d 1021 (N.D. Cal. 2004) .............. 3

*Teleflex, Inc. v. Ficosa North America Corp.*, 299 F.3d 1313, 63 USPQ2d 1374

     (Fed.Cir. 2002) ............................................. 3

*The Toro Company v. White Consolidated Industries*, 199 F.3d 1295, 52 USPQ2d

     1065 (Fed. Cir. 1999) ....................................... 2

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 39 USPQ2d 1573 (Fed.Cir.

     1996) ................................................... 1-2, 4

*York Prods., Inc. v. Cent. Tractor Farm & Family Ctr.*, 99 F.3d 1568, 40 USPQ2d

     1619 (Fed.Cir. 1996) ........................................ 3

*ZMI Corp. v. Cardiac Resuscitator Corp.*, 844 F.2d 1576, 6 USPQ2d 1557

     (Fed.Cir. 1988) ............................................. 4


**Statutes and Rules**

35 U.S.C. §112, ¶ 6 ..................................................... 12

35 U.S.C. §112, ¶ 1 ..................................................... 16

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**I. <u>INTRODUCTION</u>**

3

On January 17, 2008, the Court issued an "Interim Order Re Plaintiff's Zinus, Inc.'s

4

Motion For Reconsideration."  In the Interim Order, the Court ordered Zinus to file a "claims

5

construction brief" covering the terms "inserting . . . into" and "containment sleeve" as those

6

two terms are used in U.S. Patent No. Re 36,142 ("the '142 Patent"), as well as the term

7

"ribbon shaped film" as that term is used in U.S. Patent No. 4,711,067 to Magni (the "Magni

8

Patent").  Zinus files this claims construction brief to comply with the Court's Interim Order.

9

10

**II. <u>LEGAL STANDARDS</u>**

11

To determine the meaning of a term in a claim, the Court initially looks to intrinsic

12

evidence.  Intrinsic evidence includes the claims, the specification, and, if in evidence, the

13

prosecution history. *Autogiro v. United States*, 181 Ct. Cl. 55, 384 F.2d 391, 115 USPQ 697

14

(Ct.Cl. 1967).  See *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 75 USPQ2d 1763

15

(Fed.Cir. 2005) for the type of claim construction analysis that the Court of Appeals for the

16

Federal Circuit currently prefers.

17

18

A.  <u>The Claims</u>.

19

The Court first looks to the words of the claims themselves.  *Vitronics Corp. v.*

20

*Conceptronic, Inc.*, 90 F.3d 1576, 1582, 39 USPQ2d 1573 (Fed.Cir. 1996).  Claim construction

21

"begins and ends in all cases with the actual words" used by the patentee.  *Renishaw PLC v.*

22

*Marposs Societa' per Azioni*, 158 F.3d 1243, 1248, 48 USPQ2d 1117 (Fed. Cir. 1998).  "A

23

claim construction analysis must begin and remain centered on the claim language itself."

24

*Innova/Pure Water, Inc. v Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 72 USPQ2d

25

1001 (Fed.Cir. 2004).  "The written description part of the specification does not delimit the

26

right to exclude.  That is the function and purpose of the claims."  *Markman v. Westview*

27

*Instruments, Inc.*, 52 F.3d 967, 980, 34 USPQ2d 1321 (Fed.Cir. 1995).

28

1    1.  Ordinary and Customary Meaning.

2        The  Federal Circuit has "frequently stated that the words of a claim 'are generally given

3    their ordinary and customary meaning.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312, 75

4    USPQ2d 1321 (Fed.Cir. 2005)(en banc), citing *Vitronics*, 90 F.3d at 1582 and numerous other

5    cases.  "In some cases, the ordinary meaning of claim language as understood by a person of

6    skill in the art may be readily apparent even to lay judges, and claim construction in such cases

7    involves little more than the application of the widely accepted meaning of commonly

8    understood words.  *Phillips* 415 F.3d at 1314.

9        There is a strong presumption that a claim term carries the ordinary and customary

10   meaning that would be ascribed to that term by a person of ordinary skill in the field of the

11   invention. *The Toro Company v. White Consolidated Industries,* 199 F.3d 1295, 1299, 52

12   USPQ2d 1065 (Fed. Cir. 1999). This strong presumption may be overcome, however, in at least

13   two situations.

14       First, a term may be given a meaning other than the ordinary meaning where the

15   inventor has acted as his own lexicographer. Such a special definition must be "clearly stated"

16   in the patent specification. "The specification acts as a dictionary when it expressly defines

17   terms used in the claims or when it defines terms by implication." *Vitronics*, 90 F.3d at 1582.

18   Claim terms take on their ordinary meaning in the absence of evidence in the patent

19   specification of an "express intent to impart a novel meaning" to the claim terms. *Optical Disc*

20   *v. Del Mar Avionics*, 208 F.3d 1324, 1334, 54 USPQ2d 1289, 1295 (Fed.Cir. 2000); *Elektra*

21   *Instr. v. O.U.R. Scientific Int'l*, 214 F.3d 1302, 1307, 54 USPQ2d 1910, 1913 (Fed.Cir. 2000);

22   *N. Telecom v. Samsung*, 215 F.3d 1281, 1287, 55 USPQ2d 1065, 1069 (Fed.Cir. 2000).

