1   Kenneth B. Wilson, Calif. Bar No. 130009
      kwilson@perkinscoie.com
2   PERKINS COIE LLP
    Four Embarcadero Center, Suite 2400
3   San Francisco, CA  94111-4131
    Telephone:  415.344.7000
4   Facsimile:  415.344.7050

5   Attorneys for Defendant
    SIMMONS BEDDING COMPANY
6   and Defendant and Counterclaimant DREAMWELL, LTD.

7

8                    UNITED STATES DISTRICT COURT

9                    NORTHERN DISTRICT OF CALIFORNIA

10                        SAN JOSE DIVISION

11

12  ZINUS, INC. a California Corporation,    Case No. 07-CV-03012-PVT

13                  Plaintiff,               DREAMWELL'S OPENING BRIEF RE
                                             HYPOTHETICAL CLAIM ANALYSIS PER
14         v.                                COURT'S JANUARY 17, 2008 INTERIM
                                             ORDER
15  SIMMONS BEDDING COMPANY, a
    Delaware corporation, and DREAMWELL,
16  LTD., a limited liability company of     Date:       February 19, 2008
    Nevada,                                  Time:       10:00 a.m.
17                                           Before:     The Honorable Patricia V. Trumbull
                    Defendants.              Location:   Courtroom 5
18

19

20  AND RELATED COUNTERCLAIMS

21

22

23

24

25

26

27

28

DREAMWELL'S OPENING BRIEF RE HYPOTHETICAL CLAIM
ANALYSIS PER COURT'S JANUARY 17, 2008 INTERIM ORDER

1

TABLE OF CONTENTS

2

INTRODUCTION ................................................................................................................. 1

3

ARGUMENT ......................................................................................................................... 2

4

    I.      LEGAL STANDARDS RE HYPOTHETICAL CLAIM ANALYSIS ................. 2

5

    II.     THE PROPOSED HYPOTHETICAL CLAIM LANGUAGE LITERALLY
          COVERS THE zinus SWIRL WRAP COMBINATION OF A FLEXIBLE SHEET

6

          OF FABRIC AND BINDING TAPE OR PLASTIC STRIPPING.......................... 4

7

    III.    THE HYPOTHETICAL CLAIM WOULD NOT BE ANTICIPATED OR
          RENDERED OBVIOUS BY THE MAGNI PRIOR ART PATENT CITED  BY

8

          ZINUS ................................................................................................................. 6

9

          A.     The Magni Patent Does Not Anticipate the Asserted Claims
                of the '142 Patent ............................................................................... 7

10

11

          B.     The '142 Patent Is Not Obvious in Light of the Magni
                Patent ................................................................................................. 14

12

CONCLUSION .................................................................................................................... 18

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

i

1

**TABLE OF AUTHORITIES**

2

**Cases**

3

*Abbott Laboratories v. Dey, L.P.,*
   287 F.3d 1097, (Fed Cir. 2002) ........................................................................... 7, 14

4

*Bose Corp. v. JBL, Inc.,*
   98 F. Supp. 2d 80 (D. Mass 2000) .......................................................................... 4, 9

5

6

*Conroy v. Reebok Intern., Ltd.,*
   14 F.3d 1570 (Fed. Cir. 1994) ................................................................................. 2, 3

7

*Grain Processing Corp. v. American Maize-Prods. Co.,*
   840 F.2d 902 (Fed.Cir.1988) .......................................................................................... 2

8

*Hartness Int'l, Inc. v. Simplimatic Eng'g Co.,*
   819 F.2d 1100 (Fed.Cir.1987) ....................................................................................... 2

9

10

*Jurgens v. McKasy, 927*
   F.2d 1552, 1560 (Fed. Cir.), cert. denied, 502 U.S. 902 (1991) ........................ 3, 7, 10

11

12

*KSR International Co. v. Teleflex Inc.,*
   --- U.S. ----, 127 S.Ct. 1727 (2007) ........................................................................ 15

13

*Markman v. Westview Instruments, Inc.,*
   52 F.3d 967 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996) ......................................... 10

14

*Mars, Inc. v. Coin Acceptors, Inc.,*
   1996 WL 34385063 (D.N.J. 1996) ........................................................ 3, 15, 17, 19

15

16

*Monarch Knitting Machinery Corp. v. Sulzer Morat GmbH,*
   139 F.3d 877 (Fed. Cir. 1998) ................................................................................... 18

17

18

*National Presto Indus., Inc. v. West Bend Co.,*
   76 F.3d 1185 (Fed. Cir.1996) ........................................................................................ 7

19

*Phillips v. AWH Corp.,*
   415 F.3d 1303 (Fed. Cir. 2005) (en banc), cert. denied, 126 S. Ct. 1332
   (2006) ......................................................................................................................... 12

20

21

*Streamfeeder, LLC v. Sure-Feed Systems, Inc.,*
   175 F.3d 974 (Fed. Cir. 1999) ...................................................................................... 7

22

23

*Takeda Chemical Industries, Ltd. v. Alphapharm Pty., Ltd.,*
   492 F.3d 1350 (Fed. Cir. 2007) ................................................................................. 15

24

*Wilson Sporting Goods Co. v. David Geoffrey & Associates,*
   904 F.2d 677 (Fed Cir. 1990) ........................................................................................ 2

25

26

*Wright Medical Technology, Inc. v. Osteonics Corp.,*
   1999 WL 130578 (D. Mass. 1999) ........................................................................... 4, 9

27

*Z4 Technologies, Inc. v. Microsoft Corp.,*
   507 F.3d 1340 (2007) ..................................................................................................... 7

28

i

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Introduction**

Pursuant to this Court's January 17, 2008 Interim Order Re Plaintiff Zinus, Inc.'s Motion for Reconsideration (the "Interim Order"), defendant and counterclaimant Dreamwell Ltd. ("Dreamwell") offers the following hypothetical claim element to take the place of the existing "inserting . . . into said containment sleeve" language (with omitted original language bracketed and new language italicized and bolded):  "inserting said evacuation tube into a [containment sleeve] *pre-cut, solid cover or barrier of flexible material that substantially covers the exposed surface of the mattress assembly and* which is dimensioned or configured, *including by use of tape, adhesives or fasteners*, to retain said compressed mattress assembly in a compressed state for shipment."  Alternatively, in the event the Court does not adopt Dreamwell's definition of the phrase "inserting . . . into," Dreamwell proposes the following hypothetical claim language: "[inserting] *positioning* said evacuation tube [into] *within* a [containment sleeve] *pre-cut, solid cover or barrier of flexible material that substantially covers the exposed surface of the mattress assembly and* which is dimensioned or configured, *including by use of tape, adhesives or fasteners*, to retain said compressed mattress assembly in a compressed state for shipment." The entire language of the proposed hypothetical claims is set forth in Appendix A to this Brief.

