Kenneth B. Wilson, Calif. Bar No. 130009
KWilson@perkinscoie.com
PERKINS COIE LLP
Four Embarcadero Center, Suite 2400
San Francisco, CA  94111-4131
Telephone:  415.344.7000
Facsimile:  415.344.7050

Attorneys for Defendant
SIMMONS BEDDING COMPANY
and Defendant and Counterclaimant DREAMWELL, LTD.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| ZINUS, INC. a California Corporation,<br><br>Plaintiff,<br><br>v.<br><br>SIMMONS BEDDING COMPANY, a Delaware corporation, and DREAMWELL, LTD., a limited liability company of Nevada,<br><br>Defendants. | Case No. 07-CV-03012-PVT<br><br>**DREAMWELL'S CLAIM CONSTRUCTION BRIEF IN RESPONSE TO COURT'S INTERIM ORDER**<br><br>**Date:** February 19, 2008<br>**Time:** 10:00 a.m.<br>**Before:** The Honorable Patricia V. Trumbull<br>**Location:** Courtroom 5 |
| AND RELATED COUNTERCLAIMS | |

TABLE OF AUTHORITIES

**Cases**

*Greenberg v. Ethicon Endo-Surgery, Inc.,*
   91 F.3d 1580, 1583 (Fed.Cir.1996) ........................................................................12

*Jurgens v. McKasy,*
   927 F.2d 1552, 1560 (Fed. Cir.), cert. denied, 502 U.S. 902 (1991) ..................15, 21

*Markman v. Westview Instruments, Inc.,*
   52 F.3d 967, 980 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996)..........................4, 15

*Mars, Inc. v. Coin Acceptors, Inc.,*
   WL 34385063 (D.N.J. 1996) ............................................................................15, 21

*Novartis Pharms. Corp. v. Abbott Labs.,*
   375 F.3d 1328, 1335 (Fed. Cir. 2004) ....................................................................3

*Phillips v. AWH Corp.,*
   415 F.3d 1303, 1312-13 (Fed. Cir. 2005), *cert. denied*, 126 S. Ct. 1332
   (2006)................................................................................................................passim

*Process Control Corp. v. HydReclaim Corp.,*
   190 F.3d 1350, 1356 (Fed. Cir. 1999) ....................................................................4

*Renishaw PLC v. Marposs Societa' per Azioni,*
   158 F.3d 1243, 1248 (Fed. Cir. 1998) ....................................................................3

*Specialty Composites v. Cabot Corp.,*
   845 F.2d 981 (Fed. Cir. 1988) ................................................................................7

*Teleflex, Inc. v. Ficosa N. Am. Corp.,*
   299 F.3d 1313, 1327 (Fed. Cir. 2002) ....................................................................4

*Vitronics Corp. v. Conceptronic, Inc.,*
   90 F.3d 1576, 1582 (Fed Cir. 1996) ....................................................................4, 5

*York Prods., Inc. v. Central Tractor Farm & Family Ctr.,*
   99 F.3d 1568, 1572 (Fed. Cir. 1996) ....................................................................3

**Statutes**

35 U.S.C. § 112, ¶ 6...........................................................................................11

**Regulations & Rules**

Fed. R. Civ. P. 7(b)(1) ..........................................................................................2

1

## Introduction

2    Plaintiff and counterclaim defendant Zinus, Inc.'s ("Zinus'") proposed constructions of

3 the terms "inserting . . . into" and "containment sleeve," as they are used in U.S. Patent No.

4 RE36,142 (the "'142 Patent") are inconsistent with the ordinary meaning of the terms and/or

5 unsupported by the evidence of record.  On the other hand, defendant and counterclaimant

6 Dreamwell, Ltd.'s ("Dreamwell's") proposed definitions are fully supported not only by the

7 intrinsic evidence, including the claim language, the specification and the prosecution history, but

8 also by the extrinsic evidence of record.  Accordingly, Dreamwell respectfully requests that the

9 Court adopt its proposed definitions of these terms.[1]

10    Moreover, with respect to the term "ribbon-shaped film" in the Magni patent, Zinus did

11 not even provide a definition.  In contrast, Dreamwell offered a specific definition of what it

12 believes the Magni patent discloses, supported by (among other things) the text of the patent and

13 the testimony of Zinus' President.  At the very least, this evidence creates a triable issue of fact

14 which prevents the Court from deciding the factual question of what the Magni patent discloses at

15 this early stage in the case.

16

## Argument

17    **I.**    **THE COURT SHOULD ADOPT DREAMWELL'S INTERPRETATION OF**
       **THE '142 PATENT CLAIM TERMS "INSERTING . . . INTO" AND**
18       **"CONTAINMENT SLEEVE**

19    Zinus' briefing on its current claim construction positions, and its flip-flops from its claim

20 construction positions in prior briefing, highlight the difficulty in addressing claim construction

21 issues prior to taking advantage of the claim construction process set forth in the Patent Local

22 Rules.

23

24

25 _____

26 [1] Because the background and content of the '142 Patent, the prosecution history of the '142 Patent, and the disclosures of the Magni patent have been thoroughly discussed in the Statements of Facts submitted in Dreamwell's Opposition to Zinus' original Motion for Summary Adjudication of Non-Infringement, its Opposition to Zinus' Motion for Reconsideration, and its Hypothetical Claim Brief, Dreamwell has not included another Statement of Facts in this Opposition.  Instead, Dreamwell will reference the relevant facts in the discussions of the particular terms at issue.

27

28

1    In its original Motion for Summary Judgment, Zinus offered no definitions of the two

2    claim terms in dispute, "inserting . . . into" and "containment sleeve."[2]  However, Zinus did argue

3    at page 19 of its original Motion that its Swirl Wrap process did not satisfy the "inserting . . .

4    into" language of the '142 Patent claims because "[t]he bands are applied to the outside of the

5    rolled-up mattress assembly without the rolled-up mattress assembly sliding or moving with

6    respect to the bands."  In contrast, Zinus now argues at page 11 of its Claim Construction Brief

7    that "saying that the evacuated tube 22 is 'put or set into or between' the sleeve 26 is the same

8    thing as, or is very similar to, saying that the containment sleeve is 'fitted over' the evacuated

9    tube."

