Kenneth B. Wilson, Calif. Bar No. 130009
KWilson@perkinscoie.com
PERKINS COIE LLP
Four Embarcadero Center, Suite 2400
San Francisco, CA 94111-4131
Telephone: 415.344.7000
Facsimile: 415.344.7050

Attorneys for Defendant
SIMMONS BEDDING COMPANY
and Defendant and Counterclaimant DREAMWELL, LTD.

FILED
FEB 1 2 2008
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

RECEIVED
FEB 1 2 2008
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ZINUS, INC. a California Corporation,<br><br>              Plaintiff,<br><br>     v.<br><br>SIMMONS BEDDING COMPANY, a Delaware corporation, and DREAMWELL, LTD., a limited liability company of Nevada,<br><br>              Defendants.<br><br>AND RELATED COUNTERCLAIMS | Case No. 07-CV-03012-PVT<br><br>**DREAMWELL'S MEMORANDUM IN OPPOSITION TO PLAINTIFF ZINUS INC.'S MOTION FOR SUMMARY JUDGMENT OF NO DIRECT INFRINGEMENT**<br><br>**Date:**     March 4, 2008<br>**Time:**     10:00 a.m.<br>**Before:**   The Honorable Patricia V. Trumbull<br>**Location:** Courtroom 5 |

**Table of Contents**

Introduction ................................................................................................................. 1

Statement of Relevant Facts ....................................................................................... 2

Argument ..................................................................................................................... 8

I.    THERE IS AT LEAST A TRIABLE ISSUE OF FACT AS TO WHETHER
      ZINUS PERFORMS ALL OF THE STEPS OF THE ASSERTED CLAIMS OF
      THE '142 PATENT ............................................................................................... 8

      A.    The Law of Direct Infringement ................................................... 9

      B.    There Is at Least a Triable Issue of Fact as to Whether Zinus
            Directs Its Customers to Remove the Zinus Mattresses from
            the Box and Re-Expand the Mattresses Before Using Them......... 14

      C.    There Is at Least a Triable Issue of Fact as to Whether the
            Zinus Mattress-in-a-Box "Gradually" Re-Expands. ..................... 17

Conclusion ................................................................................................................. 21

1

**Table of Authorities**

2

**Cases**

3

*Applied Interact, LLC v. Vermont Teddy Bear Co.,*
4
    WL2133416 (S.D.N.Y. 2005)......................................................................... 13

5

*BMC Resources, Inc. v. Paymentech, L.P.,*
    498 F.3d 1373, 1381-82 (Fed. Cir. 2007) ........................................ 1, 9, 15

6

*Burlington Northern Santa Fe R. Co. v. Assiniboine and Sioux Tribes of Fort*
7
    *Peck Reservation,*
    323 F.3d 767, 774 (9th Cir. 2003)................................................................. 20

8

*Burnside-Ott Aviation Training Center, Inc. v. United States,*
9
    985 F.2d 1574 (Fed. Cir. 1993)..................................................................... 21

10

*Celotex Corp. v. Catrett,*
    477 U.S. 317, 326 (1986)................................................................................ 20

11

*Cyber Corp. v. FAS Technologies, Inc.,*
12
    138 F.3d 1448, 1456 (Fed Cir. 1998)......................................................... 17

13

*Hill v. Amazon.com, Inc.,*
    WL 151911 (E.D. Tex. 2006) ................................................................ 12, 15

14

*Phillips v. AWH Corp.,*
15
    415 F.3d 1303, 1315 (Fed. Cir. 2005)......................................................... 18

16

*Privasys, Inc. v. Visa International, Inc.,*
    WL 3461761 (N.D. Cal. 2007) ............................................................... 11, 16

17

*Program Engineering, Inc. v. Triangle Publications, Inc.,*
18
    634 F.2d 1188, 1193 (9th Cir. 1981)............................................................ 20

19

*TGIP, Inc. v. AT&T Corp.,*
    WL 3194125 (E.D. Tex. 2007) ...................................................................... 12

20

*VISA Int'l Serv. Ass'n v. Bankcard Holders of Am.,*
21
    784 F.2d 1472, 1475 (9th Cir.1986)............................................................. 20

22

*Warner-Jenkinson*
    520 U.S. at 39-40 ............................................................................................. 17

23

24

25

26

27

28

1          **Introduction**

2          Plaintiff and counterclaim defendant Zinus, Inc.'s ("Zinus'") second Motion for Summary

3     Judgment of Non-Infringement, filed before Zinus had even produced the documents identified in

4     its Rule 26(f) Initial Disclosures (let alone begin the Patent Local Rules disclosures or claim

5     construction requirements), is premature.  Moreover, and more fundamentally, the evidence of

6     record creates at least a triable issue of fact as to whether, even with respect to the limited subset

7     of accused product that is apparently covered by this motion, Zinus directly infringes the asserted

8     claims of the '142 Patent by performing each of the steps of the patent or by controlling or

9     directing the performance of such steps.

10          Zinus argues that it cannot directly infringe the '142 Patent with respect to the product

11    Zinus ships to Wal-Mart because Zinus does not perform the steps of removing the compressed

12    mattress from the box and containment sleeve (or its equivalent) or allowing the mattress to

13    gradually re-expand.  However, contrary to Zinus' assertions, the case law makes clear that Zinus

14    can be deemed to have performed these steps if it "directed" others to perform them, either

15    directly via product instructions or indirectly because the steps were necessarily performed by

16    others in their use of the product.  *See BMC Resources, Inc. v. Paymentech, L.P.*, 498 F.3d 1373,

17    1381-82 (Fed. Cir. 2007) (holding that if an accused infringer provides instructions or directions

18    regarding how to perform a step or such instructions or directions may be inferred from what the

19    accused infringer provides, the accused infringer may be deemed to perform the step).