23   Although a patentee is free to be his own lexicographer, there is a caveat:  any special

24   definition given to a word must be clearly defined in the specification.  *Markman*, 52 F.3d at

25   980, citing *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1388, 21 USPQ2d 1383, 1386

26   (Fed.Cir. 1992).  In the absence of the patentee's clear intent to give claim terms some other,

27   special meaning, the ordinary meaning controls.  *Chef America, Inc. v. Lamb-Weston, Inc.*, 358

28   F.3d 1371, 1373, 69 USPQ2d 1857 (Fed.Cir. 2004).  Claim terms take on their ordinary and

ZINUS' CLAIMS CONSTRUCTION
BRIEF RE "INSERTING . . . INTO"
AND "CONTAINMENT SLEEVE"

Case No. 07-CV-03012 PVT

accustomed meanings unless the patentee demonstrated "clear intent" to deviate from the ordinary and accustomed meaning of a claim term by redefining the term in the patent specification. *Johnson Worldwide Assocs. v. Zebco Corp.*, 175 F.3d 985, 990, 50 USPQ2d 1607 (Fed.Cir. 1999). In the absence of an "express intent" to impart a novel meaning to claim terms, an inventor's claim terms take on their ordinary meaning. *Teleflex, Inc. v. Ficosa North America Corp.*, 299 F.3d 1313, 1326, 63 USPQ2d 1374 (Fed.Cir. 2002), citing *York Prods., Inc. v. Cent. Tractor Farm & Family Ctr.*, 99 F.3d 1568, 1572, 40 USPQ2d 1619, 1576 (Fed.Cir. 1996).

Second, the presumption may be overcome where the prosecution history shows that the inventor defined the term in a way that deviates from the ordinary and common usage, or expressly disavowed a particular meaning. *Teleflex*, 299 F.3d at 1326. Therefore, "arguments and amendments made during the prosecution of a patent application and other aspects of the prosecution history . . . must be examined to determine the meaning of terms in the claims." *Teleflex*, citing *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576, 34 USPQ2d 1673, 1676 (Fed.Cir. 1995).

### 2. Courts Do Not Redraft Claims - Courts Only Interpret Claims.

In a long line of cases, the Federal Circuit "repeatedly and consistently has recognized that courts may not redraft claims." *Chef America v. Lamb-Weston*, 358 F.3d 1371, 69 USPQ2d 1857 (Fed.Cir. 2004); *TeKnowledge Corp. v Akamai Tech.*, 2004 U.S. Dist. LEXIS 18779, 73 USPQ2d 1021 (N.D. Cal. 2004). The Federal Circuit has cautioned judges that "no matter how great the temptations of fairness or policy making, courts do not redraft claims." *Quantum Corp. v. Rodime, PLC*, 65 F.3d 1577, 1584 (Fed.Cir. 1995). Courts do not rework claims; courts only interpret them. *Autogiro*, 384 F.2d at 395-96. This Court must construe the claim "as written, not as the patentees wish they had written it." *Chef America*, 358 F.3d at 1373.

### B. Specification - Single Best Guide.

"The words of patent claims have the meaning and scope with which they are used in

the specification and the prosecution history." *Kinik Co. v. Int'l Trade Comm'n*, 362 F.3d 1359, 1365, 70 USPQ2d 1300 (Fed.Cir. 2004).  The specification is always highly relevent to the claim construction analysis.  Usually it is dispositive; it is the ***single best guide*** to the meaning of disputed terms.  *Vitronics*, 90 F.3d at 1582 (emphasis added).  "In most cases, the ***best source*** for discerning the proper context of claim terms is the patent specification wherein the patent application describes the invention."  *Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1360, 71 USPQ2d 1081 (Fed.Cir. 2004) (emphasis added).

   C. <u>Prosecution History</u>.

   "The purpose of consulting the prosecution history in construing a claim is to exclude any interpretation that was disclaimed during prosecution." *Rhodia Chimie v. PPG Industries, Inc.*, 402 F.3d 1371, 74 USPQ2d 1321 (Fed.Cir. 2005), quoting *ZMI Corp. v. Cardiac Resuscitator Corp.*, 844 F.2d 1576, 1580, 6 USPQ2d 1557 (Fed.Cir. 1988); *Southwall Techs* 54 F.3d at 1576.

   D. <u>Extrinsic Evidence Frowned Upon</u>.

   1.  Rarely, If Ever, Necessary.

   Instances "rarely, if ever, occur" in which "the patent documents, taken as a whole, are insufficient to enable the court to construe disputed claim terms."  "In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term." *Vitronics*, 90 F.3d at 1585.  The Federal Circuit has cautioned judges that, "In such circumstances, it is improper to rely on extrinsic[1] evidence." *Vitronics*, 90 F.3d 1583.

   2.  Dictionaries.

   Dictionaries are extrinsic evidence.  The leading authority on using dictionaries in

---

[1]  "Extrinsic evidence is that evidence which is external to the patent and file history, such as expert testimony, inventor testimony, dictionaries, and technical treatises and articles."  *Vitronics*, 90 F.3d at 1584.

interpreting claim terms is *Phillips v. AWH Corp.*, 415 F.3d 1303, 75 USPQ2d 1321 (Fed.Cir. 2005)(en banc).  In *Phillips*, the Court sought to explain which of two contrasting approaches to interpreting a claim term was correct:  (1) a *literalist* approach, with an emphasis on ordinary meaning, often linked to dictionary definitions, the meaning being altered only by clear contrary evidence in a patent's specification and prosecution history, and (2) a *contextual* approach, with a balanced focus on customary meaning in the relevant prior art, the patent specification, including its general discussion and its examples, and other evidence.  In *Phillips*, the Federal Circuit adopted the contextual approach, and disapproved of the approach of "literalist decisions" because the literalist decisions "placed too much reliance on extrinsic sources such as dictionaries, treatises, and encyclopedias and too little on intrinsic sources, in particular the specification and prosecution history."