As established in greater detail below, this hypothetical claim element clearly covers the combination of a flexible sheet of fabric and binding tape or plastic stripping that Zinus uses to roll up, secure and confine its compressed mattress assemblies in its Swirl Wrap process.  And there should be no question that the hypothetical claim, taken as a whole, is sufficiently far away from the cited prior art and the Magni reference that the Patent Office would have issued the claim.  At the very least, there are triable issues of fact regarding the scope and content of the prior art and objective indicia of non-obviousness that would preclude resolving this issue as a question of law at this early stage of the case.  Accordingly, the hypothetical claim analysis reinforces Dreamwell's contention that it would be improper for the Court to grant Zinus' Motion for Partial Summary Judgment of Non-Infringement with respect to any Mattress-in-a-Box product manufactured using the Swirl Wrap process.

DREAMWELL'S OPENING BRIEF RE HYPOTHETICAL CLAIM
ANALYSIS PER COURT'S JANUARY 17, 2008 INTERIM ORDER

1

2

**<u>Argument</u>**

**I.     LEGAL STANDARDS RE HYPOTHETICAL CLAIM ANALYSIS**

The hypothetical claim framework articulated by the Court in its Interim Order stems from the Federal Circuit's opinion in *Wilson Sporting Goods Co. v. David Geoffrey & Associates*, 904 F.2d 677, 684-85 (Fed Cir. 1990). The Court in *Wilson Sporting Goods* set forth its reasoning as follows: "Whether prior art restricts the range of equivalents of what is literally claimed can be a difficult question to answer. To simplify analysis and bring the issue onto familiar turf, it may be helpful to conceptualize the limitation on the scope of equivalents by visualizing a *hypothetical* patent claim, sufficient in scope to *literally* cover the accused product. The pertinent question then becomes whether that hypothetical claim could have been allowed by the PTO over the prior art. If not, then it would be improper to permit the patentee to obtain that coverage in an infringement suit under the doctrine of equivalents. If the hypothetical claim could have been allowed, then *prior art* is not a bar to infringement under the doctrine of equivalents." 904 F.2d at 684 (emphasis in original).

In determining whether a hypothetical claim could have been allowed by the PTO over the prior art, the Court must examine all of the elements of the hypothetical claim to determine whether that claim would be anticipated or rendered obvious. *Conroy v. Reebok Intern., Ltd.*, 14 F.3d 1570, 1576-77 (Fed. Cir. 1994). Put another way, it would be improper for the Court to conclude "that the mere existence of an element in the prior art automatically precludes [the patentee] from asserting a scope of equivalency sufficient to encompass the corresponding element in the accused device." *Id.* at 1577. Such a conclusion would require application of "an improper test of permissible patent scope under the doctrine of equivalents, and thus contravene[] the rationale of *Wilson*." *Id. See also Grain Processing Corp. v. American Maize-Prods. Co.*, 840 F.2d 902, 907 (Fed.Cir.1988) (quoting *Hartness Int'l, Inc. v. Simplimatic Eng'g Co.*, 819 F.2d 1100, 1108 (Fed.Cir.1987)) ("'[T]he [obviousness] inquiry is not whether each element existed in the prior art, but whether the prior art made obvious the invention as a whole for which patentability is claimed.'").

1    Although the determination of whether a hypothetical claim is ensnared by the prior art is

2  a question of law, the resolution of that question is based on underlying factual issues.

3  Specifically, the scope and teachings of the prior art are questions of fact, and a dispute regarding

4  what the prior art discloses precludes entry of summary judgment on an ensnarement defense.

5  *See, e.g., Mars, Inc. v. Coin Acceptors, Inc.*, 1996 WL 34385063, at *5 (D.N.J. September 3,

6  1996) (holding that where there is a factual disagreement regarding what the relevant prior art

7  teaches, "the Court cannot summarily resolve the legal question of whether the prior art

8  anticipated or rendered obvious [the proposed] hypothetical claim"); *citing Jurgens v. McKasy*,

9  927 F.2d 1552, 1560 (Fed. Cir.), *cert. denied*, 502 U.S. 902 (1991).  Secondary considerations of

10  non-obviousness, such as commercial success, long-felt need, and unexpected results, are

11  additional factual issues that a court must consider before reaching a conclusion of obviousness.

12  *See Mars, supra.*  As the Court in *Mars* correctly noted, "without first trying the factual questions

13  upon which obviousness and anticipation are premised, the Court cannot say whether

14  infringement by equivalency would improperly expand the scope of protection set forth in" the

15  asserted claims.  *Id.*

16    Applying these standards, it is readily apparent that Zinus' Swirl Wrap process practices

17  the modified hypothetical claim element.[1]  And it is equally apparent that the Magni patent on

18  which Zinus bases its ensnarement defense lacks critical elements of the asserted claims, and

19  therefore neither anticipates nor renders obvious those claims.  At the very least, Dreamwell has

20  offered sufficient evidence to create triable issues on the factual questions upon which

21  obviousness and anticipation are premised, even at this early stage of the case, and the Court

22  therefore cannot properly say on summary judgment "whether infringement by equivalency

23  would improperly expand the scope of protection" set forth in the asserted claims.  *See, e.g., Bose*

24  *Corp. v. JBL, Inc.*, 98 F. Supp. 2d 80 (D. Mass 2000) (denying defendant's motion for summary

25  ─────────────────

26  [1] Dreamwell has not briefed whether the Swirl Wrap process practices any other claim
     elements of the '142 Patent because Zinus expressly argued in its original motion that only this
     element is at issue at this early, pre-Markman stage of the case.  However, Dreamwell was

27  required to discuss other elements in the context of the Magni patent because, as the Federal
     Circuit noted in *Conroy*, the ensnarement defense cannot be decided without comparing the prior

28  art in question with *all* elements of the asserted claims.

DREAMWELL'S OPENING BRIEF RE HYPOTHETICAL CLAIM
ANALYSIS PER COURT'S JANUARY 17, 2008 INTERIM ORDER

1    judgment on ensnarement defense where parties disputed the disclosures of prior art references);

2    *Wright Medical Technology, Inc. v. Osteonics Corp.*, 1999 WL 130578 (D. Mass. 1999) (denying

3    summary judgment on a "practicing the prior art" defense; court found that a dispute over the

4    disclosures of prior art references "cannot be resolved on a motion for summary judgment").