10    Similarly Zinus now asserts that the term "containment sleeve" is a means-plus-function

11    element.  This argument did not appear in Zinus' original Motion for Summary Adjudication of

12    Non-Infringement, or any of the other briefs Zinus filed in the nearly four months between the

13    filing of that motion and the January 29 filing of Zinus' claim construction brief.  As a result,

14    Dreamwell has been left to swing at a moving target for claim construction, which is one of the

15    inequities that the Patent Local Rules were designed to prevent.

16    Moreover, as will be clear from the discussion below, the difference between Dreamwell's

17    claim construction position and Zinus' claim construction is not nearly as great as would appear

18    at first glance.  The similarities and differences between the parties' definitions would likely have

19    been fleshed out more thoroughly if the parties had gone through the meet and confer process

20    required by the Patent Local Rules, and it is entirely possible that the parties could have reached

21    agreement on the meaning of at least one of the two '142 Patent terms in dispute.  Dreamwell

22

23    [2] Indeed, Zinus requested and the Court granted summary judgment of no literal infringement

24    without any construction of these terms.  With all due respect, Dreamwell believes that the Court's ruling on the literal infringement issue was technically improper, both because these terms had not been defined and because Zinus had not requested this relief in its motion, as required by both the Federal Rules of Civil

25    Procedure and this Court's Local Rules.  *See* Fed. R. Civ. P. 7(b)(1) (a motion must "state with particularity the grounds therefore, and shall set forth the relief or order sought"); Local Rule 7(b) (a

26    motion must contain "a concise statement of what relief or Court action the movant seeks").  Because Dreamwell never asserted that the Swirl Wrap product literally infringes the '142 Patent, Dreamwell has

27    not sought and does not intend to seek reconsideration on this issue.  However, Dreamwell does feel compelled to reiterate its assertion that it is premature to decide motions for summary judgment of non-

28    infringement before the claim construction process of the Patent Local Rules is concluded.

DREAMWELL'S CLAIM CONSTRUCTION
BRIEF                                    -2-
07-CV-03012-PVT

1  points this out as further confirmation that Zinus' Motion for Summary Adjudication for Non-

2  Infringement (like the recently filed Motion for Summary Judgment of No Direct Infringement) is

3  premature, and that the factual and legal issues presented by that motion should not be considered

4  at least until after the parties have engaged in some discovery on the issues in dispute and the

5  Patent Local Rules claim construction process.

6         However, given the amount of briefing the parties have conducted on the interpretation of

7  the "inserting . . . into" and "containment sleeve" terms, Dreamwell agrees that the time is ripe for

8  the Court to construe these two terms.  And Dreamwell is confident that under a proper

9  application of the governing claim construction rules, the Court will conclude as a matter of law

10  that these claim terms should be interpreted in the manner that Dreamwell has proposed.

11         **A.    <u>Legal Standards for Claim Interpretation</u>**

12         The fundamental purpose of claim construction is ascertain "how a person of ordinary

13  skill in the art understands a claim term." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed.

14  Cir. 2005), *cert. denied*, 126 S. Ct. 1332 (2006).  However, "the person of ordinary skill in the art

15  is deemed to read the claim term not only in the context in which the disputed term appears, but

16  in the context of the entire patent, including the specification." *Id.* at 1313.  Thus, claim

17  interpretation typically focuses on an examination of intrinsic evidence, i.e., the claims, the

18  specification, and the prosecution history.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed.

19  Cir. 2005), *cert. denied*, 126 S. Ct. 1332 (2006); *see also York Prods., Inc. v. Central Tractor*

20  *Farm & Family Ctr.*, 99 F.3d 1568, 1572 (Fed. Cir. 1996) (patent claims define the scope of the

21  patent, and are the starting point for determining the proper interpretation of the claim language);

22  *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998) (claim

23  language must be interpreted in light of the specification of which it is part); *Novartis Pharms.*

24  *Corp. v. Abbott Labs.*, 375 F.3d 1328, 1335 (Fed. Cir. 2004) (prosecution history is relevant

25  where the inventor asserted or disavowed an interpretation of the claim in order to obtain

26  allowance of the claim).

27         Words used in a claim are to be given their ordinary meaning unless the inventor acted as

28  "his own lexicographer," stating a special or different definition of a claim term in the

DREAMWELL'S CLAIM CONSTRUCTION
BRIEF                                                   -3-
07-CV-03012-PVT

1    specification or file history. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed.

2    Cir. 1995), aff'd, 517 U.S. 370 (1996) (citations omitted); *see also Teleflex, Inc. v. Ficosa N. Am.*

3    *Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002) (ordinary meanings should be used unless the

4    patentee demonstrated an intent to deviate from the ordinary and accustomed meaning of a claim

5    term by redefining the term or by characterizing the invention in the intrinsic record using words

6    or expressions of manifest exclusion or restriction).

7         In ascertaining the ordinary meaning of a claim term, the Federal Circuit has noted that in

8    some cases, like in this case, "the ordinary meaning of claim language as understood by a person

9    of skill in the art may be readily apparent even to lay judges, and claim construction in such cases

10   involves little more than the application of the widely accepted meaning of commonly understood

11   words. In such circumstances, general purpose dictionaries may be helpful" in precisely defining

12   the terms in dispute. *Phillips, supra*, 415 F.3d at 1314. As the Federal Circuit noted in *Phillips*,

13   "[a] dictionary definition has the value of being an unbiased source accessible to the public in

14   advance of litigation." *Id.* at 1322. In contrast, Dreamwell is unaware of any case in which

15   counsel's unsupported assertions regarding ordinary meaning have been given any weight.

16        Of course, a starting point in claim construction is the language of the claims themselves.

17   *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). In looking at the

18   claim language, "the context in which a term is used in the asserted claim can be highly

19   instructive." *Phillips, supra*, 415 F.3d at 1315 (citing *Process Control Corp. v. HydReclaim*

20   *Corp.*, 190 F.3d 1350, 1356 (Fed. Cir. 1999) (claim term "discharge rate" construed in light of the

21   use of the same term in another limitation of the same claim). Moreover "[b]ecause claim terms

22   are normally used consistently throughout the patent, the usage of a term in one claim can also

23   illuminate the meaning of the same term in other claims." *Phillips, supra*. And "[d]ifferences

24   among claims can also be a useful guide in understand the meaning of particular claim terms."

25   *See id.* at 1314-15.

26        Claims must also be read in light of the patent specification. *Phillips, supra*, 415 F.3d at

27   1315 (citing *Markman*, 52 F.3d at 978). Indeed, it has been said that "the specification 'is always

28   highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best

1  guide to the meaning of a disputed term.'" *Phillips, supra* (quoting *Vitronics, supra,* 90 F.3d at

2  1582).