20          There is compelling evidence that Zinus expressly provides such direction; in fact, Zinus

21    includes user instructions in its product boxes which are specifically designed to explain to

22    consumers how to remove the mattress from its cover and re-expand it.  Moreover, Zinus' moving

23    papers confirm that Zinus intends and understands that its customers will perform the last steps of

24    the asserted claims by removing the Mattress-in-a-Box from its packaging and allowing it to

25    gradually return to its uncompressed state, since these steps must be performed in order for the

26    mattress to be used for its intended purpose.  Accordingly, defendant and counterclaimant

27    Dreamwell, Ltd. ("Dreamwell") respectfully submits that Zinus' second Motion for Summary

28    Judgment of Non-Infringement must be denied.

**Statement of Relevant Facts**

Background of the '142 Patent

As noted in Dreamwell's original Opposition to Zinus' Motion for Partial Summary Judgment, the '142 Patent provides an improved method of packaging for shipment a particular type of innerspring mattress assembly (i.e., a mattress assembly "wherein each spring is contained within an individual pocket of fabric"). [*See, e.g.,* Declaration of Kenneth B. Wilson in Opposition to Zinus' Motion for Summary Judgment of No Direct Infringement ("Wilson Decl."), Exh. 1 ('142 Patent, 4:6-8, 4:43-45, 5:1-3, 5:25-59, 6:9-11)] Such mattresses "are lightweight and bulky and cannot be delivered to the consumer without an undesirably high cost associated with shipment," which "adversely affect[s] the perceived value of the article to the consumer." [*Id.* ('142 Patent, 1:22-28] To address these issues, the '142 Patent discloses a method of packaging this particular type of innerspring mattress for shipment in a compressed state, thereby simplifying and reducing the cost of shipping (and therefore potentially the cost to consumers) of the product. [*See id.* ('142 Patent, 1:15-20)]

Another concern addressed by the '142 Patent is a safety issue relating to the decompression of the mattress assembly. In particular, the '142 Patent notes that by using prior methods to produce a compressed package of pocketed coil springs, "the springs can expand to their fully extended state in an uncontrolled and somewhat abrupt manner. The result is that opening of the spring package by severing the containment sleeve with a sharp instrument, for example, can be a surprising and possibly dangerous experience." [*See id.* ('142 Patent, 2:11-26)] To address this issue, the '142 Patent claims a method that permits gradual or controlled expansion of the springs upon opening of the package. [*See id.* ('142 Patent, 2:26-29)]

Each claim of the patent discloses, with some minor variation in language, the following manufacturing and packaging steps: 1) placing the mattress in a deformable tube or bag; 2) evacuating air from the tube or bag and compressing the mattress; 3) inserting the compressed mattress and surrounding tube or bag into a containment sleeve to retain the mattress assembly in a compressed state for shipment. Each claim also discloses, again with some minor variation and language, the following steps that need to be performed, in most but not all instances by the

1   customer or end user of the mattress, before the mattress can be used for its intended purpose: 1)

2   removing the mattress assembly from the containment sleeve; and 2) allowing the mattress to

3   gradually return to an uncompressed state. [Wilson Decl., Exh. 1]

4   Zinus' Mattress-in-a-Box Product

5       Zinus has acknowledged that it performs steps that at least generally correspond to the

6   manufacturing steps set forth in the claims of the '142 Patent. Specifically, Zinus has offered

7   evidence showing that it places its mattresses in a plastic bag or "sheath," evacuates air from the

8   bag or sheath and compresses the mattresses at its factory in China. [*See* Declaration of Scott

9   Reeves in Support of Zinus, Inc.'s Motion for Summary Adjudication of Non-Infringement, filed

10  October 2, 2007 ("Reeves Oct. Decl."), ¶¶ 3-4] In addition, Zinus has provided testimony and

11  documents showing that it either places the compressed mattress and bag into what it refers to as

12  a polyethylene "duffel bag" or rolls it up into a sheet of reinforced fabric to retain the mattress in

13  a compressed state for shipping. [*See* Declaration of Scott Reeves in Support of Zinus, Inc.'s

14  Motion for Summary Judgment of Non-Infringement Due to No Direct Infringement, filed on

15  January 14, 2008 in connection with the instant motion ("Reeves Jan. Decl."), ¶¶ 2-3, 5]

16      With respect to product it has shipped to Wal-Mart Stores, Inc. (which Zinus refers to as

17  the "shipped units"), after the mattress is placed into the outer "duffel bag" or rolled into the sheet

18  of fabric, the assembly is then placed into a cardboard box for shipping. [Reeves Jan. Decl., ¶¶ 3,

19  5] Zinus also includes in the box a sheet of directions to the customers or end users that reads as

20  follows: "1) Take the spring mattress out from the box and lay it on the floor; 2) Cut the outer PE

21  bag along the sewing line with scissors making sure not to cut the PVC vacuum bag inside; 3)

22  Roll out the vacuum sealed mattress onto the floor; 4) Unfold the mattress; 5) Carefully cut open

23  the vacuum sealed bag and mattress will expand.  Remove bag.; 6) Allow mattress to fully

24  expand to its original shape." [Reeves Jan. Decl., Exh. E; Wilson Decl., Exh. 2 (Transcript of the

25  Deposition of Scott Reeves, taken February 11, 2008 ("Reeves Depo."), 109:12-110:21); *see also*

26  Reeves Jan. Decl., Exhs. A-D and F-G (Zinus' retail boxes also show users how to unpackage and

27  uncompress the mattress)]]

28

1      Zinus intends and understands that consumers who purchase the Mattress-in-a-Box

2  product from Wal-Mart will follow the steps on the enclosed instruction sheet to unpack the

3  mattress and prepare it for use. [Wilson Decl., Exh. 2 (Reeves Depo., 109:12-110:9)]

4  Specifically, Zinus intends and understands that "each individual retail customer, in order to use

5  the purchased product, presumably then opens the shipping box," and removes the mattress from

6  the box. [Zinus' Motion at 16]  Zinus further intends and understands that these customers

7  remove the mattress from the outer containment bag or surrounding fabric, as they must do in

8  order to use the mattress for its intended purpose (i.e., to sleep on it). [Wilson Decl., Exh. 2

9  (Reeves Depo., 110:15-111:22, 156:25-157:8)]  Zinus also intends and understands that these

10  customers then puncture or sever the plastic bag or "sheath" surrounding the mattress, as they

11  must do to sleep on it. [Id. (Reeves Depo., 112:2-21, 157:10-13)]  Finally, Zinus intends and

12  understands that the customers will allow the compressed mattress to uncompress in order to

13  sleep on it. [Id. (Reeves Depo., pp. 112:22-113:6, 157:14-16); Zinus' Motion at 17]

14      While Zinus' motion focuses on the "shipped units," not all Mattress-in-a-Box product

15  manufactured by Zinus is shipped to Wal-Mart Stores, Inc.  For example, Zinus has sold product

16  to "affiliates" of Wal-Mart Stores, Inc., including walmart.com and Wal-Mart Canada. [Wilson

17  Decl., Exh. 2 (Reeves Depo., 72:11-16)]  Zinus has also shipped innerspring Mattress-in-a-Box

18  product for at least evaluation purposes to customers other than Wal-Mart related entities,

19  although Mr. Reeves did not know whether Zinus had sold product to such customers. [Id.