The Federal Circuit explained, "The patent system is based on the proposition that claims cover only the invented subject matter."  "Dictionaries, by their nature, provide an expansive array of definitions. . . . By design, general dictionaries collect the definitions of a term as used not only in a particular art field, but in many different settings. In such circumstances, it is inevitable that the multiple dictionary definitions for a term will extend beyond the 'construction of the patent [that] is confirmed by the avowed understanding of the patentee, expressed by him, or on his behalf, when his application for the original patent was pending' . . . Thus, the use of the dictionary may extend patent protection beyond what should properly be afforded by the inventor's patent." [*Id.* at 1321]  "Moreover, different dictionaries may contain somewhat different sets of definitions for the same words.  A claim should not rise or fall based upon the preferences of a particular dictionary editor." [*Id.* at 1322]

In *Phillips*, the Federal Circuit rejected the approach of construing a term by starting with a broad dictionary definition, and then wittling it down only if the broad definition is contradicted by the specification.  *Acumed LLC v. Stryker Corp.*, 483 F.3d 800 (Fed.Cir. 2007); *Phillips*, 415 F.3d at 1321.  The Federal Circuit stated, "The problem is that if the district court starts with the broad dictionary definition in every case and fails to fully

appreciate how the specification implicitly limits that definition, the error will systematically cause the construction of the claim to be unduly expansive." *Phillips*, 415 F.3d at 1321.

Under *Phillips,* the rule that a court will give a claim term the full range of its ordinary meaning, does not mean that the term will presumptively receive its broadest dictionary definition or the aggregate of multiple dictionary definitions. Rather, in those circumstances where reference to dictionaries is appropriate, the task is to scrutinize the intrinsic evidence in order to determine the most appropriate definition. *Free Motion Fitness, Inc. v. Cybex International, Inc.*, 423 F.3d 1434, 76 USPQ2d 1432 (Fed.Cir. 2005), citing *Phillips*, 415 F.3d at 1322-23, 1324.

### III.   APPLICATION OF THE LAW TO THE FACTS

A.   Chart of Proposed Constructions.

|  | Zinus' Construction | Dreamwell's Construction |
|---|---|---|
| "sleeve" | "a tubular or pocket-shaped part designed to fit over another part", such as a shirt sleeve that is designed to fit over an arm, and such as a record sleeve that is designed to fit over a record, and such as sleeve 26 of the '142 Patent that is designed to fit over tube 22. | "a case into which an object or device fits", such as a "record sleeve". |
| "containment" | "the act or condition of containing", which in turn is defined as "holding or keeping within limits" | "the act or condition of containing", which in turn is defined as "holding or keeping within limits" |
| "containment sleeve" | "a sleeve that performs the act of containing" | "a case into which an object or device fits that restrains, holds or keeps the object or device within limits". |
| "inserting" | "to put or set into or between", such as "inserting" an arm into a shirt sleeve, and such as inserting a record into a record sleeve, and such as inserting the "evacuated tube" 22 of the '142 Patent into the "containment sleeve" 26 of the '142 Patent. | "to put or set into, between or among" |
| "inserting [A] into [B]" | NO SPECIAL MEANING | SPECIAL MEANING:<br>"arranging [A] and [B] such that A is inside or within the boundaries of B". |

B.   The "Containment Sleeve" Term.

The ordinary and customary meaning of the term "sleeve" in Zinus' view is "a tubular

1  or pocket-shaped part designed to fit over another part", such as a shirt sleeve that is

2  designed to fit over an arm, and such as a record sleeve that is designed to fit over a record,

3  and such as sleeve 26 of the '142 Patent that is designed to fit over tube 22 of the '142

4  Patent. The term "sleeve" is not a special term of art. It is an ordinary English term

5  understood by any ordinary person, or any person of ordinary skill in the art, who reads the

6  '142 Patent.

7         The ordinary and customary meaning of the term "containment" is "the act or

8  condition of containing", where "containing" in turn is defined as "holding or keeping within

9  limits". The term "containment" is not a special term of art. It is an ordinary English term

10  understood by any ordinary person, or any person of ordinary skill in the art, who reads the

11  '142 Patent.

12         As set forth in the Legal Standards section above, to interpret a claim term, the

13  Federal Circuit has directed Courts to start by looking at the claim language itself. Zinus

14  notes that the inserting-into-a-sleeve step in the claims occurs after the "evacuated tube" has

15  been formed. The "sleeve" is therefore to contain an already formed "evacuated tube". This

16  confirms that the "sleeve" must, in order to contain the evacuated tube, have a tubular or

17  pocket form, into which the evacuated tube can be inserted.

18         Next, the specification is consulted. There is only one example of a containment

19  sleeve disclosed in the '142 Patent, and that is the tubular containment sleeve 26 of Figure 3

20  (Fig. 3 of the '142 Patent is replicated below). The specification explains that this tubular



28  containment sleeve 26 "is installed over" the already evacuated "tube" 22 (col. 3, lines 35-

37).  The only disclosures in the '142 Patent of the structure of containment sleeve 26, or any containment sleeve, are the illustration of Figure 3 and the statement, "Preferably, the containment sleeve 26 is an extruded tube of 4 mil polyethylene" (col. 3, lines 24-26).  Thus, the specification defines the containment sleeve as a tube.  Nowhere in the '142 Patent is there any indication that the inventors of the '142 Patent had possession of any invention involving any "sleeve" for containing a "evacuated tube"[2], where the "sleeve" did not itself have tubular shape or pocket shape into which an object, such as tube 22, is inserted.  Nowhere in the '142 Patent is there any indication that the inventors of the '142 Patent had possession of any invention involving rolling up a compressed mattress with a sheet of flexible film to form a Swirl Wrap structure, and then taping the resulting structure to hold its cylindrical shape.  All references to "sleeve" in the specification of the '142 patent involve fitting the "sleeve" over an already evacuated tube, or installing the "sleeve" over an already evacuated tube.  Accordingly, the ordinary and customary meaning of "a tubular or pocket-shaped part designed to fit over another part" is appropriate because it aptly describes all examples of a sleeve set forth in the '142 Patent.