5    **II.    THE PROPOSED HYPOTHETICAL CLAIM LANGUAGE LITERALLY COVERS THE ZINUS SWIRL WRAP COMBINATION OF A FLEXIBLE**

6    **SHEET OF FABRIC AND BINDING TAPE OR PLASTIC STRIPPING.**

7    The modified claim element of the proposed hypothetical claim unquestionably and

8    literally covers the Zinus Swirl Wrap process.  For the Court's convenience (and with prior

9    bolding and brackets omitted), that element reads "inserting said evacuation tube into a pre-cut,

10    solid cover or barrier of flexible material that substantially covers the exposed surface of the

11    mattress assembly and which is dimensioned or configured, including by use of tape, adhesives or

12    fasteners, to retain said compressed mattress assembly in a compressed state for shipment," or,

13    alternatively, "positioning said evacuation tube within a pre-cut, solid cover or barrier of flexible

14    material that substantially covers the exposed surface of the mattress assembly and which is

15    dimensioned or configured, including by use of tape, adhesives or fasteners, to retain said

16    compressed mattress assembly in a compressed state for shipment."

17    As Dreamwell argued in its original Opposition to Zinus' Motion for Summary Judgment,

18    the phrase "*inserting* said evacuation tube *into* a containment sleeve" should be defined as

19    "arranging the evacuation tube and containment sleeve such that the evacuation tube is inside or

20    within the boundaries of the containment sleeve."  Zinus' President has testified in Declaration

21    and during deposition that Zinus sets the compressed mattress and surrounding evacuation tube or

22    "sheath" on top of a sheet of flexible fabric, then rolls the mattress assembly up inside the fabric

23    barrier.  [Declaration of Kenneth B. Wilson in Support of Dreamwell's Hypothetical Claim Brief

24    ("Wilson Decl."), Exh. 2 (Reeves Depo. p. 28) (Zinus employees manually place the compressed

25    mattress onto the flexible film and "the compressed mattress is then rolled up into the flexible

26    film")[2]; Declaration of Scott Reeves in Support of Zinus, Inc.'s Motion for Summary

27

28    [2] For the Court's convenience, a copy of the '142 Patent in suit is attached as Exhibit 1 to the Wilson Declaration.

DREAMWELL'S OPENING BRIEF RE HYPOTHETICAL CLAIM
ANALYSIS PER COURT'S JANUARY 17, 2008 INTERIM ORDER

1   Adjudication of Non-Infringement, filed October 2, 2007 ("Reeves Decl."), ¶¶ 7-8, and Exhs. R-

2   A, R-B, R-C, and R-D (copies of these Exhibits are re-attached to the latest Wilson Declaration

3   for the Court's convenience as Exhibit 3]  This testimony confirms that Zinus arranges (using

4   Dreamwell's proposed definition of "inserting") or positions (using the alternate hypothetical

5   claim language) the evacuation tube and fabric such that the evacuation tube is inside or within

6   the boundaries of the sheet of fabric.  Thus, whether or not the Court adopts Dreamwell's

7   definition of "inserting . . . into," Dreamwell has proffered a hypothetical claim element that

8   covers the first part of the process step in dispute.

9        The second part of the hypothetical claim, use of "a pre-cut, solid cover or barrier of

10  flexible material that substantially covers the exposed surface of the mattress," is also literally

11  satisfied in the Swirl Wrap process.  It is obvious from the photographs submitted by Zinus in

12  support of its original Motion for Summary Judgment that the sheet of reinforced fabric is a pre-

13  cut, solid or unitary barrier of flexible material, and that it substantially covers and extends just

14  beyond the width of the mattress.  [Reeves Decl., Exhs. R-A through R-F (copies of which are

15  attached to the latest Wilson Declaration as Exhibit 3)]  Zinus' President, Mr. Reeves, confirmed

16  that the Zinus sheet of reinforced plastic contains these characteristics.  [*See* Wilson Decl., Exh. 2

17  (Reeves Depo., 20:9-24, 21:19-22:10, 28:8-20, 30:11-19) (in the Swirl Wrap process, a

18  compressed mattress assembly is placed onto and rolled up inside a solid, pre-cut rectangular

19  sheet of flexible film or fabric that is longer and slightly wider than the mattress)].

20       Finally, the record clearly and indisputably establishes that the Zinus sheet of reinforced

21  fabric, when configured to hold together using tape or other fasteners, is "dimensioned or

22  configured, including by use of tape or fasteners, to retain said compressed mattress assembly in a

23  compressed state for shipment."  Mr. Reeves testified that in one embodiment of the Swirl Wrap

24  process, adhesive tape is wrapped around the outside of the fabric roll, adhering to the fabric

25  sheet and holding it together and (along with the fabric sheet) preventing the compressed mattress

26  assembly from expanding.  [Wilson Decl., Exh. 2 (Reeves Depo., 20:1-24, 28:21-29:11)]  In

27  another embodiment, instead of adhesive tape, plastic stripping is wrapped around the rolled up

28

1  mattress to secure it.  [*Id.* (Reeves Depo., 20:1-24, 38:23-40:4)]  Either way, the solid barrier of

2  fabric is dimensioned and configured to retain the compressed mattress assembly in a compressed

3  state.  And Mr. Reeves confirmed in both his Declaration and his deposition testimony that the

4  purpose of the fabric and tape/plastic stripping combination is "to retain said compressed mattress

5  assembly in a compressed state for shipment."  [*Id.* (Reeves Depo., 20:1-21:2, 30:24-31:8; *see*

6  *also* Expert Declaration of Michael S. DeFranks in Opposition to Plaintiff Zinus Inc.'s Motion for

7  Summary Adjudication of Non-Infringement, filed November 20, 2007 ("DeFranks Decl."), ¶¶

8  12-15]

9         In short, there can be no serious question that Zinus' Swirl Wrap process is literally

10  covered by the modified element of the hypothetical claim.

11  **III.    THE HYPOTHETICAL CLAIM WOULD NOT BE ANTICIPATED OR
12          RENDERED OBVIOUS BY THE MAGNI PRIOR ART PATENT CITED
          BY ZINUS**

13         At page 17 of its Motion for Reconsideration, Zinus argued that its has "presented a *prima*

14  *facie* showing that the Swirl Wrap method is either disclosed by the Magni patent or is an obvious

15  variant of the Magni method."  By implication, Zinus has therefore asserted that Dreamwell

16  cannot construct a hypothetical claim that covers the Swirl Wrap process because any such claim

17  would be anticipated by or rendered obvious in light of the U.S. Patent No. 4,711,067, the Magni

18  patent.[3]  This argument is without merit.

19

20

21

22  _____

23         [3] It was Zinus' burden to present a prima facie showing that certain prior art would
    ensnare the proposed range of equivalents, which it has only attempted to do with respect to the
    Magni patent.  *See National Presto Indus., Inc. v. West Bend Co*., 76 F.3d 1185, 1192, 37
24  U.S.P.Q.2d 1685, 1689 (Fed.Cir.1996) ("When the patentee has made a *prima facie* case of
    infringement under the doctrine of equivalents, the burden of coming forward with evidence to
25  show that the accused device is in the prior art is upon the accused infringer, not the trial judge").
    The burden then shifts to Dreamwell to prove that its hypothetical claim does not ensnare the
26  prior art cited by Zinus.  *See Streamfeeder, LLC v. Sure-Feed Systems, Inc*., 175 F.3d 974, 983
    (Fed. Cir. 1999) ("after the accused infringer satisfies its burden of going forward (here, by
27  presenting prior art which shows that the asserted range of equivalence would encompass the
    prior art), Wilson indicates that 'the burden to prove,' i.e., the burden of persuasion, rests on the
28  patentee to show that its claim does not cover the prior art.").