3      In addition to consulting the specification, a court should also consider the patent's

4  prosecution history. *Phillips, supra* at 1317. However, contrary to Zinus' assertion at page 4 of

5  its Claim Construction Brief, the prosecution history should not only be consulted "to exclude any

6  interpretation that was disclaimed during prosecution." Rather, "[l]ike the specification, the

7  prosecution history provides evidence of how the PTO and the inventor understood the patent."

8  *Phillips, supra.*

9      Finally, a court may also rely on extrinsic evidence, including testimony from experts or

10  others skilled in the art. *Id.* at 1318. However, there are a host of reasons why extrinsic evidence

11  is considered less reliable than intrinsic evidence. Thus, as the Federal Circuit summarized in

12  *Phillips,* "extrinsic evidence may be useful to the court, but it is unlikely to result in a reliable

13  interpretation of patent claim scope unless considered in the context of the extrinsic evidence." *Id.*

14      **B.    Construction of the Relevant Terms of the '142 Patent**

15          **1.    A Containment Sleeve**

16      At page 6 of its Claim Construction Brief, Zinus agreed with Dreamwell's interpretation

17  of "containment" as "the act or condition of containing." Zinus also agreed with Dreamwell's

18  proposed construction of containing as "holding or keeping within limits."[3] And Zinus does not

19  dispute that a containment sleeve is a structure designed to fit over another part (Dreamwell uses

20  the phrase "a case into which an object or device fits") for "containing" that part (i.e., holding or

21  keeping it within limits, or restraining it). [Zinus Claim Construction Brief, p. 6] However,

22  Zinus attempts to further narrow the definition of this term by asserting that it must be "tubular or

23  pocket-shaped."

24      There is nothing in the intrinsic or extrinsic record that would warrant imposing this

25  limitation. Accordingly Dreamwell submits that the Court should adopt its definition of

26

27  ───────────────

28      [3] As noted in Dreamwell's Opposition to Motion for Summary Adjudication of Non-Infringement, these definitions were taken from the online version of the American Heritage Dictionary.

"containment sleeve," which is "a case into which an object or device fits that restrains, holds or keeps the object or device within limits."[4]

### a.   The '142 Patent

Contrary to Zinus' assertion, Dreamwell's interpretation of the term "containment sleeve" does not rely exclusively on extrinsic evidence. In fact, the language of the patent claims and references to "containment sleeve" in the patent specification are fully consistent with Dreamwell's proposed definition of this term, and do not require narrowing the definition of this term to the particular shapes proposed by Zinus.

Using the claims as the starting point of the analysis, they refer only to inserting the compressed mattress and surrounding evacuated tube "into a containment sleeve which is dimensioned and configured to retain said compressed mattress assembly in a compressed state for shipment," and subsequently removing the mattress and evacuated tube from the containment sleeve. [Declaration of Kenneth B. Wilson in Support of Dreamwell's Hypothetical Claim Brief, filed January 29, 2008 ("Wilson Decl."), Exh. 1 ('142 Patent, claims 1 and 5-8)] There is nothing in this language that would require the containment sleeve to be "tubular or pocket-shaped." Indeed, the general description of the sleeve as being "dimensioned," without specifying any shape or dimensions, strongly suggests that the claim should not be limited to a particular shape or dimension.

The patent specification and drawings also support a relatively broad definition of containment sleeve that does not require a particular shape. For example, in much the same manner as the claims, the Background of the Invention section of the patent references compressed coil springs in an evacuated tube that are "retained in a compressed state by a containment sleeve fitted over the tube." [Wilson Decl., Exh. 1 ('142 Patent, 2:9-10; *see also* '142 Patent, 2:42-43 (virtually the same language appears in the Summary of Invention section))] The very next paragraph describes how the compressed mattress relies on the "outer containment sleeve" to remain in its compressed state, and discusses how the springs can expand when the

---

[4] Dreamwell would not object if the word "cover" was substituted for "case" in its definition, as that term would also be supported by the record.

1   containment sleeve is severed or removed. [*Id.* ('142 Patent, 2:15-27; *see also* 2:43-46][5] These

2   passages do not limit the sleeve to any particular shape or dimensions.

3       The Detailed Description of the Preferred Embodiment contains a slightly more detailed

4   description of the containment sleeve, which also supports Dreamwell's definition. In particular,

5   the patent discloses how "[i]llustrated in FIG. 3 is the package system 20 shown in completed

6   form, wherein the coil string 10 has been compressed and is maintained in a compressed state by

7   a containment sleeve 26. Preferably, the containment sleeve 26 is an extruded tube of 4 mil

8   polyethylene." That paragraph further references that in the preferred embodiment, "the

9   containment sleeve 26 is installed over the compressed tube 22." And Figure 3 itself discloses a

10  flexible, tubular containment sleeve that surrounds, and is not quite as wide as, the evacuated

11  tube.

12      Zinus mistakenly asserts at page 8 of its Claim Construction Brief that "the specification

13  defines the containment sleeve as a tube," based exclusively on the patent's disclosure of a

14  tubular sleeve in Figure 3, and its statement that "[p]referably, the containment sleeve 26 is an

15  extruded tube of 4 mil polyethylene." While these disclosures certainly demonstrate that the

16  containment sleeve *may be* tubular, they expressly do so in the context of a preferred

17  embodiment, and there is no mention of a "pocket-shaped" sleeve. This passage cannot possibly

18  support an interpretation of "containment sleeve" that requires the sleeve to be tubular or pocket-

19  shaped. *See Specialty Composites v. Cabot Corp.,* 845 F.2d 981 (Fed. Cir. 1988) (where a

20  specification does not require a limitation, that limitation should not be read into the claims).

21      Moreover, as is clear from the '142 Patent, when the inventors intended to limit a claim

22  element to a tubular shape, it did so by using the word "tube" in the claim, as they did repeatedly

23  with respect to the term "evacuation tube." The use of the word "tube" in the claims is further

24  evidence that the containment sleeve cannot be limited to a "tube" shape.

25      In sum, there is nothing in the '142 Patent that would limit the containment sleeve to a

26  tubular or pocket shape, as proposed by Zinus.