20  (Reeves Depo., 72:17-20, 73:2-12)]  And Zinus itself has performed the steps of removing the

21  compressed mattress from the "duffel bag" or fabric roll, puncturing the plastic wrapper

22  surrounding the mattress, and allowing the mattress to expand, both during sales presentations to

23  Wal-Mart and others and for its own internal purposes (such as testing). [Id. (Reeves Depo.,

24  75:5-17, 84:17-86:8, 102:1-103:12, 118:19-119:16, 120:22-121:3)]  Zinus has not submitted any

25  testimony or documentary evidence regarding those units, and at least according to Zinus'

26  Statement of Relief and Memorandum of Points and Authorities, those units should not be at

27  issue in Zinus' Motion (although the Motion itself purports to seek summary judgment of non-

28  infringement without limitation as to product or customer). .

1    Finally, with respect to the manner in which the Mattress-in-a-Box mattress returns to its

2    uncompressed state, Mr. Reeves testified that the mattress expands in a safe, non-abrupt and

3    "very controlled" manner  [Wilson Decl., Exh. 2 (Reeves Depo., 107:17-108:3, 120:9-20, 124:22-

4    25)]  And although Mr. Reeves argued that it takes the mattress less than a minute for the mattress

5    to expand, other evidence of record contradicts Mr. Reeves' testimony, and confirms that the

6    mattress takes somewhere between several minutes and 48 hours to fully and gradually re-expand

7    to its uncompressed state. [See, e.g., Wilson Decl., Exhs. 3 (Spanish language user instructions

8    state that the Mattress-in-a-Box may take up to 48 hours to fully return to its original shape)[1] and

9    4 (Wal-Mart customer for Mattress-in-a-Box reports that "we had to let it sit for 48 hours to fully

10    reach it's [sic] size"); Reeves Jan. Decl., Exh D (Mattress-in-a-Box packaging represents that the

11    mattress "expands in minutes")]  In fact, Mr. Reeves himself ultimately acknowledged that some

12    innerspring Mattress-in-a-Box product may have taken more than an hour to fully expand.

13    [Wilson Decl., Exh. 2 (Reeves Depo., 104:14-106:3]

14    <u>Status of Discovery</u>

15    To date, although Zinus has attempted to aggressively push the case forward with motions

16    for summary judgment of non-infringement, it has provided remarkably little information about

17    its accused products and processes, or for that matter any other aspect of its business operations.

18    The Complaint in this action was filed on June 11, 2007, although the Third Amended

19    Complaint, which is the operative version of the Complaint, was not filed until January 7, 2008,

20    or little more than a month ago, and discovery did not commence until mid-December.  [Wilson

21    Decl., ¶¶ 8, 11]

22    On September 11, 2007, the parties served their Initial Disclosures.  Although Zinus

23    identified several categories of documents in its Initial Disclsoures document, it did not actually

24    produce any documents with the Disclosures. [Wilson Decl., ¶ 9]

25

26

27    [1] Although Mr. Reeves did not recognize this document and could not confirm that it related to the
28    innerspring Mattress-in-a-Box product, the instructions show scissors cutting plastic stripping, indicating
      that this is a Swirl Wrap product, and therefore would be an innerspring Mattress-in-a-Box.

1    On October 2, 2007, Zinus filed its first Motion for Summary Adjudication of Non-

2    Infringement. As of that date, Zinus still had not produced any documents. After Dreamwell

3    pushed Zinus to produce certain documents to permit Dreamwell to respond to Zinus' motion,

4    Zinus produced 24 pages of documents, 8 pages of which consisted of correspondence between

5    Zinus and Defendants. [Wilson Decl., ¶ 10]

6    On January 14, 2008, Zinus filed the instant motion, without having produced any

7    documents other than the 24 pages produced in November. Accordingly, Dreamwell again

8    advised Zinus that it needed certain documents in order to respond to Zinus' motion. Dreamwell

9    also asked Zinus to continue the hearing on its motion to give Dreamwell an opportunity to

10    conduct discovery on the issues presented by Zinus' motion. [Wilson Decl., ¶ 12]

11    In response to Dreamwell's Request, Zinus refused to continue the hearing date, but

12    agreed to produce documents and/or things relating to the manufacturing process of the Mattress-

13    in-a-Box product, documents relating to communications between Zinus and Wal-Mart relating to

14    the Mattress-in-a-Box product, Zinus' financial records relating to the manufacture and sale of the

15    Mattress-in-a-Box product, and documents relating to communications between Zinus and

16    defendants. However, Zinus only produced approximately 220 pages of documents, and that

17    production included very few documents that might be relevant in any way to this motion.

18    [Wilson Decl., ¶¶ 13-14, Exh. 7]

19    On February 7, 2008, Dreamwell sent additional correspondence to Zinus pointing out the

20    insufficiency of Zinus' production, and asking Zinus to produce at least the following categories

21    of documents: communications between Zinus and Wal-Mart relating to the Mattress-in-a-Box

22    product that had not yet been produced, including any such communications prior to Dreamwell's

23    May 2007 cease and desist letter; the Sales Plan and any communications relating to the Sales

24    Plan; any transactional documents involving Wal-Mart (such as the Supply Agreement); any

25    promotional materials and/or videos created regarding the product; information regarding any

26    Wal-Mart displays of Zinus product; and documents relating to any testing of the Mattress-in-a-

27    Box product showing how quickly it takes for the product to re-expand to its uncompressed state,

28    or any advertisements or communications on the subject. [Wilson Decl., Exh. 8]

1    In response to this correspondence, on the evening of February 10, Zinus produced

2  another 31 pages of documents, bringing its total production to just over 250 pages.  However,

3  Zinus still has not produced a substantial portion of the documents that might be relevant to this

4  motion, including documents relating to any Wal-Mart sales plan, the Wal-Mart Supply

5  Agreement, promotional materials and videos created regarding the product (including the Wal-

6  Mart Video), any testing showing how quickly the mattress returns to its uncompressed state, and

7  communications with consumers that purchased the product.[2]  [Wilson Decl., ¶ 16]