There is nothing in the '142 Patent that indicates a "clear intent" to provide a special definition of the term "sleeve."  The '142 Patent includes no special definition of "sleeve".  The patentees simply used the term "sleeve" in context in describing the packaging system of Figure 3, and in fact used the term "sleeve" to describe a "sleeve" of tubular shape[3] that is installed over another tube[4].  In view of the fact that the Federal Circuit has said that a special definition must be "clearly stated" in the patent specification in order for the "ordinary and customary" meaning of a term to be superseded by a special definition, the term "containment sleeve" in the '142 Patent is not given any "special meaning".

Next, the prosecution history is consulted.  Although the patentees and the Examiner

---

[2] It is important to note that the claims of the '142 Patent recite that the "evacuated tube" is a "tube".  A tube is therefore being "inserted into" a sleeve, according to the words of the claims.

[3] "Preferably, the containment sleeve 26 is an extruded tube of 4 mil polyethylene." (Col. 3, lines 24-25).

[4] ". . . the containment sleeve 26 is installed over the compressed tube 22 . . ." (Col. 3, lines 34-35).

had considerable argument over whether the "mattress cover" 1 of the prior art Broyles

patent was or was not a containment sleeve, Zinus submits that this discussion does not affect

the meaning of the term "sleeve" in the claims of the '142 Patent because the Examiner's

rejections were overcome by adding other words to the claims.  In particular, the two

important words "for shipment" were added to the end of the "inserting . . . into a

containment sleeve . . ." claim element.  Zinus submits that the meaning of the term

"containment sleeve" was not varied from its ordinary and customary meaning.

Lastly, there is the issue of extrinsic evidence.  Although Zinus is tempted to submit

dictionary definitions and to act as if this is one of those "rare" cases in which the intrinsic

evidence is "insufficient to enable the court to construe disputed claim terms", the fact is that

this case is not one of those "rare" cases.  Ordinary people[5] know what a "sleeve" is.  It

would be improper to look to dictionary definitions and extrinsic evidence in this case.  Zinus

therefore does not raise or discuss extrinsic evidence.


C.  The "Inserting . . . into" Term.

The ordinary and customary meaning of the term "inserting" is "to put or set into or

between".  The term "inserting" is an ordinary and commonly understood English word, and

determining its meaning requires no elaborate exercise in claim interpretation.  Nothing in

the claims, or in the specification, or in the prosecution history contradicts the ordinary and

customary meaning of the term.

Because the Federal Circuit has directed Courts to start by looking at the claim

language itself, the claims are examined first.  Zinus notes that the term "inserting . . . into"

in the claims is used as part of the larger phrase "inserting said evacuated tube into a

containment sleeve".  The term "sleeve" therefore informs the meaning of the term

"inserting" in that the act of "inserting" must be consistent with the associated "sleeve"

structure.  Because a "sleeve" is "a tubular or pocket-shaped part designed to fit over another

---

[5] As well as those of ordinary skill in this mattress packaging art.

part", and because the "another part" here is itself the already-evacuated "tube" as defined by the claim itself, the act of "inserting" must encompass either coaxially inserting the evacuated tube into the containment sleeve tube in an "arm-into-a-sleeve" type movement, or must encompass somehow rolling the containment sleeve up and then unrolling it along the shaft of the evacuated tube in a similar fashion to the way a shirt sleeve is unrolled when a person rolls his/her sleeves down.  But, regardless of how this inserting is accomplished, the "evacuated tube" of the claims is a unitary tube structure that is already formed at the beginning of the "inserting" step as defined by the claim terminology itself.

The term "inserting . . . into" is also used a second time in each of the independent claims as part of the larger phrase "inserting a mattress assembly constructed of pocketed coil springs into said tube".  This second use of the term  "inserting . . . into" in each claim is the same as the first use.  In the second use, the term "tube" informs the meaning of the term "inserting" in that the act of "inserting" must be consistent with the associated "tube" structure.  The act of "inserting" must here encompass either coaxially inserting a mattress assembly into a tube or rolling the tube up and then unrolling it over the mattress assembly.

Both times the term "inserting . . . into" is used in each independent claim, the term is used to mean inserting an object into a tube.  Other than making this association between the two terms "inserting  . . . into" and "containment sleeve", the claims do not provide much additional assistance in further defining the "ordinary and customary meaning" of the term "inserting . . . into".

Next, the specification is consulted.  Nothing in the specification is inconsistent with the ordinary and customary definition of "to put or set into or between".  Because there is only one embodiment disclosed in the '142 Patent, it is presumed that the proper interpretation of the term "inserting . . . into" would result in the claims reading on the disclosed embodiment of Figure 3, and the way the "evacuated tube" 22 engages the "containment sleeve" 26.  See Figure 3 of the '142 Patent replicated above.  Clearly the "evacuated tube" 22 was somehow "put into" the tubular "containment sleeve" 26.