DREAMWELL'S OPENING BRIEF RE HYPOTHETICAL CLAIM
ANALYSIS PER COURT'S JANUARY 17, 2008 INTERIM ORDER

A.    **The Magni Patent Does Not Anticipate the Asserted Claims of the '142 Patent**

In order for a hypothetical claim to be anticipated, "a single prior art document [must] describe *every element* of the claimed invention, either expressly or inherently. . . ." *Abbott Laboratories v. Dey, L.P.*, 287 F.3d 1097, (Fed Cir. 2002) (reversing summary judgment that hypothetical claim would not have been allowed by the Patent Office). This determination is a question of fact, as is the scope of prior art disclosures. *Z4 Technologies, Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1347 (Fed. Cir. 2007) anticipation is a question of fact); *Jurgens, supra*, 927 F.2d at 1560 ("[w]hat a reference teaches is a question of fact for the jury to decide . . . .").

Here, it is clear that the hypothetical claim of the '142 Patent, like the actual claims of the '142 Patent, incorporates limitations that are part of the Swirl Wrap process but are not disclosed anywhere in the Magni patent.

1.    **The Magni Patent Does Not Disclose a Mattress Assembly Constructed of Coil Springs Wherein Each Spring Is Contained Within an Individual Pocket of Fabric.**

Both the actual claims and the hypothetical claim are expressly limited to "[a] method of packaging a mattress assembly constructed of coil springs *wherein each spring is contained within an individual pocket of fabric*." The Magni patent clearly does not disclose packaging of an innerspring mattress with individual pocket coils. In fact, while the Magni patent generically states that its methods may be "adopted for many types of mattresses," it specifically states that it is designed "particularly for those which have an intermediate layer of rubber or a synthetic elastic foam resin and, possibly, outer layers of artificial or natural fibres on the surfaces ensuring the comfort of the user." [Wilson Decl., Exh. 4 (Magni patent 2:4-9)] Indeed, Zinus has not even attempted to argue that this claim limitation is disclosed in Magni. This material difference between the Zinus process and the Magni process should preclude Zinus from relying on the "practicing the prior art defense" to avoid Dreamwell's doctrine of equivalents claim.

This difference permeates numerous other elements of the claims as well. For example, the second element of the '142 Patent claims discloses "inserting a mattress assembly constructed of pocketed coil springs" into the evacuation tube. Since the Magni patent does not apply its

7

1    process to an innerspring mattress with individual pocket coils, it cannot be deemed to have

2    disclosed this element.  The fourth element of the '142 Patent claims refers to deforming the

3    evacuation tube "around said mattress assembly and causing said mattress assembly to

4    compress;" because Magni does not disclose the claimed mattress assembly, this element also

5    cannot be deemed present in the Magni patent.  Similarly, the modified element in the

6    hypothetical claim involves configuring a solid cover or barrier of flexible material "to retain said

7    compressed mattress assembly in a compressed state for shipment."  Absent a disclosure in the

8    Magni patent of the claimed mattress assembly (i.e., an assembly in which "each spring is

9    contained within an individual pocket of fabric"), the Court cannot find this element satisfied by

10   the Magni reference.  And the final step of the claims of the '142 Patent likewise references

11   allowing "said mattress assembly" to gradually return to an uncompressed state; this element is

12   absent from Magni for the reasons set forth above.

**2.    There Is at Least a Triable Issue of Fact as to Whether the Magni Patent Discloses Inserting the Compressed Mattress into "a Pre-Cut, Solid Cover or Barrier of Flexible Material that Substantially Covers the Exposed Surface of the Mattress Assembly.**

16       As a second and separate basis for establishing that the hypothetical claim would not have

17   been anticipated by the Magni patent, the record contains abundant evidence demonstrating that

18   the Magni patent does not disclose the step of inserting the compressed mattress and surrounding

19   plastic tube into ***"a pre-cut, solid cover or barrier of flexible material that substantially covers***

20   ***the exposed surface of the mattress assembly***," as set forth in the hypothetical claim.  In prior

21   briefing, Zinus has mistakenly asserted[4] that the Magni process involves "rolling up the

22   compressed mattress with a sheet of film 222."  [Motion for Reconsideration at 14]  However, the

23   evidence of record, when viewed as a whole, unquestionably provides support for Dreamwell's

24   assertion that the Magni patent discloses rolling up the mattress with a slender "ribbon shaped

25   film 222" that is not pre-cut and does not cover or surround a substantial portion of the exposed

26   _____

27       [4] In an effort to soften the rhetoric, Dreamwell will not accuse Zinus of misrepresenting or mischaracterizing the Magni patent when Zinus asserts that it discloses such a cover or material. Zinus' motive is irrelevant; all that matters is that a dispute exists over the disclosures of the

28   Magni patent, which is sufficient to create a triable issue of fact.

DREAMWELL'S OPENING BRIEF RE HYPOTHETICAL CLAIM
ANALYSIS PER COURT'S JANUARY 17, 2008 INTERIM ORDER

1    surface of the mattress.  At the very least, Zinus' argument highlights a disputed issue of fact that

2    precludes entry of summary judgment on this issue.  *See, e.g., Bose, supra*, 98 F. Supp. 2d 80

3    (denying defendant's motion for summary judgment on ensnarement defense where parties

4    disputed the disclosures of prior art references); *Wright Medical Technology, Inc. v. Osteonics*

5    *Corp.*, 1999 WL 130578 (D. Mass. 1999) (same).

6          To begin with, Zinus cannot seriously argue that the "ribbon-shaped film" that is rolled up

7    with the Magni patent's mattress is a "pre-cut cover or barrier."  To the contrary, the Magni

8    patent's disclosure makes clear that the mattress is first rolled up in the film, and only after that

9    process is completed is the film cut to size.  [Wilson Decl., Exh. 4 (Magni patent, 6:23-29 (after

10   rolling up the mattress with the ribbon-shaped film "to form at least one outside convolution

11   surrounding the rolled mattress . . . , a mechanically or even manually operated cutting means

12   cuts the film 222 . . . ."); 7:47-49 (claim 1 discloses the step of "continuing the rolling up of said

13   ribbon-shaped film for at least one convolution around the mattress being rolled up on the

14   mandrel and cutting said film"); 8:27-29 (claim 5 discloses the same step))]

15         Moreover, the Magni patent's use of a "convolution" of a "ribbon-shaped film" to

16   package the compressed mattress does not correspond to the "solid cover or barrier of flexible

17   material that substantially covers the exposed surfaces of the mattress" of the hypothetical claim,

18   because a single convolution of that thin film would not cover the exposed surfaces of the

19   mattress, and multiple convolutions (to the extent they are even disclosed) would not constitute a

20   solid cover or barrier.