27

28  [5] Contrary to Zinus assertion, it is clearly not the case that the only structural disclosures of a
    "containment sleeve" in the '142 Patent are in Figure 3 and at column 3, lines 24-25. ]

1

            **b.**      **The '142 Patent prosecution history**

2           Dreamwell's proposed construction is also wholly consistent with the prosecution history

3  of the '142 Patent, which of course is also intrinsic evidence.  Zinus' Claim Construction Brief

4  contains only a short discussion at pages 7-8 to the references to the containment sleeve in the

5  '142 Patent prosecution history, and suggests that the prosecution history "does not affect the

6  meaning of the term "sleeve" in the claims of the '142 Patent," probably because the statements

7  made in the prosecution history are inconsistent with Zinus' claim construction position.

8  However, Zinus' characterization of the significance of statements in the file history is incorrect

9  as a matter of law.  Indeed, the discussions of and references to the containment sleeve during the

10  prosecution of the '142 Patent prosecution provide compelling evidence that it would be

11  inappropriate to limit the containment sleeve to a particular shape. *Phillips, supra,* 415 F.3d at

12  1317 ("the prosecution history provides evidence of how the PTO and the inventor understood the

13  patent").

14           In fact, during the '142 Patent prosecution, both the inventors and the Patent Office

15  expressly discussed an embodiment of a "sleeve" that would fall outside the definition proffered

16  by Zinus, thereby undermining Zinus' claim construction position.  [*See* Declaration of Darien K.

17  Wallace in Support of Zinus, Inc.'s Motion for Summary Adjudication of Non-Infringement, filed

18  in this action on October 2, 2007 ("Wallace Decl."), Exh. W-D and W-F]  Specifically, in the

19  initial Office Action, the Patent Office rejected the claims of the '142 Patent as obvious in light of

20  U.S. Patent No. 3,611,524 (the "Broyles Patent").  [*See* Wallace Decl., Exh. W-D (pp. 45-46)]

21  The Broyles Patent disclosed a method of vacuum compressing a mattress within a plastic

22  wrapper, placing the compressed mattress into a mattress cover, and letting it expand within the

23  cover.  [Supplemental Declaration of Kenneth B. Wilson in Support of Dreamwell's Claim

24  Construction Brief ("Wilson Supp. Decl."), Exh. 1]  In relevant part, the Broyles Patent described

25  the cover as follows: "a cover or tick 1 comprised of top and bottom rectangular panels 2, 3,

26  which latter are interconnected by a side panel or border 4 to the edges of which said top and

27  bottom rectangular panels 2, 3 are secured as by lines of stitching (not shown) which are obscured

28  by the customary finishing tape, as at 5." [*Id.* (Broyles Patent at 3:12-32 (also describing an

1  opening in one of the panels for receiving the compressed mattress))]  The cover is similarly

2  described in the claims, as well as in a more broad fashion as "a cover dimensioned for accepting

3  said body support member when the latter is in normal condition and having a line of opening

4  formed therein."  These passages reflect a disclosure in the Broyles Patent of a "cover" that would

5  not qualify as a "tubular" or "pocket-shaped structure".

6       In rejecting the initial claims of the '142 Patent, the Patent Office specifically noted that in

7  Broyles, "the tube 19 is placed into another sleeve 1 for final packaging."  [Wallace Decl., Exh.

8  W-F (p. 46)]  In subsequent communications, the Patent Office similarly expressed its

9  understanding that "cover 1" of the Broyles Patent was a "containment sleeve" as that term is

10  used in the '142 Patent.  [*See id.*, Exh. W-F (pp. 61-62)]  And while the inventors disputed that

11  the mattress cover performed the function of "containing" the mattress after evacuation and/or

12  "for shipment," they themselves referred to the mattress cover as "sleeve 1".  [*See id.*, Exh. W-F

13  (pp. 65-66) (Second Amendment, filed on or about June 26, 1996)].  Thus, both the Patent Office

14  and the inventors demonstrated an understanding that a "sleeve" could assume a shape other than

15  a tube or pocket.  Put another way, both the Patent Office and the inventors reflected an

16  understanding of the term "sleeve" that falls within the relatively broad scope of this term

17  proffered by Dreamwell and outside the definition advanced by Zinus.

18       As a matter of law, whether or not the Patent Office allowed the claims based on

19  amendments to the containment sleeve element as Zinus suggests,[6] these statements are highly

20  relevant in determining how the term "containment sleeve" was meant in the context of the '142

21  Patent.  *Phillips, supra,* 415 F.3d at 1317.

22

23

24

25     [6] Although Zinus repeatedly asserts that the Patent Office allowed the claims of the '142 Patent to

26  issue because the words "for shipment" were added to the "containment sleeve" element, Dreamwell notes that the final pre-issuance amendments to the '142 Patent claims contained at least four modifications to

27  the claims, including a change to the subject of the claimed process (i.e., pocketed coil mattress assemblies) and the addition of two new steps at the end of the claim.  [*See* Wallace Decl., Exh. W-F (pp.

28  64-65).  The Patent Office did not specify which of these changes was the basis for its Notice of Allowance.

1

### c.    Other evidence

2     Unlike Zinus' proposed definition, Dreamwell's definition of the word "sleeve" as used in

3     the term "containment sleeve" is also consistent with ordinary understanding, as reflected in

4     dictionary definitions.  As Dreamwell noted in its Opposition to Zinus' Motion for Summary

5     Adjudication, according to the American Heritage Dictionary, a "sleeve" is commonly understood

6     as "a case into which an object or device fits," such as a "record sleeve," which is precisely the

7     definition advanced by Dreamwell.  [*See* Wilson Supp. Decl., Exh.2]  Other dictionaries provide a

8     virtually identical definition.  [*See* Wilson Supp. Decl., Exh. 3 (WordNet Dictionary defines

9     "sleeve" as "small case into which an object fits"); Wilson Supp. Decl., Exh. 4 (Cambridge

10    Advanced Learner's Dictionary also defines sleeve as "a protective cover")]  These dictionary

11    definitions provide strong corroboration that Dreamwell's proposed definition of "sleeve" is the

12    correct one.  *Phillips, supra*, 415 F.3d at 1314 (where the Court is asked to construe terms

13    commonly used in the English language without unique technical significance, "general purpose

14    dictionaries may be helpful" in precisely defining the terms in dispute).  In contrast, Zinus has not

15    advanced any dictionary or other support for its argument regarding the "ordinary meaning" of

16    "sleeve," other than the unsupported assertions of its counsel.

17    Zinus attempts to minimize Dreamwell's evidence of ordinary meaning by criticizing

18    Dreamwell for relying on the American Heritage Dictionary's second definition of "sleeve" rather

19    than the first one in its original summary judgment briefing, but that criticism misses the mark.