8    On February 11, 2008, Dreamwell served its initial discovery requests in this action,

9  which cover various subjects at issue in this motion, including but not limited to the extent of

10  directions or instructions that Zinus has provided to Wal-Mart and its customers, as well as other

11  customers and potential customers of Zinus; the extent to which Zinus has performed or caused to

12  be performed the steps of removing the mattress from the evacuated tube and allowing the

13  mattress to expand to its uncompressed state for product other than "shipped units;" and the

14  manner in which Zinus' Mattress-in-a-Box product expands.  Zinus' responses to those requests

15  will be on or about March 12.  [Wilson Decl., Exhs. 9-10]

16    In addition, on February 11, 2008, Dreamwell took the deposition of Mr. Reeves, which

17  was limited to the subject matter of this motion.  Although Mr. Reeves was able to provide some

18  of the requested information, he was unable to provide basic information on such subjects as

19  whether or to whom Zinus has made presentations of the Mattress-in-a-Box, whether Zinus had

20  otherwise explained to people how to remove the innerspring Mattress-in-a-Box product from its

21  packaging and allow it to decompress, and even whether Zinus has sold any innerspring Mattress-

22  in-a-Box product to anyone other than Wal-Mart.  [*See, e.g.,* Wilson Decl., Exh. 2 (Reeves Depo.,

23  72:17-20, 118:19-119:6, 125:1-22)]  Moreover, Mr. Reeves testified concerning several

24  categories of documents that are relevant to this motion but that have not yet been produced by

25

26    [2] Anticipating an argument that Zinus is almost certain to make, Dreamwell acknowledges that
   like Simmons, it has only produced a handful of documents (roughly 375 pages, although more will be
27  produced in the coming week) in connection with its Initial Disclosures and discovery responses.
   However, unlike Zinus, Dreamwell has not sought to obtain summary judgment before fulfilling its
28  discovery obligations.

1    Zinus. [*See, e.g.,* Wilson Decl., Exh. 2 (Reeves Depo., 85:11-25 (disclosing an unproduced

2    "Supply Agreement" with Wal-Mart); 108:4-109:11 (Zinus retains records of customer service

3    calls with Wal-Mart's retail customers)]

4    **Argument**

5    I.    **THERE IS AT LEAST A TRIABLE ISSUE OF FACT AS TO WHETHER**
      **ZINUS PERFORMS ALL OF THE STEPS OF THE ASSERTED CLAIMS**
6    **OF THE '142 PATENT**

7    Before turning to the merits of Zinus' papers, Dreamwell notes as an initial matter that the

8    scope of Zinus' motion is quite unclear. At page 1 of the Motion itself, Zinus requests complete

9    summary judgment of non-infringement, without qualification. However, on the next page, under

10   Summary of Relief, Zinus asks for "summary adjudication that Zinus is not liable for

11   infringement of any claim of the '142 Patent due to Zinus' manufacture and sale of Zinus'

12   Mattress-in-a-Box product to Wal-Mart Stores, Inc." (i.e., product sold to a single customer). In

13   other words, the Statement of Relief suggests that it is seeking relief that excludes product sold to

14   customers other than Wal-Mart Stores, Inc. (including even Wal-Mart affiliate), as well as

15   product that is not sold at all (e.g., demo product, and product that Zinus itself tests). Zinus later

16   asserts at page 5 of its moving papers, that "Zinus has sold the Mattress-in-a-Box product to no

17   customer other than Wal-Mart Stores, Inc. *and its affiliates*," suggesting that there may even be

18   sales to Wal-Mart entities that are excluded from the scope of this motion. But on pages 7-8,

19   Zinus defines the term "shipped units" as products "that have ever been supplied or sold to Wal-

20   Mart," suggesting again that the motion is limited to product shipped to Wal-Mart Stores, Inc.

21   Assuming that consistent with the Summary of Relief, the scope of the motion is limited

22   to product shipped to Wal-Mart, Inc., it is clear from Zinus' papers that this motion would only

23   resolve the infringement question as to product sold to one of multiple customers. It would not

24   even purport to address Zinus' infringement with respect to product that Zinus has manufactured

25   and tested internally, product that Zinus has shipped to customers other than Wal-Mart, or even

26   product that Zinus may have provided to Wal-Mart that has not been "shipped." Certainly, Zinus

27   has not proffered any evidence on these other instances of infringement.

28

1    At any rate, it is clear from the record that Zinus cannot meet its burden on summary

2 judgment, even with respect to the limited subset of products for which it has offered evidence of

3 non-infringement.

4    **A.    The Law of Direct Infringement**

5    Dreamwell recognizes that in its recent opinion in *BMC Resources, Inc. v. Paymentech,*

6 *L.P.*, 498 F.3d 1373 (Fed. Cir. 2007), the Federal Circuit provided detailed and controlling

7 guidance on the law of direct infringement of a method patent where the claimed steps are

8 performed by multiple parties. However, contrary to Zinus' assertions, both *BMC Resources* and

9 the cases preceding and following that opinion make clear that a manufacturer may be deemed to

10 perform a step if it provides its customers or end users of the product with instructions regarding

11 the performance of such step, or if the step must be performed to use the product at issue.

12    1.    *BMC Resources*

13    In *BMC Resources*, plaintiff BMC asserted that defendant Paymentech infringed a method

14 claim that was drafted in such a way as "to have four different parties perform different acts

15 within" that one claim. 498 F.3d at 1381. The district court granted Paymentech's motion for

16 summary judgment, finding that Paymentech did not perform all of the steps of the claimed

17 method, and that the record did not contain any evidence that Paymentech "directed or controlled

18 the behavior of the financial institutions that performed those claimed method steps that

19 Paymentech did not perform." *Id.* at 1378.

20    The Federal Circuit affirmed. In doing so, the Court started with the well-established

21 proposition that "[f]or process patent or method patent claims, infringement occurs when a party

22 performs all of the steps of the process." *Id.* at 1379; *see also id.* at 1380 ("Infringement requires,

23 as it always has, a showing that a defendant has practiced each and every element of the claimed

24 invention"). However, the Court acknowledged that even if an accused infringer does not itself

25 perform all the steps of a method claim, "the law imposes vicarious liability on a party for the acts

26 of another in circumstances showing that the liable party controlled the conduct of the acting

27 party." *Id.* at 1379. And the Court reiterated that "a defendant cannot thus avoid liability for

28

1   direct infringement by having someone else carry out one or more of the claimed steps on its

2   behalf. *Id.*

3       The Federal Circuit went on to note that "[c]ourts faced with a divided liability theory

4   have also generally refused to find liability where one party did not control or direct each step of

5   the patented process." *Id.* at 1380. On the other hand, the Court recognized that "[a] party cannot

6   avoid infringement . . . simply by contracting out steps of a patented process to another entity. In

7   those cases, the party in control would be liable for direct infringement. It would be unfair indeed

8   for the mastermind in such situations to escape liablilty." *Id.*

9       The Federal Circuit then proceeded to articulate a standard "requiring control or direction"

10  for a finding of infringement of a method claim where multiple parties perform the claimed

11  method. *Id.* at 1381. Put another way, the Court required that for a defendant to be held liable for

12  direct infringement of a method claim, it must "perform or cause to be performed each and every

13  element of the claims." *Id.* at 1382.