It is interesting to note that the specification nowhere uses the term "inserting" in

describing how evacuated tube 22 is put into containment sleeve 26.  There are only three passages in the '142 Patent that describe the operation of inserting evacuated tube 22 into containment sleeve 26, and none of these passages uses the term "inserting".  For example, line 9 of the abstract explains that the containment sleeve "is fitted over" the sealed tube.  Similarly, line 42 of column 2 explains that the containment sleeve "is fitted over" the sealed tube.  Line 37 of column 3 uses slightly different wording and states that the containment sleeve "is installed over" the compressed tube.  Although these three passages in the specification do not use the term "inserting", they are nonetheless descriptions of the relative movement between the containment sleeve and evacuated tube.  As such, saying that the evacuated tube 22 is "put or set into or between" the sleeve 26 is the same thing as, or is very similar to, saying that the containment sleeve is "fitted over" the evacuated tube.  Accordingly, nothing in the specification is inconsistent with using the ordinary and customary definition of inserting as "to put or set into or between".

The specification of the '142 Patent does not indicate a "clear intent" to deviate from the ordinary and customary meaning of the term "inserting . . . into".  In view of the fact that a special definition must be "clearly stated" in the patent specification in order for the "ordinary and customary" meaning of a term to be superseded by a special definition, the term "inserting . . . into" is not given a "special meaning".  The ordinary and customary meaning of the term controls.

Lastly, there is the issue of extrinsic evidence.  Again, although Zinus is tempted to submit dictionary definitions and to act as if this is one of those "rare" cases in which the intrinsic evidence is "insufficient to enable the court to construe disputed claim terms", the fact is that this case is not one of those "rare" cases.  Ordinary people, as well as people of ordinary skill in the mattress packaging arts, know what the word "inserting" means, especially when the context of the term involves a "tube" being "inserted into" a "sleeve" as recited in all claims of the '142 Patent.  This is not one of those "rare" cases in which the intrinsic evidence is "insufficient to enable the court to construe disputed claim terms".  Zinus therefore does not raise or discuss extrinsic evidence.

D. The "Containment Sleeve . . . For Shipment" Recitation Is A Means-Plus-Function Recitation.

If an accused instrumentality does not perform the function recited in a means-plus-function recitation ***exactly***, then the means-plus-function recitation does not cover the accused instrumentality. To determine that the accused instrumentality does not literally infringe does not require engaging the further analysis of identifying the supporting "structure, material or acts" set forth in the specification, and determining what a §112, ¶6, equivalent of that corresponding "structure, material or acts" is. Because the accused instrumentality does not perform the recited function ***exactly***, there can be no literal infringement.

In the present case, Zinus does not want to complicate the task of deciding the Motion for Summary Adjudication at hand by raising the complexities of a §112, ¶6 equivalents analysis. Indeed, it is not necessary for the Court to engage in such an analysis to find non-infringement. The Swirl Wrap method does not perform the "inserting . . . into . . ." element according to its literal terms. The Swirl Wrap method therefore cannot literally infringe, regardless of whether §112, ¶6, is implicated or not.

Zinus does, however, point out for completeness that the "containment sleeve . . . for shipment" recitation (in all the claims of the '142 Patent) is either: 1) a means-plus-function recitation, or 2) the claims are invalid for being vague and indefinite under 35 U.S.C. §112, ¶2, because the "for shipment" words place no ascertainable limits on the "containment sleeve", or 3) both. During prosecution, the claims were rejected over the Broyles prior art. To distinguish Broyles, the patentee amended the "inserting" element by adding the last two words "for shipment". "For shipment" is not a recitation of structure, and it is not a recitation of a step or an action. Simmons expressly represented in the prosecution history, however, that the addition of "for shipment" "more clearly and specifically defined" the "***structure and functioning*** of applicants' containment sleeve" [6/26/96 Amendment, 4:1-7 (emphasis added), found in Exh W-F to Wallace Declaration to Zinus' Motion for Summary Judgment]. And, evidently in response to this amendment, the claims were allowed by the

1    Examiner.  To give this statement in the prosecution history meaning, and to give the added

2    words themselves meaning, Zinus submits that the "containment sleeve . . . for shipment"

3    recitation should be construed as a means-plus-function recitation.  The presumption that the

4    "containment sleeve . . ." recitation is not a means-plus-function recitation because it does

5    not start with the special word "means" is overcome in this case due to the express and clear

6    representations made to the Examiner in the prosecution history.

7

8        E.  Dreamwell's Proposed Construction.

9        1.  Dreamwell's Proposed Construction.

10       Dreamwell, in its Opposition papers, acknowledges that the common definition of

11   "inserting" is "to put or set into, between or among".  This definition, however, does not

12   result in the Zinus' Swirl Wrap product infringing the '142 Patent.  Dreamwell therefore

13   argues that the term "inserting" is not to be given its ordinary and customary meaning, but

14   rather should be given a special meaning.  Dreamwell refers to this special meaning as "a

15   broader definition" (Opposition, page 11, line 4).  Then, without setting forth any special

16   definition for the term "inserting"[6], Dreamwell jumps to defining the overall phrase

17   "inserting said evacuation tube into a containment sleeve."  Dreamwell's special definition is

18   "arranging the evacuation tube and containment sleeve such that the evacuation tube is inside

19   or within the boundaries of the containment sleeve".  (Opposition, page 11, lines 15-18).

20   Dreamwell provides no support for broadening the term "inserting" to mean "arranging".

21

22       2.  Why Dreamwell's Definition of "Containment Sleeve" Is Incorrect.