21         Although Zinus argues that the Magni patent discloses a "sheet of film 222," the Magni

22   patent repeatedly and consistently uses the term "ribbon-shaped film" on at least sixteen

23   occasions to describe film 222, the film in which the Magni mattress is rolled up.  [Wilson Decl.,

24   Exh. 4 (Magni patent 2:43-55 (referring to a "preferred package" for the mattress which includes

25   "a ribbon-shaped film coupled to said mattress"), 5:66, 6:30-31 (referring to an "outside

26   convolution 222A of the ribbon-shaped film" surrounding the mattress assembly), 6:58-59

27   (describing what happens "after the packaging by the outside convolution 222A of the ribbon-

28

DREAMWELL'S OPENING BRIEF RE HYPOTHETICAL CLAIM
ANALYSIS PER COURT'S JANUARY 17, 2008 INTERIM ORDER

1   shaped film 222"), 7:37-40 and 7:43-53 (claim 1), 8:25-33 (claim 5), 7:11-17 (claim 7), and 10:9-

2   13 (claim 12) (all specifically referring to "ribbon-shaped film" or "ribbon-shaped film 222"))]

3   In contrast, the term "sheet of film," which Zinus uses to characterize film 222, never once

4   appears in the patent, nor does any similar description of film 222.

5          The repeated use of the term "ribbon-shaped" to describe film 222 corroborates

6   Dreamwell's contention that film 222 is a narrow strand of film that is significantly narrower than

7   the width of the mattress.  The Magni patent does not indicate that any special uncommon

8   definition should be given to the modifier "ribbon-shaped."  As a result, and since "ribbon-

9   shaped" is not a specialized industry term, the Court should interpret the term "ribbon-shaped

10  film" in a manner consistent with the common understanding of the phrase "ribbon-shaped film,"

11  which is:  "a long, narrow-strip of film resembling a thin line."[5]  *See Markman v. Westview*

12  *Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996) (citations

13  omitted) (words used in a claim are to be given their ordinary meaning unless the inventor acted

14  as "his own lexicographer," stating a special or different definition of a claim term in the

15  specification or file history).  This definition would be inconsistent with Zinus' claim that film

16  222 in the Magni patent is "a solid cover or barrier of flexible material that substantially covers

17  the exposed surface of the mattress assembly," and is therefore roughly as wide as the exposed

18  surface of the mattress

19         Although the term "ribbon-shaped" is generally not found in dictionaries, the word

20  "ribbon" is, and has a fairly consistent definition.  For example, the Cambridge Advanced

21  Learners Dictionary defines " ribbon" as "a long narrow strip of material used to tie things

22  together or as a decoration."  [Wilson Decl., Exh. 5]  Similarly, "ribbon" is defined in the

23  American Heritage Online Dictionary as a "narrow strip or band of fine fabric, such as satin or

---

[5] Dreamwell recognizes that in the Interim Order, the Court directed the parties to address the proper interpretation of the term "ribbon-shaped film" in the context of a separate claim construction brief, not the hypothetical claim brief.  However, because the meaning of this phrase is directly relevant to Zinus' claim that any hypothetical claim would be unpatentable over the Magni patent, Dreamwell feels compelled to address this interpretation issue here as well, keeping in mind that the interpretation of a prior art reference is an issue of fact, not a question of law.  *See Jurgens, supra*, 927 F.2d at 1560 ("What a reference teaches is a question of fact for the jury to decide....").

10

DREAMWELL'S OPENING BRIEF RE HYPOTHETICAL CLAIM
ANALYSIS PER COURT'S JANUARY 17, 2008 INTERIM ORDER

1    velvet, finished at the edges and used for trimming, tying, or finishing;" "[s]omething, such as a

2    tape measure, that resembles a ribbon;" or "[a] long thin strip: a ribbon of land along the shore."

3    [Wilson Decl., Exh. 6]  The Princeton University Wordnet Dictionary defines "ribbon" as "any

4    long object resembling a thin line."  [Wilson Decl., Exh. 7]  And Merriam-Webster's Online

5    Dictionary defines "ribbon" in relevant part as "a narrow fabric used for tying packages."

6    [Wilson Decl., Exh. 8]  Thus, the dictionary definitions are consistent with and supportive of

7    Dreamwell's proposed construction.

8        The text of the Magni patent provides substantial confirmation that the inventors of that

9    patent intended the term "ribbon shaped" to disclose or reference a long, narrow strip of film

10   resembling a thin line.  Specifically, the Magni patent repeatedly discloses the step of wrapping

11   two or three "ribbon-shaped strings" around the rolled up mattress assembly (and in some

12   instances on top of the "at least one convolution" of "ribbon-shaped film 222") to secure or

13   stabilize it.  [Wilson Decl., Exh. 4 (Magni patent, 2:31-33, 2:43-55, 2:65-68, 6:29-65)]  The

14   claims of the Magni patent also contain several references to "ribbon-shaped string."  [*See id.*

15   (Magni patent, claims 1, 5 and 6 (refers to "circularly applying at least two adhesive ribbon-

16   shaped strings" to stabilize the rolled mattress); claims 7 and 13 (refers to "means for feeding and

17   applying at least two ribbon-shaped adhesive strings around the mattress"))]  Clearly, the term

18   "ribbon-shaped" in this context means string "having a long, narrow shape resembling a thin

19   line."  It is a fundamental principle of claim construction that the usage of a term in one place in a

20   patent typically provides guidance regarding the meaning of the same term in other places in the

21   same patent.  *Phillips v. AWH Corp*., 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc), *cert.*

22   *denied*, 126 S. Ct. 1332 (2006).  Thus, these other uses of the term "ribbon-shaped" should be

23   deemed to corroborate Dreamwell's interpretation of this term.

24       Extrinsic evidence also supports Dreamwell's understanding of the disclosure of the term

25   "ribbon-shaped film" as it used in the Magni Patent.  For example, Zinus' President verified that

26   he understood the term "ribbon-shaped" to mean "significantly longer than it is wide," and that in

27   his view the rectangular sheet of fabric in which Zinus rolls up its compressed mattresses, which

28

DREAMWELL'S OPENING BRIEF RE HYPOTHETICAL CLAIM
ANALYSIS PER COURT'S JANUARY 17, 2008 INTERIM ORDER

1    is slightly wider than the width of the mattress and appears to be roughly three times as long as it

2    is wide, is not "ribbon-shaped." [Wilson Decl., Exh. 2 (Reeves Depo., 24:23-25:1)]  This

3    testimony directly undermines Zinus' current contention that the term "ribbon-shaped film" in the

4    '142 Patent refers to a film that is only roughly three times as long as it is wide and/or that

5    substantially covers the exposed surface of the compressed mattress (like the Zinus film or

6    fabric).