20    As Zinus pointed out at page 5 of its Claim Construction Brief, the Federal Court in *Phillips*

21    noted that "[b]y design, general dictionaries collect the definitions of a term as used not only in a

22    particular art field, but in many different settings," and warned courts to be careful to avoid

23    applying definitions that are not applicable to the art or application at issue.  *Phillips*, 415 F.3d at

24    1321-22.

25    Here, the first American Heritage Dictionary definition for sleeve was "[a] part of a

26    garment that covers all or part of an arm."  Since the '142 Patent invention has nothing to do with

27    garments, Dreamwell properly did not rely on the first American Heritage Dictionary definition,

28    or other dictionary definitions that relate to clothing.  Indeed, that first definition and its

1  inapplicability to the invention at hand is precisely the reason that the Federal Circuit has urged

2  caution in relying on dictionary definitions for claim construction.

### d.    The "containment sleeve" is not a means-plus-function element

4         Zinus' new assertion that the containment sleeve element is a means-plus-function

5  element is wholly without merit.  As an initial matter, Dreamwell notes that Zinus never advanced

6  this assertion in connection with its Motion for Summary Judgment or in any of the briefing filed

7  on that motion in the subsequent three and a half months.  The belated nature of Zinus' assertion

8  that the containment sleeve is a means-plus-function renders that assertion suspect.

9         More fundamentally, the containment sleeve element is not a means-plus-function element

10  under 35 U.S.C. § 112, ¶ 6.  Characterization of an element as a means-plus function element

11  "applies only to purely functional limitations that do not provide the structure that performs the

12  recited function." *Phillips*, 415 F.3d at 1311.  These claims are typically drafted using a "means

13  for . . ." nomenclature, such as (using the element at issue here) "means for containing."  Indeed,

14  the absence of the "means for" language "creates a rebuttable presumption that section 112,

15  paragraph 6 does not apply."  *Id.*

16         Here, the claims clearly identify a sleeve as the structure for containing the evacuation

17  tube for shipment.  As discussed in detail above, the term "sleeve" has a well understood

18  structural definition that distinguishes it from other types of structures that might be used to

19  "contain" the compressed mattress (such as string, or twine, or "ribbon-shaped film").  The claims

20  also note that the sleeve is "dimensioned and configured" to retain the mattress in a compressed

21  state for shipment and that the compressed mattress and evacuated tube are later removed from

22  the containment sleeve, thereby providing further clarification of the containment sleeve

23  structure.  Thus, this element discloses a physical structure for performing the claimed functions,

24  and as such, cannot properly be characterized as a means-plus-function element under 35 U.S.C.

25  § 112, ¶ 6.  *See, e.g., Greenberg v. Ethicon Endo-Surgery, Inc.,* 91 F.3d 1580, 1583 (Fed. Cir.

26

27

28

1  1996) (construing the term "detent mechanism" to refer to particular structure, even though the

2  term has functional connotations).[7]

3  ## 2.  Inserting . . . Into

4      In the context of the claims of the '142 Patent, the phrase "*inserting* said evacuated tube

5  *into* a containment sleeve" is properly construed as "arranging the evacuated tube and

6  containment sleeve such that the evacuated tube is inside or within the boundaries of the

7  containment sleeve." This definition was designed to encompass the way the phrase "inserting . .

8  . into" is used in the patent, i.e., it is irrelevant whether the evacuated tube moves, or the

9  containment sleeve moves, or both of them move, so long as the evacuated tube winds up inside

10  the containment sleeve.

11      Dreamwell proffered a definition designed to clearly specify that either the evacuated tube

12  or the containment sleeve could move, because in its original Motion for Summary Adjudication,

13  Zinus took the position the "inserting . . . into" language required that the evacuated sleeve be slid

14  into a stationary containment sleeve. [*See* Zinus Motion at 19 (arguing that Zinus does not

15  practice the inserting into element because "[t]he bands are applied to the outside of the rolled-up

16  mattress assembly without the rolled-up mattress assembly sliding or moving with respect to the

17  bands."] However, in its recent Claim Construction Brief, Zinus has retreated from that position,

18  arguing at page 11 that "saying that the evacuated tube 22 is 'put or set into or between' the

19

20      [7] Zinus erroneously asserts that by adding the "for shipment" language to this element, the
21  inventors converted the element to a means-plus-function element, since the "for shipment" language is
   neither structural or functional, even though the inventors' purportedly represented that it was. To support
22  this claim, Zinus argues (as it has on several other occasions) that "Simmons expressly represented in the
   prosecution history . . . that the addition of 'for shipment' 'more clearly and specifically defined the
23  ***structure and functioning*** of applicants' containment sleeve.' And, evidently in response to this
   amendment, the claims were allowed by the Examiner." [Zinus Claim Construction Brief at 12-13]
24  However, as is evident from the portion of the prosecution history cited by Zinus, when the inventors
   referred to more clearly and specifically defining the structure and function of the containment sleeve, they
25  were not necessarily referring to the "for shipment" language, as the inventors had also added an entire
   new element relating to the containment sleeve (i.e., "removing said evacuated tube from said containment
26  sleeve"). Moreover, both of these amendments provided some additional clarity regarding the structure
   and function of the containment sleeve, as they made clear that the sleeve was not a mattress cover
27  designed to remain on the mattress as disclosed in the Broyles prior art patent, but rather a removable
   sleeve designed to be used only for shipment. Thus, Zinus' argument is factually and legally incorrect. To
28  the extent Zinus seeks to raise its alternate indefiniteness argument, it should do so in a motion addressing
   the validity of the patent, after the claims are construed.

1  sleeve 26 [i.e., Zinus' new definition of "inserted"] is the same thing as, or is very similar to,

2  saying that the containment sleeve is 'fitted over' the evacuated tube." Therefore, it seems that

3  Dreamwell and Zinus are in substantial agreement about the fundamental concept that Dreamwell

4  sought to encompass in its definition, namely that either the evacuated tube or the containment

5  sleeve (or both) can move relative to one another, so long as the evacuated tube winds up inside

6  of the containment sleeve.