14      Of particular importance for purposes of this motion, the Court went on to apply this

15  standard to the evidence of record. BMC unsuccessfully attempted to argue that merely because

16  there was some commercial relationship between Paymentech and the debit networks that

17  performed the other steps, and because Paymentech provided data to those networks, it had

18  established that Paymentech controlled or directed the third parties' activities. The Federal

19  Circuit rejected this contention, concluding that the district court properly found "BMCs'

20  evidence that Paymentech provides data (debit card number, name, amount of purchase, etc.) to

21  the debit networks, ***absent any evidence that Paymentech also provides instructions or***

22  ***directions regarding the use of those data***, to be inadequate." *Id.* at 1381 (emphasis added).

23      BMC also suggested that instructions or directions could be inferred from the fact that

24  BMC provided data to the debit networks. Once again, the Federal Circuit rejected this argument,

25  noting that BMC had "presented no evidence below" to support this theory, and therefore was

26  "not entitled to such an inference with respect to the debit networks that would allow it to survive

27  summary judgment." *Id.* at 1381-82. In so holding, however, the Court indicated that had BMC

28

1    offered evidence to suggest that directions or instructions could be inferred from the provision of

2    the data, such evidence would have been sufficient to at least create a triable issue of fact.

3          Therefore, while *BMC Resources* certainly stands for the proposition that a defendant can

4    only be held liable for direct infringement of a method claim if it "performs or causes to be

5    performed each and every element of the claims," it also makes clear that if a patentee proffers

6    evidence that a defendant provides instructions or other direction to customers or downstream

7    users regarding the performance of a step, or if such instructions or direction may be inferred

8    from what the defendant provides to the customers or consumers, or if the defendant otherwise

9    "causes to be performed" the relevant steps of the method claim, the defendant is not entitled to a

10   summary adjudication that there is no direct infringement.

11             2.    Other Cases

12         Cases both before and following *BMC Resources* confirm that opinion's fundamental

13   holding that a defendant may be deemed to perform a patented step if it provides directions or

14   instructions regarding that step or if such instructions or direction may be inferred from the

15   information or product provided by the defendant.  For example, in *Privasys, Inc. v. Visa*

16   *International, Inc.*, 2007 WL 3461761 (N.D. Cal. 2007), a case decided b Judge Illston shortly

17   after the *BMC Resources* opinion issued, plaintiff sought to amend its Complaint to add two

18   banks as additional defendants.  Defendants opposed plaintiff's motion as futile, arguing that the

19   new defendant banks did not practice each step or element of any claim of the patent in suit.

20   Judge Illston rejected this argument, noting that plaintiff may be able to put forth facts showing

21   either that the banks "directed or controlled the conduct of other parties, such that direct

22   infringement may be proven," or that defendant VISA provided such direction or control (and

23   was therefore the direct infringer) and that the banks could be liable for such infringement as

24   indirect infringers.  As the Court observed, "plaintiff has already indicated that it can produce

25   precisely the type of evidence that had been absent in *BMC Resources*, i.e. that Visa 'provides

26   instructions or directions regarding the use of' its payWave card to the merchants and banks

27   involved in the process, and also that Visa has a 'contractual relationship' with 'the financial

28   institutions.' Both pieces of evidence tend to show that Visa exercised 'direction or control' over

1    the customer-merchant interaction as well as over the banks, and thus 'perform[ed] or cause[d] to

2    be performed each and every element of the claims'. . . ."  In other words, Judge Illston correctly

3    recognized that by providing directions regarding its payWave card product, Visa could be

4    deemed to have performed the relevant steps.

5         Similarly, in *TGIP, Inc. v. AT&T Corp.*, 2007 WL 3194125 (E.D. Tex. 2007), also

6    decided shortly after *BMC Resources*, defendant AT&T argued in a motion for judgment as a

7    matter of law that there was "no evidence that AT&T directed or controlled the third parties who

8    performed steps essential to any finding of noninfringement" relating to plaintiff's method patent

9    for activating prepaid phone cards.  The district court rejected this contention, noting that plaintiff

10   "presented evidence that AT&T 'controlled or directed' the work that third-parties provided for

11   AT&T to perform activation process."  Specifically, the court noted that there was evidence that

12   "AT&T provided specifications to each of its retailers directing the retailers on the processes for

13   sending an activation message to AT&T," and that AT&T required information from its retailers

14   to be in a certain format "defined by AT&T's technical plan, indicating what 'requirements' were

15   necessary in order for AT&T to provide its services to retailers."  Accordingly, the court denied

16   the defendant's motion.

17        Cases decided before *BMC Resources* reached similar conclusions.  Thus, in *Hill v.*

18   *Amazon.com, Inc.*, 2006, WL 151911 (E.D. Tex. 2006), defendants moved for summary judgment

19   of no direct infringement, arguing that while they may have performed certain claimed steps that

20   were required to be performed on a host computer, they did not perform other steps that were

21   required to be performed on remote computers (i.e., steps performed on the computers of

22   consumers who access the defendants' web sites).  The Court denied defendants motion.  In doing

23   so, the court rejected defendants' argument (which Zinus has made in its moving papers) that they

24   could not be held liable for the acts of its customers because there was no agency relationship,

25   noting that "although proof of an agency relationship or concerted activity would be sufficient to

26   impose liability in circumstances where one party does not perform all of the steps of the claimed

27   method, such a showing is not invariably required."  Instead, the Court noted, consistent with the

28   later-decided *BMC Resources* opinion, that "[i]n the absence of an agency or contractual

1    relationship, the case law appears to require a showing that the defendant and the third party are

2    connected at least to the extent that the defendant must actually direct the third party to perform

3    the remaining steps of the method." Analyzing the evidence, the Court found that the defendants

4    designed their Web sites in such a way that visitors to the sites would necessarily perform certain

5    of the steps, and made suggestions to potential customers regarding other steps. The district court

6    found this evidence sufficient to create a triable issue of fact on the issue of "direction or control".