23       First, Dreamwell's construction of the term "sleeve" is a result-oriented, selective

24   choosing of one dictionary definition over another.  Which definition Dreamwell has chosen

25   is not determined by the intrinsic evidence, but rather is motivated solely by a need for the

26

27   [6] Dreamwell nowhere says what "inserting" means, but Dreamwell states elsewhere in the
        Opposition that the term "inserting" is "broad enough to cover placing the compressed mattress

28

claim to read on a sheet of fabric that is rolled up with a mattress. The definition Dreamwell chose is not the first definition[7] in the dictionary, but rather is a second definition. Moreover, the second definition ("a case into which an object or device fits") is a bizarre and overly broad definition that appears to imply that if something is a "case" then it is also a "sleeve". Obviously, not all things that are cases can fairly be said to be sleeves. The term "sleeve" and the term "case" have different meanings. Zinus submits that the second definition is very imprecise, and was selected by Dreamwell as a basis for Dreamwell's proposed construction for that reason. Dreamwell intentionally skipped the first definition ("a part of a garment that covers all or a part of an arm") because that first definition implies the common notion of a tubular structural relationship between a sleeve (a tube) and the other object within the sleeve that the sleeve is designed to cover (an arm). The first definition leads away from interpreting the term "sleeve" to describe a sheet that is integrally rolled up together with the other object. Dreamwell therefore avoided applying the first dictionary definition.

Second, Dreamwell's proposed construction (Opposition, page 11, lines 20-28) relies heavily on extrinsic evidence, and in fact relies entirely on extrinsic evidence. Nowhere is there a discussion of the intrinsic evidence, or why the secondary "a case into which an object or device fits" definition for the term "sleeve" is appropriate in view of the patent documents. Dreamwell's analysis begins with and ends with, and is entirely based upon, a dictionary. Engaging in this kind of result-oriented analysis that starts with a selective choosing between dictionary definitions, and then takes the selected abstract definition out of context and applies it to subject matter never contemplated by the inventors of the patent, would be reversible legal error.[8]

---

onto a sheet of fabric and rolling the mattress up inside the fabric". (Opposition, page 19, lines 16-17).

[7] The first definition is closer to the ordinary meaning of the term containment "sleeve".

[8] ". . . if the district court starts with broad dictionary definition in every case and fails to fully appreciate how the specification implicitly limits that definition, then error will systematically cause the construction of the claim to be unduly expansive. The risk of systematic overbreadth is greatly reduced if the court instead focuses at the outset on how the patentee used the claim term in the claims, specification, and prosecution history, rather than starting with a broad definition and whittling it down." *Phillips*, 415 F.3d at 1321.

3.  Why Dreamwell's Definition of "Inserting . . . Into" Is Incorrect.

Dreamwell's attempt to bend the claims of the '142 Patent to get them to read on Zinus' Swirl Wrap product depends on interpreting the term "inserting . . . into" to have a special meaning, and not to have its ordinary and customary meaning.  There is, however, nothing in the specification of the '142 Patent that indicates a "clear intent" to deviate from the ordinary and customary meaning of the term "inserting . . . into".  There is no "express intent" in the '142 Patent to impart a novel meaning to the term "inserting . . . into".  In view of the fact that a special definition must be "clearly stated" in the patent specification according to the Federal Circuit in order for the "ordinary and customary" meaning of a term to be superseded by a special definition, the term "inserting . . . into" is not given a "special meaning".  The ordinary and customary meaning controls.

Second, "***inserting*** a tube ***into*** a sleeve" is not the same thing as "***arranging*** a tube and a sleeve ***such that*** the tube is inside or within the boundaries of the sleeve".  Dreamwell is pretty clearly proposing that the Court not interpret the claim as it is, but rather that the Court rework the claim, remove the term "inserting", replace it with the term "arranging", and then interpret the reworked claim.  This is improper.  Courts do not rework claims.  They only interpret them.  The Court must construe the claim "as written, not as the patentees wish they had written it." *Chef America*, 358 F.3d at 1373.

4.  Dreamwell's Construction Is Contrived and Reads Limitations Out Of The Claims.

A major problem with Dreamwell's construction is that ordinary people know what a "tube" is, they know what a "sleeve" is, and they know what "inserting the tube into the sleeve" is.  That action, known to ordinary people and to people of ordinary skill as well, is not involved in taking a compressed mattress, laying it on a sheet, and then rolling the mattress and sheet up together.  A sheet that is integrally rolled up in this manner is not a "sleeve".  Performing this rolling action is not "inserting" the mattress "into" a sleeve.  Dreamwell's construction is contrived and results in reading "inserting", "into" and "sleeve" out of the claims.

1

2

     5.   Dreamwell's Overly Broad Construction Expands the "Inserting" Element Such That The Written Description Requirement Is Violated.

3

     Paragraph one of 35 U.S.C. § 112 requires that a patent specification contain "a

4

written description of the invention, and of the manner and process of making and using it, in

5

such full, clear, concise, and exact terms as to enable any person skilled in the art . . . to make

6

and use the same." 35 U.S.C. § 112, ¶ 1.  The Federal Circuit has recently stated that §112,

7

¶1, <u>mandates that the specification describe</u> the manner and process of making and using the

8

invention so as to enable a person of skill in the art to make and use <u>the full scope of the</u>

9

<u>invention</u> without undue experimentation.  *Lizardtech, Inc. v. Earth Resource Mapping, Inc.*,

10

424 F.3d 1336, 1344-1345, 76 USPQ2d 1724 (Fed.Cir. 2005).  The first paragraph of section

11

112 requires that the specification both enable <u>the full scope</u> of the recited invention and also

12

evidence that the inventor was in possession of <u>the full scope</u> of the invention.[9]

13

     In the present case, if the "inserting" claim element is construed so broadly that it