7         The flaw in Zinus' position regarding the width of the Magni patent's "ribbon-shaped

8    film" can be further illuminating through an understanding of the length of film that would be

9    required to cover various standard sized mattresses using the teachings of the Magni patent  If

10   film or other flexible material was rolled up inside of a compressed queen-sized mattress and

11   formed at least one convolution around the rolled up mattress, as disclosed in the Magni patent,

12   the length of such material would be roughly equal to the length of the mattress plus the

13   circumference of the mattress roll.  Without knowing the thickness of the compressed mattress or

14   the tightness of the roll, one cannot precisely compute the circumference of the roll.  However,

15   the circumference of the rolled mattress must be less than the length of the mattress, and it is

16   likely significantly smaller than that.  Thus, for any mattress packaged using the Magni process,

17   the "ribbon-shaped film" rolled up inside the mattress and forming a single convolution around

18   the mattress would measure no more than double the length of the mattress, and likely somewhat

19   less.

20        Applying this calculation to a specific example, a standard queen-sized mattress is 80"

21   long and 60" wide. [Wilson Decl., Exh. 9]  Therefore, the length of ribbon-shaped film needed to

22   package such a mattress in accordance with the teachings of the Magni patent would be less than

23   160" (or less than double the 80" length of the mattress).  However, taking Zinus' contention that

24   film 222 in the Magni patent spans the width of the bed, the width of the ribbon-shaped film for a

25   queen-sized bed would be 60".  Put another way, under Zinus' interpretation of the Magni

26   "ribbon-shaped film," for a queen-sized bed, the length of the film would only be approximately

27   2.5 times greater than the width of the film.  It is hard to imagine any definition of the term

28

DREAMWELL'S OPENING BRIEF RE HYPOTHETICAL CLAIM
ANALYSIS PER COURT'S JANUARY 17, 2008 INTERIM ORDER

1   "ribbon-shaped that would cover film of these dimensions.[6]  Certainly, a film with these relative

2   dimensions would not satisfy Zinus' own understanding of the term "ribbon-shaped," as reflected

3   in the testimony of its President.

4        Zinus has attempted to support its assertion that a sheet of film as wide as the mattress

5   satisfies the Magni patent's definition of "ribbon-shaped film" by citing to Figure 13 of the Magni

6   patent.  Zinus has argued that this figure shows a sheet of film that is as wide as and covers the

7   compressed mattress.  But it is difficult to tell exactly what Figure 13 is actually disclosing.

8   There is no reference to that drawing in the text of the patent specification, aside from a brief

9   description of the drawing as "in a perspective view, a rolled-up mattress and a container for it."

10  The Figure itself labels an "outside convolution 222A of ribbon shaped film 222."  [Wilson Decl.,

11  Exh. 4 (Magni patent 6:29-31)]  It also points to an item "C", which the patent discloses is the

12  cover for the mattress.  [Wilson Decl., Exh. 4 (Magni patent, 4:29-37)]  The outside of the

13  mattress roll also shows the criss-cross pattern of the mattress cover, as depicted in Figure 12.

14  Thus, while Zinus has asserted that the label C refers to a cover that lies underneath ribbon-

15  shaped film 222, there would be no reason to label and depict the cover for the mattress and to

16  show the pattern of the mattress if the cover and pattern were not visible after application of the

17  "ribbon-shaped film 222."  In addition, Figure 13 shows another series of narrow, parallel lines

18  that criss-cross in some places; these lines might represent multiple convolutions of the ribbon-

19  shaped film, or they might represent something else altogether.

20       The specifics of this disclosure would seem to be an appropriate subject for expert

21  testimony, but given the early stage of this litigation, Dreamwell has not yet engaged an expert to

22  analyze and provide his or her expert interpretation of the prior art.  However, even without

23  expert testimony, there is substantial evidence that the Magni patent discloses not a solid sheet of

24

25       [6] For the Court's reference, the dimensions of a king-sized mattress is 80" long by 76"
    wide, and the length of film that would be needed to roll up the film inside the mattress and form
26  a single convolution around the mattress (less than 160") should be less than double the width of
    the mattress (76").  The dimensions of a full-sized mattress is 75" long by 53" wide, and the
27  length of film that would be needed to roll up film inside the mattress and form a single
    convolution around the mattress (less than 150") should be less than three times the 53" width of
28  the mattress.

13

DREAMWELL'S OPENING BRIEF RE HYPOTHETICAL CLAIM
ANALYSIS PER COURT'S JANUARY 17, 2008 INTERIM ORDER

1  film that substantially covers the exposed surface of the mattress as Zinus claim, but rather a long,

2  narrow film that resembles a line and that is wrapped around the mattress at least once.  There is

3  certainly more than enough evidence from which a trier of fact could reasonably infer that the

4  Magni patent does not disclose the solid cover or barrier of the hypothetical claim.  And there is

5  no express disclosure in Figure 13 (or anywhere else in the Magni patent) of using a solid sheet of

6  fabric or other flexible material that covers or surrounds a substantial portion of the exposed

7  surface of the mattress to restrict the mattress from expanding during shipping.

8       On the state of this record, it would be inappropriate for the court to conclude as a matter

9  of law at any point, let alone at this early point in the case, that the Patent Office would have

10  found the hypothetical claim anticipated in light of the Magni prior art.

11       **B.    The '142 Patent Is Not Obvious in Light of the Magni Patent**

12       "[T]o make [a] hypothetical claim obvious, the court must find that 'the differences

13  between the subject matter sought to be patented [i.e., the hypothetical claim] and the prior art are

14  such that *the subject matter as a whole* would have been obvious at the time the invention was

15  made to a person having ordinary skill in the art to which said subject matter pertains." *Abbott*,

16  287 F.3d at 1106 (emphasis in original) (citing 35 U.S.C. § 103(a)).  While obviousness is a

17  question of law, a determination of obviousness requires resolution of four underlying factual

18  issues:  "1) the scope and content of the prior art; 2) the differences between the prior art and the

19  claims; 3) the level of ordinary skill in the pertinent art; and 4) objective evidence of

20  nonobviousness," such as commercial success, long-felt need, and unexpected results.  *See*

21  *Takeda Chemical Industries, Ltd. v. Alphapharm Pty., Ltd.*, 492 F.3d 1350, 1355-56 (Fed. Cir.