7      Nonetheless, the definition that Zinus has proffered for the "insert . . . into" language, "put

8  or set into or between," could fairly be read to require a moving evacuated tube and a stationary

9  containment sleeve. Accordingly, Dreamwell submits that its definition is more precise that

10  Zinus' definition, and therefore should be adopted.

11      As an initial matter, Dreamwell takes issue with Zinus' assertion in its chart at page 6 of

12  its Claim Construction Brief that like Zinus, Dreamwell construed the term "inserting" as "to put

13  or set into, between or among." Dreamwell never took that position. To the contrary, while

14  Dreamwell noted at page 10 of its original Opposition to Zinus' Motion for Summary

15  Adjudication that the dictionary definition of "inserting" is "to put or set into, between or

16  among," in the very next sentence, Dreamwell stated that "the '142 Patent makes clear that the

17  inventors intended a broader definition of this phrase," and went on to discuss the references in

18  the patent that supported that statement. The Court should not be misled by Zinus' misstatement

19  of Dreamwell's position, which is clearly set forth both in its original Opposition Brief and above.

20      Zinus also asserts that its proposed definition is appropriate because it embodies "[t]he

21  ordinary and customary meaning of the term 'inserting'".[8] However, as with the "containment

22  sleeve" element, Zinus offers no support for its view of "ordinary and customary meaning," other

23  than the statement of Zinus' counsel.

24      Finally, and most importantly, Zinus now concedes, as it must, that the '142 Patent makes

25  clear that either the containment sleeve or the evacuated tube can move relative to one another in

26  _____

27  [8] Although Zinus generally disparages the use of dictionaries to ascertain "ordinary meaning," Dreamwell notes that Zinus' proposed definition is of this term virtually identical to the American Heritage Dictionary definition of "inserting" quoted by Dreamwell in its original Opposition to Zinus'

28  Motion for Summary Adjudication.

DREAMWELL'S CLAIM CONSTRUCTION
BRIEF                                              -13-
07-CV-03012-PVT

1   the "inserting" process.  In fact, as Zinus correctly acknowledges, the specification repeatedly and

2   consistently discloses placing or fitting the containment sleeve over or around the mattress

3   assembly, rather than dropping the mattress into the containment sleeve.  For example, the

4   passage at column 2, lines 9-10 of the '142 Patent refers to the "containment sleeve fitted over the

5   tube" containing the compressed mattress.  [Wilson Decl., Exh. 1]  Similarly, column 2, lines 42-

6   43 disclose that "[a] containment sleeve is fitted over the sealed tube to maintain the article in a

7   compressed state."  [*Id.*]  And the passage at column 3, lines 36-37 discloses that "the

8   containment sleeve is installed over the compressed tube."  [*Id.*]  In fact, nowhere does the patent

9   disclose dropping the compressed mattress assembly into a stationary containment sleeve, as

10  Zinus' proposed definition could be interpreted.

11      Accordingly, in the context of the claims of the '142 Patent, the phrase "*inserting* said

12  evacuated tube *into* a containment sleeve" should be defined as "arranging the evacuated tube and

13  containment sleeve such that the evacuated tube is inside or within the boundaries of the

14  containment sleeve."

15  **II.    THE COURT SHOULD EITHER ADOPT DREAMWELL'S
        CONSTRUCTION OF THE MAGNI PATENT'S "RIBBON-SHAPED
16      FILM" OR DEFER RULING ON THE FACTUAL QUESTION OF WHAT
        THE MAGNI PATENT DISCLOSES**
17
        Although the Court directed Zinus to file a claim construction brief on the term "ribbon
18
    shaped film as it is used in the Magni Patent, Zinus failed to expressly set forth any specific
19
    proposed definition of that term.[9]  Instead, Zinus has related its interpretation of "ribbon-shaped
20
    film" back to its Swirl Wrap process, arguing that the "rectangular sheet of film" in the Zinus
21
    Swirl Wrap process "is the same structure" as ribbon-shaped film 222 in the Magni patent, and
22
    asserting that the ribbon-shaped film in the Magni patent (like the rectangular sheet in the Zinus
23
    Swirl Wrap process) is roughly as wide as the mattress.  [Zinus Claim Construction Brief at 18]
24

25

26
    ─────────────────────
27      [9] Zinus' failure to comply with the Court's directive and provide a construction of this central term
    in the prior art that Zinus claims to practice has made it difficult for Dreamwell to respond to Zinus'
28  position, and could legitimately serve as an independent basis for denying Zinus' request for relief on its
    "practicing the prior art" defense.

However, the Magni patent's "ribbon shaped film" cannot fairly be construed to mean a rectangular film like that used in the Zinus Swirl Wrap process. Instead, the term "ribbon-shaped film," as used in the Magni patent, should be interpreted in accordance with the common understanding of the words in the phrase to mean "material having a long, narrow shape resembling a thin line." This definition is amply supported by the claims and specification of the Magni patent, as well as the extrinsic evidence of record. Indeed, even Zinus acknowledges at one point in its Claim Construction Brief that the Magni patent refers to film 222 as a "ribbon" because "it is very long compared to its width" (although Zinus would not concede that a ribbon is "narrow").

At the very least, the Federal Circuit has clearly articulated that the determination of what a prior art patent like the Magni patent discloses (and therefore how the term should be interpreted) is a question of fact. *Jurgens v. McKasy*, 927 F.2d 1552, 1560 (Fed. Cir.), *cert. denied*, 502 U.S. 902 (1991) ("What a reference teaches is a question of fact for the jury to decide...."); *Mars, Inc. v. Coin Acceptors, Inc.*, 1996 WL 34385063 (D.N.J. 1996) (holding that "faced with disagreement among experts regarding what the relevant prior art teaches, the Court cannot summarily resolve the legal question of whether the prior art anticipated or rendered obvious [a proposed] hypothetical claim"). Given the state of the record, there is certainly sufficient evidence to permit a reasonable fact finder to infer that Dreamwell's interpretation is the correct one. As a result, it would be inappropriate to resolve this disputed factual issue on summary judgment.

To begin with, the Magni patent does not indicate that any special uncommon definition should be given to the modifier "ribbon-shaped." Zinus certainly has not argued that any special definition is appropriate. As a result, and since "ribbon-shaped" is not a specialized industry term, the Court should interpret the term "ribbon-shaped film" in a manner consistent with the common understanding of the phrase "ribbon-shaped film," which Dreamwell submits is "a long, narrow-strip of film resembling a thin line." *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996) citations omitted) (words used in a claim

1   are to be given their ordinary meaning unless the inventor acted as "his own lexicographer,"

2   stating a special or different definition of a claim term in the specification or file history).