7            And in *Applied Interact, LLC v. Vermont Teddy Bear Co.*,

8    2005 WL2133416 (S.D.N.Y. 2005), the district court analyzed the "direct infringement" issue in

9    the context of an Internet-based patent, the claims of which contemplate that an "organizer"

10   would broadcast certain stimuli, such as product advertisements or sweepstakes; that audience

11   members would respond to the stimuli from remote locations and would be able to generate

12   product coupons at those locations; and that the organizer would evaluate the audience members'

13   responses. Defendant argued that it could not be liable for infringement because it did not

14   perform the "audience members" steps of the asserted method claims, and that it had no

15   connection with its customers when they independently performed those steps. The district court

16   rejected this argument and denied defendant's request for summary judgment on this basis,

17   finding that there was sufficient connection between the defendant and its customers to impose

18   liability on defendant for its customers' conduct. Specifically, the Court found that if customers

19   printed out defendant's coupons from a Web page containing the instructions "print this coupon,"

20   it did so in accordance with those printed instructions. The district court found the existence of

21   these instructions sufficient to potentially hold defendant liable for direct infringement, even

22   though defendant did not personally perform the final step(s) of the claims.

23           In sum, the relevant case authority has clearly and consistently held that summary

24   judgment of no direct infringement must be denied if there is evidence that a defendant provides

25   instructions or other direction to customers or downstream users regarding how to perform a step,

26   or if such instructions or direction may be inferred from what the defendant provides to the

27   customers or consumers.

28

1

**B.**     **There Is at Least a Triable Issue of Fact as to Whether Zinus Directs**
2          **Its Customers to Remove the Zinus Mattresses from the Box and Re-**
           **Expand the Mattresses Before Using Them.**

3

4          Appling the relevant legal standards to the facts of this case, there is overwhelming

evidence that Zinus "performs or causes to be performed" the steps of "removing said evacuation
5
tube from said containment sleeve" and allowing the mattress "to gradually return to said

6          uncompressed state" by providing instructions to customers on how to perform these steps.  In

7          fact, Zinus' own moving papers demonstrate that Zinus provides express directions and

8          illustrations explaining to Mattress-in-a-Box customers how to remove the mattress from the

9          "outer PE bag," to "carefully cut open the vacuum sealed bag" that is deformed around the

10         mattress, and to "allow mattress to fully expand to its original shape." [Reeves Jan. Decl., Exh.

11         E]  Under the case law discussed above, these directions are sufficient in and of themselves to

12         justify denial of Zinus' motion.

13         These are not the only directions that Zinus provides to Wal-Mart and retail customers

14         regarding how to unpack the mattress and allow it to return to its uncompressed state.  For

15         example, Zinus includes similar directions or instructions on the outside of the Mattress-in-a-Box

16         retail cartons.  [Reeves Jan. Decl., Exhs. A-D and F-G]  Mr. Reeves also testified that Zinus

17         provided presentations to Wal-Mart and other customers demonstrating how to perform these

18         steps, and confirmed that Zinus may have provided other unspecified explanations of these steps.

19         [Wilson Decl., Exh. 2 (Reeves Depo., 75:5-17, 84:17-86:8, 102:1-103:12, 118:19-119:16)]  In

20         addition, for months the wal-mart.com Web site a link to a Zinus promotional video that

21         explained and demonstrated these steps.[3]  Dreamwell is confident that discovery will reveal

22         additional evidence that Zinus has directed consumers how to satisfy these claim elements.  [*See*

23         *generally* Wilson Decl., ¶¶ 18-19]

24

25

26         _____

27             [3] Several weeks ago, there was a link to a copy of this video on the Wal-Mart Web site, and other
           copies were available at various locations on the Internet.  However, over the past few weeks, the copies of
           this video of disappeared both from the Wal-Mart Web site and from elsewhere on the Web.  [Wilson
28         Decl., ¶ 6]  To date, Zinus has failed to produce this video

1    The very nature of the Mattress-in-a-Box product provides additional evidence from

2  which a jury could infer that Zinus controls or directs the performance of the final steps. As is

3  readily apparent, the intended purpose of the Mattress-in-a-Box product is "to sleep on it."

4  [Wilson Decl., Exh. 2 (Reeves Depo., 111:24-112:1)] Zinus intends and understands that "in

5  order to use the purchased product" for its intended purpose, Wal-Mart's customers must open

6  and remove the mattress from the box, take the mattress out of the outer containment bag or

7  surrounding fabric, puncture or sever the plastic bag or "sheath" surrounding the mattress, and

8  allow the compressed mattress to uncompress, as recited in the claims of the '142 Patent. [*Id.*

9  (Reeves Depo., 110:10-113:6); *see also* Zinus' Motion at 17] Indeed, Mr. Reeves confirmed that

10  the Zinus' Mattress-in-a-Box product could not be used for its intended purpose (i.e., consumers

11  could not sleep on it) without performing these steps. [Wilson Decl., Exh. 2 (Reeves Depo.,

12  156:25-157:15)] Thus, under *BMC Resources* and its progeny, the very nature of the Mattress-in-

13  a Box product provided to Wal-Mart and its retail customers would permit a jury to infer that

14  Zinus "caused to be performed" the the final steps of the '142 Patent claims, thereby rendering

15  partial summary judgment of no direct infringement improper. *See Hill, supra.*

16    Zinus tries to minimize the legal effect of the directions it provides by grasping the

17  Federal Circuit's statement in the *BMC Resources* case that "the standard requiring control or

18  direction for a finding of joint infringement may in some circumstances allow parties to enter into

19  arms-length agreements to avoid infringement." But this statement is in no way inconsistent with

20  Dreamwell's argument. As is clear from the plain language of the statement, the Court in *BMC*

21  *Resources* was merely saying that if two parties agree that one party will perform certain steps in

22  an infringing method claim and the other party will perform the remaining steps, they may avoid