14

means "arranging the evacuation tube and containment sleeve such that the evacuation tube

15

is inside or within the boundaries of the containment sleeve", then the specification would

16

fail to satisfy both the "enablement" and "written description" requirements of section 112

17

because the specification would not instruct a person of skill in the art how to make and use

18

the full scope of this "arranging", and because the specification would not provide objective

19

evidence that the inventors were ever in possession of the full scope of the "arranging".  The

20

specification of the '142 Patent describes only a single way of inserting a tube containing a

21

compressed mattress into a containment sleeve.  The specification does not objectively

22

evidence that the inventors of the '142 Patent ever contemplated a more generic "arranging"

23

of the evacuated tube and the sleeve.  The specification of the '142 Patent does not enable the

24

Magni method, and does not evidence that the inventors knew of the Magni method, yet the

25

claims would read on the Magni method.  Dreamwell's overly broad construction would

26

therefore leave the claims of the '142 Patent overly broad and invalid under 35 U.S.C. §112,

27

28

1    ¶ 1 because there would be no written description or enablement for the full scope of the

2    claims.  See *Lizardtech*, 424 F.3d at 1346; *Chiron Corp. v. Genentech, Inc.*, 363 F.3d 1247,

3    1253, 70 USPQ2d 1321 (Fed. Cir. 2004).  Zinus therefore submits that Dreamwell's

4    construction is improper, and is not supported by the specification of the '142 Patent.

5

6        **IV. The "Ribbon Shaped Film" in the Magni Patent**

7        As Zinus stated in its original Motion for Summary Adjudication, the "Swirl Wrap"

8    packaging method is merely the prior art Magni packaging method by a different name.  This

9    was true and remains true.  The Motion for Summary Adjudication explains both the Zinus

10   Swirl Wrap packaging method, and the Magni method, at length and in considerable detail.

11   Both methods (they are the same method) involve compressing a mattress in a sheath, and

12   then rolling this compressed mattress/sheath up together with an amount of "flexible film".

13   The resulting cylindrical, rolled-up assembly is then secured in its cylindrical form by

14   "ribbon-shaped strings" (which may be adhesive tape or durable plastic strips).  The ribbon-

15   shaped strings are applied circumferentially to hold the cylindrical assembly in place.

16        In its Opposition, Dreamwell argues that Zinus' method is not the Magni method

17   because the "ribbon-shaped film 222" of Magni "does not cover or surround a substantial

18   portion of the exposed surface of the mattress" (Dreamwell's Opposition, 23:22-23).

19        Zinus responded in its Reply and explained at length, with reference to figures in the

20   Magni Patent, why Magni's "ribbon-shaped film" indeed covers the entire outer

21   circumferential surface of the cylindrical, rolled-up assembly.  (Zinus' Reply, 7:25 through

22   8:10).  Dreamwell did not, however, drop the issue.  Dreamwell again repeated verbatim in

23   its Opposition to Zinus' Motion for Reconsideration the same statement that Zinus' Swirl

24   Wrap method is not the Magni method because the "ribbon-shaped film" of Magni "does not

25   cover or surround a substantial portion of the exposed surface of the mattress."  Dreamwell

26   added the statement that "properly understood" Magni's Figure 13 discloses a process that

27

28   [9] These two requirements (enablement and written description) usually rise and fall together.

involves "wrapping a compressed mattress in a criss-cross pattern with one or more revolutions of a narrow, ribbon-shaped strand of film." (Dreamwell's Opposition to Zinus' Motion for Reconsideration, 14:5-21).

In Zinus' Reply, Zinus exposed Dreamwell's statement about wrapping a strand in a criss-cross pattern as a fabrication. [Plaintiff Zinus, Inc.'s Reply To Dreamwell's Opposition To Zinus's Motion for Reconsideration of the Order Denying Zinus' Motion for Summary Judgment of Non-Infringement.]  Magni includes no disclosure of a "criss-cross pattern" of narrow strands.  Magni never mentions making a "criss-cross" pattern.  Zinus explained that the "criss-cross pattern" in Magni's Figure 13 is actually an illustration of quilting on mattress cover "C" of Magni's Figure 12.  Zinus explained that "the ribbon-shaped film 222 on the reservoir-spool 220 at the right in Figures 9 and 10 of Magni is as wide as the mattress $M_3/M_5/M_7/M_g$ of Figure 10."  [Zinus' Reply, 14:26 through 15:10].

Then in the Interim Order, the Court asked Zinus to cover in this claim construction brief the term "ribbon-shaped film" as that term is used in the Magni Patent.  Zinus responds as follows

The "rectangular sheet of flexible film" in the Zinus Swirl Wrap method as described in Zinus' original Motion for Summary Adjudication is the same structure, and has the same function, as the rectangular piece of "film 222" with which Magni's compressed mattress is wrapped in the Magni method.  Moreover, the circumferentially applied tape or durable plastic strips of Zinus' Swirl Wrap method are the same structure, and have the same function, as the "ribbon-shaped strings" 230 of Magni.  The Swirl Wrap and Magni products have the same structure, and the functions of the corresponding parts of the Swirl Wrap and Magni products are the same.