22  2007) (citing *KSR International Co. v. Teleflex Inc.*, --- U.S. ----, 127 S.Ct. 1727, 167 L.Ed.2d

23  705 (2007).  If there is a dispute with respect to any of these underlying factual inquiries,

24  summary judgment is inappropriate.  *Mars, supra,* 1996 WL 34385063 (denying motion for

25  summary judgment of non-infringement based on a hypothetical claim analysis, holding that

26  "without first trying the factual questions upon which obviousness and anticipation are premised,

27  the Court cannot say whether infringement by equivalency would improperly expand the scope of

28

14

1    protection set forth in" the asserted claims, and noting that patentee's evidence of secondary

2    considerations of non-obviousness constituted a separate basis for denying the motion).

3        As discussed in detail above, there are several significant factual disputes between the

4    parties over the scope and content of the prior art and the differences between the prior art and the

5    hypothetical claim.  Indeed, as noted previously, Zinus has not seriously argued that the Magni

6    patent discloses compressing and packaging "a mattress assembly constructed of coil springs

7    wherein each spring is contained within an individual pocket of fabric," a limitation that

8    permeates virtually every element of the asserted claims.

9        There is compelling evidence that the specific application of the patented compression and

10    packaging techniques to pocketed coil innerspring mattress assemblies was a meaningful and

11    non-obvious advance in the relevant art.  In fact, the Patent Office rejected the original claims as

12    obvious, and would not allow them to issue until after the "pocketed coil" limitations were added.

13        As Dreamwell has previously discussed, the original application claims sought broad

14    coverage of a method of packaging a "resiliently compressible article," rather than pocketed coil

15    innerspring mattresses.  [*See* Declaration of Darien K. Wallace in Support of Zinus, Inc.'s Motion

16    for Summary Adjudication of Non-Infringement, filed in this action on October 2, 2007

17    ("Wallace Decl."), Exh. W-F]  The Patent Office rejected these claims as obvious in light of the

18    Broyles prior art reference, which describes a process for compressing a rigid frame non-pocket

19    coil innerspring mattress sufficient to permit the mattress to be fitted into its cover.  [Wallace

20    Decl., Exh. W-F]

21        The inventors responded by narrowing the subject matter of the claims to an "assembly of

22    coiled springs wherein each spring is contained within an individual pocket of fabric."  In

23    presenting this amendment, the inventors stressed the importance of the pocketed coil limitation,

24    noting that "[i]n an effort to distinguish even more clearly over Broyles, claim 1 has been

25    amended herein to specifically recite a method of packaging *pocketed* coils."  [Wallace Decl.,

26    Exh. W-F (emphasis in original)]  The inventors supported its assertion that the amended claims

27    were patentable over Broyles by submitting argument and a Declaration from one of the inventors

28

15

1   showing that application of the claimed method to pocketed coil spring assemblies achieved

2   substantial and unexpected benefits verus utilizing those steps with a spring mattress assembly

3   without pocketed coils.  [*Id.*; Wilson Decl., Exh. 10 (Declaration of Ricky F. Gladney Under Rule

4   1.132, which was filed with the Patent Office in January 1996 ("Gladney Decl."). at ¶¶ 6-9))]

5           Notwithstanding these arguments and evidence of patentability, the Patent Office again

6   rejected all claims in light of the Broyles patent, without so much as referencing the evidence and

7   argument submitted by the inventors regarding the benefits of applying their techniques to

8   pocketed coil mattresses.  [Wallace Decl., Exh. W-F]  In response, the inventors submitted an

9   Amendment After Final Rejection in which they further narrowed the type of material to be

10  packaged, this time from "an assembly of coil springs" to "a mattress assembly constructed of

11  coil springs," and also amended the claims to clarify that the mattress was being packaged for

12  shipment.[7]  [Wallace Decl., Exh. W-F]  Along with the Amendments, the inventors submitted

13  argument to support all of the changes.  Of particular relevance for purposes of this motion, the

14  inventors "note[d] with some concern that no mention is made in the instant Office Action of the

15  previously filed Rule 132 Declaration of inventor Rickey F. Gladney setting forth specific

16  technical data consisting of the results of a comparative analyses of Broyles-type springs versus

17  applicants' pocketed coil springs in compressibility testing.  These tests are believed to factually

18  demonstrate the unexpected results obtainable in compressing applicants' pocketed coil springs.

19  It is respectfully submitted that this Declaration should be given weight in the present situation of

20  an obviousness-type rejection as a secondary consideration of patentability."  [*Id.*]  After these

21  amended claims were refiled as part of a continuation application, the Patent Office finally

22  allowed the claims to issue as U.S. Patent No. 5,622,030, the predecessor to the '142 Patent.  [*Id.*]

23          Thus, boiled down to basics, the Patent Office initially rejected the claims of the '142

24  Patent as obvious based on a reference that related to packaging innerspring mattresses that were

25  not of the pocket coil variety.  The Patent Office then refused to allow issuance of the patent until

26

27  _____
        [7] The inventors also amended the claims to specify that the mattress should be removed
    from the containment sleeve and allowed to expand to its uncompressed shape, steps that are
28  necessary to use the mattress for its intended purpose.

DREAMWELL'S OPENING BRIEF RE HYPOTHETICAL CLAIM
ANALYSIS PER COURT'S JANUARY 17, 2008 INTERIM ORDER

1    the pocketed coil mattress assembly limitation was added.  [See Wallace Decl., Exh. W-F]  This

2    evidence should be sufficient in and of itself to preclude any finding that the asserted claims are

3    obvious in light of Magni (which was directed primarily toward packaging foam mattresses and

4    included no express application of its method to any type of spring mattress).  *See Mars, supra.*

5         As discussed above, there is also at the very least a factual dispute over whether the Magni

6    patent discloses the hypothetical claim element of "a pre-cut, solid cover or barrier of flexible

7    material that substantially covers the exposed surface of the mattress assembly."  There is nothing

8    in the Magni patent that would suggest to or motivate one of ordinary skill to incorporate such an

9    element into the Magni process.  Indeed, the only disclosure of an alternative or modification to

10   the "ribbon-shaped film" in the Magni patent is the discussion that "[t]he rolling up may be also

11   operated starting without the film 222 and by inserting it during the rolling up, or even without

12   using the film and applying the ribbon-shaped strings on the wrapper."  Thus, to the extent there

13   is any suggestion or teaching in the Magni patent regarding the use of a pre-cut, solid cover or

14   barrier, the patent teaches away from using such a structure.  This passage provides further

15   evidence of non-obviousness, and further highlights the impropriety of summarily resolving the

16   ensnarement issue at this early stage of the case.  *Monarch Knitting Machinery Corp. v. Sulzer*

17   *Morat GmbH*, 139 F.3d 877, 884 (Fed. Cir. 1998) (dispute over whether a prior art reference

18   teaches away from a claimed invention may be sufficient to preclude entry of summary

19   judgment).

20        Finally, as mentioned above, there is evidence in the record supporting at least one of the

21   secondary considerations of non-obviousness, the patented method yielded unexpected results.