3   Although the term "ribbon-shaped" is generally not found in dictionaries, the word

4   "ribbon" is, and has a fairly uniform definition.  For example, the Cambridge Advanced Learners

5   Dictionary defines " ribbon" as "a long narrow strip of material used to tie things together or as a

6   decoration."  [Wilson Decl., Exh. 5]  Similarly, "ribbon" is defined in the American Heritage

7   Online Dictionary as a "narrow strip or band of fine fabric, such as satin or velvet, finished at the

8   edges and used for trimming, tying, or finishing;" "[s]omething, such as a tape measure, that

9   resembles a ribbon;" or "[a] long thin strip: a ribbon of land along the shore."  [*Id.*, Exh. 6]  The

10  Princeton University WordNet Dictionary defines "ribbon" as "any long object resembling a thin

11  line."  [*Id.*, Exh. 7]  And Merriam-Webster's Online Dictionary defines "ribbon" in relevant part

12  as "a narrow fabric used for tying packages."  [*Id.*, Exh. 8]  These dictionary definitions are

13  consistent with and supportive of Dreamwell's proposed construction, as well as of the way the

14  term "ribbon-shaped" film is used in the Magni patent.

15  These definitions are also consistent with the testimony of Zinus' President, Scott Reeves.

16  Mr. Reeves verified during his deposition that he understood the term "ribbon-shaped" to mean

17  "significantly longer than it is wide," and that in his view the rectangular sheet of fabric in which

18  Zinus rolls up its compressed mattresses, which is slightly wider than the width of the mattress

19  and appears to be roughly three times as long as it is wide, is not "ribbon-shaped."  [Wilson Decl.,

20  Exh. 2 (Reeves Depo., 24:23-25:1)]  This testimony directly undermines Zinus' current

21  contention that the "rectangular sheet of film in the Zinus Swirl Wrap process "is the same

22  structure" as ribbon-shaped film 222 in the Magni patent.

23  The numerous and consistent uses of the term "ribbon-shaped" to describe film 222 in the

24  text of the Magni Patent further corroborate Dreamwell's contention that film 222 is a narrow

25  strand of film that is significantly narrower than the width of the mattress.  Zinus's Claim

26  Construction Brief virtually ignores the textual references to "ribbon-shaped" in the Magni

27  patent; in fact, there does not appear to be a single citation to the text of the Magni patent

28  anywhere in Zinus' claim construction brief.  Zinus' failure to discuss the patent text is

DREAMWELL'S CLAIM CONSTRUCTION
BRIEF                                                    -16-
07-CV-03012-PVT

1   particularly remarkable because the Magni patent uses the term "ribbon-shaped" on at least

2   sixteen occasions to describe film 222. [Wilson Decl., Exh. 4 (Magni patent 2:43-55, 5:66, 6:30-

3   31, 6:58-59, 7:37-40 and 7:43-53 (claim 1), 8:25-33 (claim 5), 7:11-17 (claim 7), and 10:9-13

4   (claim 12) (all specifically referring to "ribbon-shaped film" or "ribbon-shaped film 222"))]  Each

5   of these uses is wholly consistent with Dreamwell's interpretation of this phrase.[10]

6          On the other hand, several of these textual references are inconsistent with Zinus'

7   assertion that the "ribbon-shaped film" is as wide as the compressed mattress.  Specifically, the

8   Magni patent repeatedly uses the adjective "ribbon-shaped" to describe the shape of the film after

9   it is cut from the spool and wrapped around the evacuated tube.  [*See id.* (Magni patent 2:43-55

10  (referring to a "preferred package" for the mattress which includes "a ribbon-shaped film coupled

11  to said mattress"), 6:30-31 (referring to an "outside convolution 222A of the ribbon-shaped film"

12  surrounding the mattress assembly), 6:58-59 (describing what happens "after the packaging by

13  the outside convolution 222A of the ribbon-shaped film 222"), 7:37-40 and 7:43-53 (claim 1)]

14  The length of the film at this stage of the process is not significantly greater than the width of the

15  mattress (and therefore, under Zinus' proposed interpretation, the width of the ribbon-shaped

16  film).  Film of this shape would not fall under any reasonable definition of "ribbon-shaped."

17          The following example illustrates this point.  If film or other flexible material is rolled up

18  inside of a compressed mattress and forms at least one convolution around the rolled up mattress,

19  as disclosed in the Magni patent, the length of such material would be roughly equal to the length

20  of the mattress (which would roughly correspond to the portion of the film inside the roll) plus the

21  circumference of the mattress roll (which would correspond to the portion of the film forming the

22  "convolution").  Without knowing the thickness of the compressed mattress or the tightness of the

23  roll, one cannot precisely compute the circumference of the roll.  However, the circumference of

24  the rolled mattress must be less than the length of the mattress, and it is likely significantly

25  smaller than that.  Thus, for any mattress packaged using the Magni process, the "ribbon-shaped

26

27

28  [10] In contrast, the term "sheet of film," which Zinus uses to characterize film 222, never once
    appears in the patent, nor does any similar description of film 222.

film" rolled up inside the mattress and forming a single convolution around the mattress would measure no more than double the length of the mattress, and likely somewhat less.

Applying this calculation to a specific mattress size, a standard queen-sized mattress is 80" long and 60" wide. [Wilson Decl., Exh. 9] Therefore, the length of ribbon-shaped film needed to package such a mattress in accordance with the teachings of the Magni patent would be less than 160" (or less than double the 80" length of the mattress). Taking Zinus' contention that film 222 in the Magni patent spans the width of the bed, the width of the ribbon-shaped film for a queen-sized bed would be 60". Put another way, under Zinus' interpretation of the Magni "ribbon-shaped film," for a queen-sized bed, the length of the film would only be approximately 2.5 times greater than the width of the film. It is hard to imagine any definition of the term "ribbon-shaped" that would cover film of these dimensions.[11] Certainly, a film with these relative dimensions would not satisfy Zinus' own understanding of the term "ribbon-shaped," as reflected in the testimony of its President.