23  liability for direct infringement, so long as one party does not direct or control the activities of the

24  other. In contrast here, there is ample evidence that Zinus has provided direction or instructions

25  to customers regarding the performance of the final elements of the asserted claims. This is

26  precisely the type of evidence that the Court in *BMC Resources* indicated would be sufficient to

27  defeat a motion for summary judgment of no direct infringement. 498 F.3d at 1381 (concluding

28  that the district court properly found "BMCs' evidence that Paymentech provides data (debit card

1   number, name, amount of purchase, etc.) to the debit networks, *absent any evidence that*

2   *Paymentech also provides instructions or directions regarding the use of those data*, to be

3   inadequate"); *see also Privasys, supra* ("plaintiff has already indicated that it can produce

4   precisely the type of evidence that had been absent in *BMC Resources*, i.e. that Visa 'provides

5   instructions or directions regarding the use of' its payWave card to the merchants and banks

6   involved in the process, and also that Visa has a 'contractual relationship' with the financial

7   institutions.' Both pieces of evidence tend to show that Visa exercised 'direction or control' over

8   the customer-merchant interaction as well as over the banks, and thus 'perform[ed] or cause[d] to

9   be performed each and every element of the claims'. . . .").

10      Zinus' assertion that allowing user instructions to satisfy the "control or direction"

11   standard would eliminate the needs to bring a claim for indirect infringement is equally flawed.

12   As the Federal Circuit noted in *BMC Resources*, direct infringement may exist if a manufacturer

13   provides instructions or directions to customers regarding the performance of steps that the

14   manufacturer does not personally perform.  Indirect infringement would still exist if a third party

15   "induced" the manufacturer to engage in the acts that constitute direct infringement.  At least one

16   post-*BMC Resources* opinion has recognized the distinction between of these two theories of

17   liability. *See Privasys, supra* (Judge Illston reasoned that noting plaintiff may be able to put forth

18   facts showing either that the banks "directed or controlled the conduct of other parties, such that

19   direct infringement may be proven," or that defendant VISA provided such direction or control

20   (and was therefore the direct infringer) and that the banks could be liable for such infringement as

21   indirect infringers).

22      In sum, the evidence of record establishes that even with respect to the subset of

23   infringement for which Zinus has purported to offer evidence, there is at least a triable issue of

24   fact as to whether Zinus has "performed or caused to performed" the steps in question.[4]  As a

25   result, any summary judgment of non-infringement would be inappropriate.

26

27

28   [4] As noted in the Statement of Facts above, there is direct testimony that Zinus performed these
     steps itself, which would preclude any summary judgment on the direct infringement claim as a whole.

**C.    There Is at Least a Triable Issue of Fact as to Whether the Zinus Mattress-in-a-Box "Gradually" Re-Expands.**

As a fallback argument, as it did in its initial Motion for Summary Judgment, Zinus has asked the Court to rule that it doesn't practice a particular claim element before that element is construed (and without even proffering a proposed interpretation of the language at issue), and before providing discovery with respect to the extent to which it practices the element. Specifically, Zinus asserts that once removed from the containment sleeve or equivalent, the mattress expands "instantly," and that Zinus therefore does not perform the step of allowing the mattress to "gradually return to [its] uncompressed state."

However, as Dreamwell properly observed in the context of the original summary judgment motion, "[a] determination of infringement requires a two-step analysis." *Warner-Jenkinson, supra,* 520 U.S. at 39-40. As the first step in this analysis, "the Court determines the scope and meaning of the patent claims asserted." *Cyber Corp. v. FAS Technologies, Inc.*, 138 F.3d 1448, 1456 (Fed Cir. 1998) (en banc). Only after the asserted claims are construed can the Court move on to the fact-intensive task of comparing the properly construed claims to the accused device. *Id.*

1.    In the Context of the '142 Patent, the Term "Gradually Expands" Means "Expands in a Controlled, Non-Abrupt Manner"

The '142 Patent specification provides substantial guidance on what is meant by the term "gradually" in the context of the phrase "gradually returns to said uncompressed state." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005), *cert. denied*, 126 S. Ct. 1332 (2006) (citations omitted) ("the specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'"). For example, the "Background of the Invention" section of the patent states that "a disadvantage of using known vacuum packaging methods to provide a compressed package of springs is that once the vacuum source is removed from the inner tube, the springs are entirely dependent upon the presence of the outer containment sleeve for retaining their compressed condition. Thus, once the containment sleeve is severed, such as in opening of the package, the

1    springs can expand to their fully extended state in an uncontrolled and somewhat abrupt manner.

2    The result is that opening of the spring package by severing the containment sleeve with a sharp

3    instrument, for example, can be a surprising and possibly dangerous experience."[5] [Wilson Decl.,

4    Exh. 1 ('142 Patent, 2:15-26] Thus, the Summary of the Invention section notes that in the

5    patented invention, "[w]hen the article is unpackaged, the containment sleeve is severed and the

6    tube is allowed to expand in a gradual, controlled fashion by the bleeding of air back into the

7    tube." [Id. ('142 Patent, 2:44-46)]

8        Similarly, the "Detailed Description of the Preferred Embodiment" section of the '142

9    Patent provides the following disclosure: "[t]he advantages of sealing the tube 22 at both ends 24

10    after evacuation should likewise be apparent. When the package 20 is delivered, the customer can

11    sever the containment sleeve 26 and initially the tube 22 together with the article encapsulated

12    therein will remain relatively compressed under the effect of the vacuum within the tube 22.

13    Then, depending upon the type of end 24 sealing method used, air will gradually bleed into the

14    tube 22 allowing the compressed article to slowly expand until the inside of the tube 22 reaches

15    ambient air pressure. Accordingly, an undesirable, abrupt expansion of the tube 22 is avoided."

16    [Id. ('142 Patent, 3:47-57)]

17        Given this context, Dreamwell submits that the proper definition of "gradually expands to

18    said uncompressed state" is that the mattress re-expands in a regular or controlled, non-abrupt

19    manner. This definition is fully supported by the intrinsic record, as well as the ordinary meaning

20    of the term.[6] Since Zinus has not offered its own definition in its moving papers, Zinus should

21    not now be permitted to offer a contrary definition, at least in the context of this motion.

22        2.    There Is Substantial Evidence Showing that the Mattress-in-a-Box Product
          "Gradually Expands to Said Uncompressed State."