The statement by Dreamwell that Magni's Figure 13 illustrates a mattress that is wrapped "in a criss-cross pattern with one or more revolutions of a narrow, ribbon-shaped strand of film" is utterly false and finds no support in the Magni patent.  Magni distinguishes

between "ribbon-shaped <u>film</u> 222" and "ribbon-shaped <u>strings</u> 230". Yet Dreamwell

incorrectly equates the film 222, as opposed to the strings 230, with narrow strands. In

Magni, there is a large "reservoir spool 220" of the film 222. This reservoir spool 220 of

film 222 is seen in the side view of Figure 9 (see the portion of Figure 9 of Magni reproduced

on the left below). Very importantly, the reservoir spool 220 of film 222 is also seen in the

top-down view of Figure 10 of Magni, along with a top-down view of compressed mattress

Mg. See the portion of Figure 10 of Magni reproduced below. Unfortunately, spool 220 is

not identified with a numeral in Figure 10, but reference numeral 45 refers in both figures to

the same "pressing device" portion 45 of the overall equipment. Although not identified with

a numeral, spool 220 is pictured in the top-down view of Figure 10.



Magni Fig. 9 (portion)        Magni Fig. 10 (portion)

Note that Magni's Figure 10 shows that the width of reservoir spool 220 is slightly wider

than the width of mattress Mg. Film 222 on spool 220 is referred to as a "ribbon" not

because it is narrow, but rather because it is very long compared to its width.

Magni's Figures 15-19 illustrate, in side views, subsequent steps in the rolling up of

film 222 with compressed mattress Mg. The side view of Figure 15 shows an end of film

222 being wrapped around mandrel 207. Figure 16 (reproduced below) shows a subsequent

stage when the film 222 is starting to be applied to the top of the compressed mattress Mg as

the mattress moves from left to the right. Figures 17 and 18 show subsequent stages in the

rolling process. When the mattress Mg is fully wrapped onto mandrel 207 (see Figure 19

below), then film 222 is cut by a cutting means 226. At this point a rectangular piece of film

222 is rolled-up with mattress Mg on mandrel 207. The remainder of the "ribbon-shaped

1  film" 222 remains on reservoir spool 220.  While the rolled-up cylindrical mattress/film

2  assembly is still spinning on mandrel 207, machines 232 (see Figure 19) apply

3  circumferential "ribbon-shaped strings" 230 (for example, adhesive tape) to the outside of the



Fig.16      Fig.18      Fig.19

11  convolution 222A of film 222 on the outside of the cylindrical assembly.  Note that a

12  different mechanism applies the "ribbon-shaped strings" 230 than the mechanism that rolls

13  the compressed mattress Mg together with the "ribbon-shaped film" 222.  There is nothing in

14  the Magni disclosure that even suggests that the "ribbon-shaped strings" 230 are applied in a

15  criss-cross pattern.  And certainly the "ribbon-shaped film" 222 cannot be applied in a

16  criss-cross pattern because it is as wide as mattress Mg.

17       After application of the "ribbon-shaped strings" 230, the taped-up cylindrical

18  assembly is taken off the mandrel and appears as pictured in Magni's Figure 13.  The

19  structure of Magni's Figure 13 is the very same structure as Zinus' Swirl Wrap product.





Magni Prior Art                    Swirl Wrap Product

28  There is no support whatsoever in the Magni patent for Dreamwell's repeated assertion that

1   Magni's film 222 "does not cover or surround a substantial portion of the exposed surface of

2   the mattress". There is no mechanism in Magni that could make a "criss-cross pattern" out

3   of "a narrow, ribbon-shaped strand of film" that Dreamwell asserts is present in the structure

4   of Magni's Figure 13. To the contrary, Magni's reservoir spool 220 (see Magni Fig. 10, a

5   portion of which is replicated above) is as wide as the mattress Mg because the film 222 that

6   spool 220 carries is as wide as the mattress. The "criss-cross" pattern in the finished product

7   illustrated in Figure 13 that Dreamwell seizes upon is not, as Dreamwell argues, a criss-cross

8   pattern of narrow strands of film, but rather is the very same quilting seen on the cover C of

9   the mattress pictured in Figure 12. Magni's Figure 12 (replicated below) shows the mattress

10  at the beginning of the process. Reference numeral "C" identifies the "cover" of the

11  mattress. The pattern of this cover, as well as the reference numeral "C", is the same in the

12  illustration of the finished product in Figure 13 (replicated below to the right) as it is in the

13  illustration of the mattress of Figure 12 at the beginning of the process (replicated below to

14  the left). Clearly, the criss-cross pattern is not a criss-cross pattern of narrow bands.



23  As an aid to understanding the invention, Figure 13 is drawn so that the quilting pattern of

24  mattress cover "C" can be seen through film 222A. The fact that mattress cover "C" is

25  covered by film 222A is denoted by the dashed lead line to "C" in Figure 13. (The quilting

26  already is a dashed pattern in the surface view of Figure 12.)

27        In summary, the term "ribbon-shaped film" as it is used in the Magni patent refers to

28  the film on Magni's reservoir spool 220. Magni's film 222 is as wide as the previously

compressed mattress Mg.  As a result of the Magni method, a rectangular piece of this film 222 is cut from the reservoir spool 220 and is left rolled-up together with the compressed mattress Mg in the rolled-up structure of Figure 13.  Reference numeral 222A in the Magni Patent identifies the "outside convolution" of this piece of film 222 on the rolled-up assembly of Figure 13.   The rolled-up assembly of Figure 13 of Magni has the same identical structure as Zinus' Swirl Wrap product that is considered in Zinus' Motion for Summary Adjudication [also depicted in Exhibit R-F to the "Declaration of Scott Reeves in Support of Zinus' Motion for Summary Adjudication"].

Dated:  January 29, 2008                    By:  _____/s/_____

                                            Darien K. Wallace
                                            IMPERIUM PATENT WORKS
                                            Attorneys for Plaintiff and Counterdefendant
                                            ZINUS, INC.