22   *See Monarch Knitting, supra* (evidence that a patented invention yielded unexpected results

23   created a disputed issue of fact sufficient to warrant denial of a motion for summary judgment of

24   obviousness).  Specifically, the record contains the prosecution history Declaration of Ricky F.

25   Gladney, one of the inventors of the '142 Patent with substantial experience in the manufacture of

26   bedding products, including mattresses.  [Wilson Decl., Exh. 10]  In his Declaration, Mr. Gladney

27   explained how the Broyles innerspring assembly, which includes rigid frames and open coil

28

DREAMWELL'S OPENING BRIEF RE HYPOTHETICAL CLAIM
ANALYSIS PER COURT'S JANUARY 17, 2008 INTERIM ORDER

1    springs, "differs significantly from an assembly of coil springs wherein each spring is contained

2    within an individual pocket of fabric." [*Id.* (Gladney Decl., ¶ 5)]  He detailed the results of tests

3    that he had conducted which established that applying the claimed method to pocketed coil spring

4    assemblies resulted in much higher compressibility than the use of Broyles-type innerspring

5    assemblies. [*Id.* (Gladney Decl., ¶¶ 6-8)]  And from these tests, Mr. Gladney concluded and

6    testified that "the significantly greater height reduction of 72.5% achieved with the method of the

7    present invention utilizing pocketed coil spring assemblies as compared with only a 41.9%

8    reduction in height achieved employing the method of Broyles was unexpected and would not

9    have been obvious." [*Id.* (Gladney Decl., ¶ 9)]  This evidence further undermines any potential

10   argument that the hypothetical claim (which contained the same limitation) would have been

11   obvious in light of the Magni patent.

12        In sum, there is evidence of substantial and meaningful differences between the Magni

13   patent and the hypothetical claim, and further evidence of secondary considerations of non-

14   obviousness.  Given additional time to develop the factual record and engage experts on these

15   issues, there can be little question that Dreamwell would be able to offer even more evidence of

16   non-obviousness.  In light of this record, and particularly at this early stage of this case, it would

17   be inappropriate for the Court to attempt to resolve these factual disputes and conclude on

18   summary judgment that the Patent Office would have rejected the hypothetical claim as obvious

19   in light of the Magni patent.  *See Mars, supra.*

20                                        **Conclusion**

21        As discussed in detail above, and pursuant to the Court's Interim Order, Dreamwell has

22   proffered a hypothetical claim that literally covers the Swirl Wrap process.  Dreamwell has also

23   established that the Patent Office should not have found the hypothetical claim either anticipated

24   or obvious in light of the Magni prior art patent.  At the very least, there are triable issues of fact

25   that preclude resolution of these issues as a matter of law at this early stage in the case.

26   ///

27   ///

28

18

1  For these reasons, as well as the reasons set forth in the prior briefing on Zinus' Motion for

2  Summary Adjudication of Non-Infringement and Zinus' Motion for Reconsideration, Zinus'

3  various requests for entry of summary judgment of non-infringement of the Swirl Wrap process

4  based on the doctrine of equivalents should be denied.

5  DATED:  January 29, 2008                **PERKINS COIE LLP**

6

7                                          By _____/s/_____
                                                      Kenneth B. Wilson

8                                          Attorneys for Defendant
                                           SIMMONS BEDDING COMPANY
9                                          and Defendant and Counterclaimant DREAMWELL,
                                           LTD.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DREAMWELL'S OPENING BRIEF RE HYPOTHETICAL CLAIM
ANALYSIS PER COURT'S JANUARY 17, 2008 INTERIM ORDER

# APPENDIX A

**Claim 1**.  A method of packaging a mattress assembly constructed of coil springs wherein each spring is contained within an individual pocket of fabric, comprising the steps of:

providing a tube of deformable material, said tube having a predetermined length;

inserting a mattress assembly constructed of pocketed coil springs into said tube, said mattress assembly having a length which is less than the length of said tube, thereby defining first and second tube ends of excess material;

sealing a first end of said tube;

evacuating air from said tube through said second end thereby deforming said tube around said mattress assembly and causing said mattress assembly to compress;

inserting said evacuated tube into a [containment sleeve] *pre-cut, solid cover or barrier of flexible material that substantially covers the exposed surface of the mattress assembly and* which is dimensioned or configured, *including by use of tape, adhesives or fasteners*, to retain said compressed mattress assembly in a compressed state for shipment;

removing said evacuated tube from said [containment sleeve] *cover or barrier of flexible material*;

whereby said mattress assembly in said tube gradually returns to an uncompressed state.


**Claim 5**.  A method of packaging a mattress assembly constructed of coil springs wherein each spring is contained within an individual pocket of fabric, comprising the steps of:

providing a tube of deformable material, said tube having a predetermined length;

inserting a mattress assembly constructed of pocketed coil springs into said tube, said mattress assembly having a length which is less than the length of said tube, thereby defining first and second tube ends of excess material;

sealing a first end of said tube;

evacuating air from said tube through said second end thereby deforming said tube around said mattress assembly and causing said mattress assembly to compress;

sealing said second end of said tube after evacuating said tube to a predetermined state;

inserting said evacuated tube into a [containment sleeve] *pre-cut, solid cover or barrier of flexible material that substantially covers the exposed surface of the mattress assembly and* which is dimensioned or configured, *including by use of tape, adhesives or fasteners*, to retain said compressed mattress assembly in a compressed state for shipment;

removing said evacuated tube from said [containment sleeve] *cover or barrier of flexible material*; and

allowing said mattress assembly in said tube to gradually return to an uncompressed state.

**Claim 7**.  A method of packaging a mattress assembly constructed of coil springs wherein each spring is contained within an individual pocket of fabric, comprising the steps of:

providing a tube of deformable material, said tube having a predetermined length;

inserting a mattress assembly constructed of pocketed coil springs into said tube, said mattress assembly having a length which is less than the length of said tube, thereby defining first and second tube ends of excess material;

sealing a first end of said tube;

evacuating air from said tube through said second end thereby deforming said tube around said mattress assembly and causing said mattress assembly to compress;

inserting said evacuated tube into a [containment sleeve] ***pre-cut, solid cover or barrier of flexible material that substantially covers the exposed surface of the mattress assembly and*** which is dimensioned or configured, ***including by use of tape, adhesives or fasteners***,  to retain said compressed mattress assembly in a compressed state for shipment;

removing said evacuated tube from said [containment sleeve] ***cover or barrier of flexible material***; and

allowing said mattress assembly in said tube to gradually return to an uncompressed state; and

said evacuated tube is punctured to allow said mattress assembly in said tube to gradually return to said uncompressed state.

65839-0001/LEGAL13897673.1

DREAMWELL'S OPENING BRIEF RE HYPOTHETICAL CLAIM
ANALYSIS PER COURT'S JANUARY 17, 2008 INTERIM ORDER