Unlike Zinus' arguments, Dreamwell's proposed definition of "ribbon-shaped film" is also consistent with other uses of the term "ribbon-shaped" in the text of the '142 Patent. In particular, the Magni patent discloses the step of wrapping two or three "ribbon-shaped strings" around the rolled up mattress assembly (and in some instances on top of the "at least one convolution" of "ribbon-shaped film 222") to secure or stabilize it. [Wilson Decl., Exh. 4 (Magni patent, 2:31-33, 2:43-55, 2:65-68, 6:29-65)] The claims of the Magni patent also contain several references to "ribbon-shaped string." [*See id.* (Magni patent, claims 1, 5 and 6 (refers to "circularly applying at least two adhesive ribbon-shaped strings" to stabilize the rolled mattress); claims 7 and 13 (refers to "means for feeding and applying at least two ribbon-shaped adhesive strings around the mattress"))] Clearly, the term "ribbon-shaped" in this context means string

---

[11] For the Court's reference, the dimensions of a king-sized mattress is 80" long by 76" wide, and the length of film that would be needed to roll up the film inside the mattress and form a single convolution around the mattress (less than 160") should be less than double the width of the mattress (76"). The dimensions of a full-sized mattress is 75" long by 53" wide, and the length of film that would be needed to roll up film inside the mattress and form a single convolution around the mattress (less than 150") should be less than three times the 53" width of the mattress.

1    "having a long, narrow shape resembling a thin line." It is a fundamental principle of claim

2    construction that the usage of a term in one place in a patent typically provides guidance

3    regarding the meaning of the same term in other places in the same patent. *Phillips v. AWH*

4    *Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc), *cert. denied*, 126 S. Ct. 1332 (2006).

5         Zinus has primarily attempted to support its assertion that a sheet of film as wide as the

6    mattress satisfies the Magni patent's definition of "ribbon-shaped film" by citing to drawings in

7    the '142 Patent. However, those drawings raise more questions than they answer.

8         For example, Zinus has asserted that Figure 10 shows a reservoir spool that is "slightly

9    wider than the width of" the mattress, and asserts that this fact establishes that the ribbon itself

10   must also be as wide as the mattress. However, as Zinus itself acknowledges, while reservoir

11   spool 220 is specifically identified in Figure 9, it "is not identified with a numeral in Figure 10."

12   However, Figure 10 does label "rolling and pressing device 45." The spool does not perform the

13   function of rolling or pressing. Moreover, since the spool holds a consumable ribbon, it is

14   certainly possible that spool 220 is removable. If the spool is removable, there would be no need

15   to show it on a top view of the rolling and pressing device 45. This conclusion is reinforced by

16   Figures 14 to 19 of the Magni patent, in which, according to the patent, "the rolling and pressing

17   device is illustrated in more details than in the preceding figures." [Wilson Decl., Exh. 4 (Magni

18   patent 5:36-38] Dreamwell notes that spool 220 is not shown at all in Figures 14 and 16-19, and

19   is only partially displayed in Figure 15, suggesting that the inventors may not have considered it

20   part of "rolling and pressing device 45." Finally, even if the spool is as wide as the mattress, that

21   doesn't necessarily mean that the ribbon is as wide as the mattress; Dreamwell suspects that the

22   Court is aware of ribbon spools that are substantially wider than the ribbon held on the spool.

23   There is certainly nothing in Figures 9 or 10 that conclusively establishes that "ribbon-shaped

24   film 222" is as wide as the mattress, particularly in light of the contrary evidence discussed

25   above. At most, these ambiguous drawings create another disputed issue of fact that would

26   preclude the Court from resolving the disclosures of the Magni patent on summary judgment.

27         Zinus' argument regarding Figure 13 of the Magni patent is similarly flawed. Zinus has

28   argued that this figure shows a sheet of film that is as wide as and covers the compressed

DREAMWELL'S CLAIM CONSTRUCTION
BRIEF                                                      -19-
07-CV-03012-PVT

mattress, and has harshly criticized Dreamwell and its counsel for arguing a contrary interpretation. But it is difficult to tell exactly what Figure 13 is actually disclosing. There is no reference to that drawing in the text of the patent specification, aside from a brief description of the drawing as "in a perspective view, a rolled-up mattress and a container for it." The Figure itself labels an "outside convolution 222A of ribbon shaped film 222," but it is not clear what specifically is being labeled with these numbers. [Wilson Decl., Exh. 4 (Magni patent 6:29-31)] The drawing also points to an item "C", which the patent discloses is the cover for the mattress. [Wilson Decl., Exh. 4 (Magni patent, 4:29-37)] The outside of the mattress roll also shows the checkerboard pattern of the mattress cover, as also depicted in Figure 12. While Zinus has asserted that the label C refers to a cover that lies underneath ribbon-shaped film 222, the patent itself does not so state, and there would be no reason to label and depict the cover for the mattress and to show the checkerboard pattern of the mattress if the cover and pattern were not visible after application of the "ribbon-shaped film 222." In addition, Figure 13 shows another series of narrow, parallel lines that criss-cross in some places. These lines might represent multiple convolutions of the ribbon-shaped film, or they might represent something else altogether. Thus, as was the case with Figures 9-10, the parties dispute the disclosures of Figure 13, and given the lack of clarity in the drawing, it would be inappropriate to resolve this factual dispute in the context of a summary judgment motion.

In sum, there is substantial evidence that the Magni patent does not disclose a solid sheet of film that substantially covers the exposed surface of the mattress, but rather a long, narrow film that resembles a line and that is wrapped around the mattress at least once. The specifics of this disclosure would seem to be an appropriate subject for expert testimony, but given the early stage of this litigation, Dreamwell (and it appears Zinus as well) has not yet engaged an expert to analyze and provide his or her expert interpretation of the prior art. Nonetheless, there is more than enough evidence from which a trier of fact could reasonably infer that Dreamwell's interpretation of the disclosures of the Magni patent is the correct interpretation. At the very least, given the factual nature of this inquiry, it would be inappropriate for the court to find on summary judgment that Zinus' interpretation of "ribbon-shaped film" (to the extent Zinus has

provided an interpretation) is the correct one. *See Jurgens, supra*, 927 F.2d at 1560 ("What a reference teaches is a question of fact for the jury to decide...."); *Mars, supra*, 1996 WL 34385063 (holding that where there is a dispute regarding what a prior art reference teaches, the Court should not resolve that dispute in the context of a summary judgment motion).

## Conclusion

For the foregoing reasons, Dreamwell's interpretation of the terms "inserting . . . into" and "containment sleeve," as used in the '142 Patent, and the term "ribbon-shaped film," as used in the Magni patent, should be adopted.

Dated:  February 5, 2008                    **PERKINS COIE** LLP


                                            By _____/s/_____
                                                      Kenneth B. Wilson

                                            Attorneys for Defendant
                                            SIMMONS BEDDING COMPANY
                                            and Defendant and Counterclaimant DREAMWELL,
                                            LTD.