23

24

---

25    [5] At the end of this passage from the Background of the Invention section, the inventors added that
      "[a]ccordingly, it is desirable to provide a vacuum packaging method for packaging springs in a manner

26    which permits controlled expansion of the springs upon opening of the package. However, as is apparent
      from the language of the claims, they do not require that a vacuum packaging method be used.

27    [6] As the Court is surely aware, "gradually is not a technical term. Rather, it is an ordinary term
      used in the English language, and it is commonly understood to mean "advancing or progressing by

28    regular or continuous degrees." [Wilson Decl., Exh. 5 (American Hertiage Dictionary)]

1      Applying the above definition of "gradually," the evidence of record establishes that the

2      Zinus Mattress-in-a-Box returns to its uncompressed state in a gradual, controlled manner.  In

3      fact, Zinus' President expressly testified that the compressed mattress expands in a safe, non-

4      abrupt and "very controlled" manner  [Wilson Decl., Exh. 2 (Reeves Depo., 107:17-108:3, 120:9-

5      20, 124:22-25)]  The Spanish language version of the Zinus instruction sheet acknowledges that it

6      may take up to 48 hours for the mattress to fully expand to its uncompressed state.  [Wilson Decl.,

7      Exh. 3]  And customer reviews of the Mattress-in-a-Box product further confirm that the

8      Mattress-in-a-Box expands in a gradual manner as described in the claim.  [*See* Wilson Decl.,

9      Exh. 4 (one customer notes that "we had to let it sit for 48 hours to fully reach its size")]

10      Dreamwell is confident that discovery would turn up further evidence supporting its position.

11      [*See generally* Wilson Decl., ¶¶ 20-21]

12      Thus, notwithstanding the self-serving statements of Zinus' President that he did not

13      intend the Zinus mattresses to expand gradually, there is substantial and compelling evidence that

14      the Zinus Mattress-in-a-Box re-expands in a "gradual" manner as claimed in the '142 Patent.  At

15      the very least, the evidence of record creates a triable issue of fact as to whether the Mattress-in-

16      a-Box satisfies this requirement.

17

18    II.    **IN THE EVENT THE COURT FINDS THE ABSENCE OF A TRIABLE ISSUE OF FACT, DREAMWELL REQUESTS LEAVE TO OBTAIN RELEVANT AND**

19           **NECESSARY DISCOVERY PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 56(F).**

20      Pursuant to Federal Rule of Civil Procedure 56(f), "[s]hould it appear from the affidavits

21      of a party opposing the motion that the party cannot for reasons state present by affidavit facts

22      essential to justify the party's opposition, the court may refuse the application for judgment or

23      may order a continuance to permit affidavits to be obtained or depositions to be taken or

24      discovery to be had, or may make such other order as is just."  This rule is an essential element of

25      the federal summary judgment scheme, and provides a mechanism for dealing with the problem

26      of premature summary judgment motions.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986).

27      As the 9th Circuit has noted, "the denial of a Rule 56(f) application is generally disfavored

28      where the party opposing summary judgment makes (a) a timely application which (b)

1   specifically identifies (c) relevant information, (d) where there is some basis for believing that the

2   information sought actually exists." *Burlington Northern Santa Fe R. Co. v. Assiniboine and*

3   *Sioux Tribes of Fort Peck Reservation*, 323 F.3d 767, 774 (9th Cir. 2003) (finding abuse of

4   discretion in granting summary judgment without permitting discovery), citing *VISA Int'l Serv.*

5   *Ass'n v. Bankcard Holders of Am.*, 784 F.2d 1472, 1475 (9th Cir.1986) (same).

6              Moreover, where, as here, a summary judgment motion is filed in the early stages of the

7   discovery process, "district courts should grant any Rule 56(f) motion fairly freely." *Burlington*

8   *supra*, 323 F.3d at 773 (9th Cir. 2003); *see also Program Engineering, Inc. v. Triangle*

9   *Publications, Inc.*, 634 F.2d 1188, 1193 (9th Cir. 1981) ("Generally where a party had had no

10  previous opportunity to develop evidence and the evidence is crucial to material issues in the

11  case, discovery should be allowed before the trial court rules on a motion for summary

12  judgment."); *Burnside-Ott Aviation Training Center, Inc. v. United States*, 985 F.2d 1574 (Fed.

13  Cir. 1993) (summary judgment should be refused when non-moving party has not had

14  opportunity to discover essential information).  Indeed, the 9th Circuit has held that denial of a

15  Rule 56(f) request for additional discovery "is especially inappropriate where the material sought

16  is also the subject of outstanding discovery requests." *Burlington*, 323 F.3d at 775.

17             As set forth in the supporting Declaration of Kenneth B. Wilson in Opposition to Zinus'

18  Second Motion for Summary Judgment, Dreamwell has propounded discovery seeking additional

19  information to establish that Zinus has provided directions or instructions regarding the removal

20  of the mattress from its packaging and the expansion of the mattress to its uncompressed state to

21  Wal-Mart and its customers; that Zinus has performed or caused to be performed the final steps of

22  the claims of the '142 Patent for certain units of the shipped product; that Zinus has performed or

23  caused to be performed the steps of removing the mattress from the evacuated tube and allowing

24  the mattress to expand to its uncompressed state for product other than "shipped units," and that

25  Zinus' Mattress-in-a-Box product expands in a gradual and controlled fashion. [Wilson Decl., ¶¶

26  18-23] As the Wilson Declaration further indicates, such evidence is likely to exist. [*Id.*]  And

27  there can be little question that such facts are essential to Dreamwell's opposition, if the Court

28  concludes that there is no triable issue of fact on the present record. [*Id.*]

1          Accordingly, to the extent the Court has any inclination to grant Zinus' motion,

2    Dreamwell submits that it has satisfied the requirements of Federal Rule of Civil Procedure 56(f),

3    and that it is entitled to conduct discovery on the issues presented by Zinus' motion before the

4    Court makes any final ruling.

5    **Conclusion**

6          For the foregoing reasons, Zinus' Motion for Summary Judgment of No Direct

7    Infringement should be denied.

8    DATED:  February 12, 2008        **PERKINS COIE** LLP

9

10       By _____
                 /s/
                 Kenneth B. Wilson

11       Attorneys for Defendant SIMMONS BEDDING
         COMPANY and Defendant and Counterclaimant
12       DREAMWELL, LTD.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

65839-0001/LEGAL13899620.1        -21-