**EXHIBIT 1**



US00RE36142E

# United States Patent [19]

## Steed et al.

[11] E    Patent Number:    Re. 36,142

[45] Reissued    Date of Patent:    Mar. 16, 1999

[54] **METHOD OF PACKAGING RESILIENTLY COMPRESSIBLE ARTICLES**

[75] Inventors: **C. Edward Steed**, Alpharetta; **Ricky F. Gladney**, Fairburn, both of Ga.

[73] Assignee: **Simmons Company**, Atlanta, Ga.

[21] Appl. No.: **919,655**

[22] Filed:    **Aug. 28, 1997**

### Related U.S. Patent Documents

Reissue of:
[64] Patent No.:    **5,622,030**
     Issued:    Apr. 22, 1997
     Appl. No.:    694,803
     Filed:    Aug. 9, 1996

U.S. Applications:
[63] Continuation of Ser. No. 416,065, Apr. 4, 1995, abandoned.

[51] Int. Cl.⁶ ........................................... **B65B 1/24**

[52] U.S. Cl. .......................... **53/436; 53/524; 53/528; 53/114**

[58] Field of Search ...................... 53/432, 436, 469, 53/399, 114, 524, 528

[56]    **References Cited**

### U.S. PATENT DOCUMENTS

1,861,429    5/1932    Schneider et al. ....................... 53/114

3,585,700    6/1971    Jansson .......................... 53/436
3,611,524   10/1971    Broyles ........................... 53/432
4,234,983   11/1980    Stumpf .
4,575,990    3/1986    von Bismarck ..................... 53/469
4,854,023    8/1989    Stumpf ........................... 53/114

*Primary Examiner*—James F. Coan
*Assistant Examiner*—Gene L. Kim
*Attorney, Agent, or Firm*—Jones, Day, Reavis & Pogue

[57]    **ABSTRACT**

A method of packaging a resiliently compressible article comprises the steps of inserting the article into a tube of deformable material such that excess material is provided at the ends of the tube. A first end of the tube is then sealed closed. Air is then evacuated from the tube through the second end thereby deforming the tube around the article and causing the article to compress. While a vacuum is maintained in the tube, the second end of the tube is sealed closed. A containment sleeve is fitted over the sealed tube to maintain the article in a compressed state. When the article is unpackaged, the containment sleeve is severed and the tube is allowed to expand in a gradual controlled fashion by the bleeding of air back into the tube.

**9 Claims, 3 Drawing Sheets**



**U.S. Patent**        Mar. 16, 1999        Sheet 1 of 3        Re. 36,142



*FIG. 1*



FIG. 2



*FIG. 3*

Re. 36,142

1

# METHOD OF PACKAGING RESILIENTLY COMPRESSIBLE ARTICLES

Matter enclosed in heavy brackets [ ] appears in the original patent but forms no part of this reissue specification; matter printed in italics indicates the additions made by reissue.

This application is a *reissue application of Ser. No. 08/694,803 filed on Aug. 9, 1996 now U.S. Pat. No. 5,622, 030 which is a continuation of application Ser. No. 08/416, 065 filed on Apr. 4, 1995* abandoned.

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention relates generally to a method of packaging resiliently compressible articles and, more particularly, to a method wherein compressible articles can be conveniently packaged for shipment in a compressed state and can be unpackaged at their destination in a controlled manner.

### 2. Description of the Prior Art

Many articles of manufacture are lightweight and bulky and cannot be delivered to the consumer without an undesirably high cost associated with shipment. Often these articles are also inexpensive to manufacture but their cost to the consumer necessarily reflects a disproportionately high component of shipping charges, thereby adversely affecting the perceived value of the article to the consumer. One such article whose cost of shipment is undesirably high as compared to its manufactured cost is an innerspring component of a typical mattress, cushion or the like.

In standard mattress construction, for example, an innerspring assembly is used comprising an arrangement of closely packed coil springs. One form of innerspring construction which has proved to be highly successful is known as the Marshall construction. In this construction, individual coil springs are encapsulated in discrete pockets of fabric material with the pockets of fabric material formed together to create strings of coils. These strings of coils are then arranged in an array with the coil springs all oriented parallel to one another, thereby forming an innerspring assembly. An example of such construction is disclosed in U.S. Pat. No. 4,234,983, issued to Stumpf and assigned to the common assignee herein, the disclosure of which is expressly incorporated hereby by reference.

In order to construct a mattress assembly which provides adequate support yet is comfortable to the user, the springs used in the foregoing construction characteristically have such few coil turns and have such relatively weak compressive strength that they can be readily compressed to a size on the order of one-tenth their naturally expanded size. Accordingly, strings of coils of the foregoing type are lightweight and considerably bulky.

Recently, a new construction of mattress has been developed which is capable of being disassembled to knocked down form for convenient shipment to customers or retail outlets. Such a knock down mattress *is* disclosed in co-pending U.S. patent application Ser. No. 08/398,227 filed Mar. 3, 1995, assigned to the common assignee herein. This construction comprises four bolsters each having a generally rectangular cross section and dimensioned to be arranged in a mattress outline. The bolsters are retained within a shell having a bottom panel, perimeter side panels and a zippered cover panel. Each bolster comprises a fabric casing which contains lengths of pocketed coil springs.

The aforesaid mattress assembly, because of its knock down construction, can be shipped in a highly economical

2

manner by comparison to conventional unitary mattress structures. The components of this mattress can be assembled into packages of very manageable size for shipment. However, it is desirable to provide a packaging method which further reduces the size of the packaging. To this end, vacuum packaging of the coil springs may be employed wherein the strings of coils are compressed within an initially evacuated plastic tube and retained in a compressed state by a containment sleeve fitted over the tube as the vacuum source is removed.

Because conventional springs of the pocketed coil type can be compressed significantly from their naturally extended state, substantial reductions in size of packaging for such springs can be achieved by vacuum packaging methods. However, a disadvantage of using known vacuum packaging methods to provide a compressed package of springs is that once the vacuum source is removed from the inner tube, the springs are entirely dependent upon the presence of the outer containment sleeve for retaining their compressed condition. Thus, once the containment sleeve is severed, such as in opening of the package, the springs can expand to their fully extended state in an uncontrolled and somewhat abrupt manner. The result is that opening of the spring package by severing the containment sleeve with a sharp instrument, for example, can be a surprising and possibly dangerous experience. Accordingly, it is desirable to provide a vacuum packaging method for packaging springs in a manner which permits controlled expansion of the springs upon opening of the package.

## SUMMARY OF THE INVENTION

The present invention improves over the prior art by providing a method of packaging a resiliently compressible article comprising the steps of inserting the article into a tube of deformable material such that excess material is provided at the ends of the tube. A first end of the tube is then sealed closed. Air is then evacuated from the tube through the second end thereby deforming the tube around the article and causing the article to compress. While a vacuum is maintained in the tube, the second end of the tube is sealed closed. A containment sleeve is fitted over the sealed tube to maintain the article in a compressed state. When the article is unpackaged, the containment sleeve is severed and the tube is allowed to expand in a gradual, controlled fashion by the bleeding of air back into the tube.

## BRIEF DESCRIPTION OF THE DRAWINGS

The foregoing and other novel features of the invention will become apparent upon a reading of the following detailed description taken in conjunction with the accompanying drawings wherein:

FIG. 1 is a fragmentary side elevational view of a string of pocketed coil springs as known in the prior art;

FIG. 2 is a side elevational view partly broken away showing a packaging system in accordance with the invention prior to evacuation; and

FIG. 3 is a side elevational view partly broken away showing the packaging system after evacuation.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

Referring now to the drawings, and initially to FIG. 1, a string of coil springs, as known in the art for use in innerspring construction of mattresses or the like is designated generally by the reference numeral 10. The coil string

Re. 36,142

3

10 includes individual coil springs 12 which are encapsulated in discrete pockets of suitable fabric 14. The fabric 14 is preferably heat sensitive such that ultrasonically formed welds 16 create webs 18 between adjacent coils 12 thereby defining the pockets. It can be appreciated that in this construction of a mattress innerspring or the like, the coil springs 12 are typically formed of relatively few coil turns and relatively weak compressive strength. Accordingly, these springs 12 can readily be compressed to a size which is only a fraction of their naturally expanded size.

Turning now to FIG. 2, a package system in accordance with the invention is designated generally by the reference numeral 20. The system 20 is shown as packaging a string of coil springs 10 of the type illustrated in FIG. 1, comprising coil springs 12 which are pocketed in fabric 14. The string 10 is inserted into a tube of deformable material 22. In preferred form, this material 22 is ¾ mil polyethylene which has been extruded into tubular form and is supplied in roll form. The tube 22 has a length greater than the length of the coil string 10 such that the two ends of the tube 22 define portions 24 of excess tube material 22.

Illustrated in FIG. 3 is the package system 20 shown in completed form, wherein the coil string 10 has been compressed and is maintained in a compressed state by a containment sleeve 26. Preferably, the containment sleeve 26 is an extruded tube of 4 mil polyethylene. In order to achieve the configuration of FIG. 3, one end 24 of the tube 22 is gathered and sealed. Sealing can be accomplished by various means including taking the gathered end 24, taping it closed, pinching the end 24 with a suitable clip or cable tie, or heat sealing the end 24. Then, the open end is manually gathered around a hose connected to a vacuum pump and the air within the tube 22 is evacuated. Evacuation of the tube 22 causes the tube to deform around the string of coils 10 and in turn causes the coils 10 to compress. When evacuation has reached a predetermined level, the containment sleeve 26 is installed over the compressed tube 22 and the second end 24 of the tube [is] *may be* sealed. The vacuum source is then removed.

It can now be appreciated that the packaging method in accordance with the invention provides a highly desirable method for packaging articles which are resiliently compressible. Although the invention has been described in connection with the packaging of coil string 10, it can be appreciated that numerous other compressible articles can be packaged with the present method for cost-effective shipment. The advantages of sealing the tube 22 at both ends 24 after evacuation should likewise be apparent. When the package 20 is delivered, the customer can sever the containment sleeve 26 and initially the tube 22 together with the article encapsulated therein will remain relatively compressed under the effect of the vacuum within the tube 22. Then, depending upon the type of end 24 sealing method used, air will gradually bleed into the tube 22 allowing the compressed article to slowly expand until the inside of the tube 22 reaches ambient air pressure. Accordingly, an undesirable, abrupt expansion of the tube 22 is avoided. If a sealing method is used which is too air tight, the tube 22 can simply be punctured with a small hole to allow air to enter the evacuated tube 22. By this method of packaging, strings 10 of pocketed coil springs 12 stacked 23 inches high can readily be compressed to a stack 5 inches high and, thereby, can be packaged for cost-effective shipment.

While the present invention has been described in connection with a preferred embodiment thereof, it will be apparent to those skilled in the art that many changes and modifications may be made without departing from the true

4

spirit and scope of the invention. Accordingly, it is intended by the appended claims to cover all such changes and modifications as come within the true spirit and scope of the invention.

What is claimed is:

1. A method of packaging a mattress assembly constructed of coil springs wherein each spring is contained within an individual pocket of fabric, comprising the steps of:

   providing a tube of deformable material, said tube having a predetermined length;

   inserting a mattress assembly constructed of pocketed coil springs into said tube, said mattress assembly having a length which is less than the length of said tube, thereby defining first and second tube ends of excess material;

   sealing a first end of said tube;

   evacuating air from said tube through said second end thereby deforming said tube around said mattress assembly and causing said mattress assembly to compress;

   [sealing said second end of said tube after evacuating said tube to a predetermined state;]

   inserting said evacuated tube into a containment sleeve which is dimensioned and configured to retain said compressed mattress assembly in a compressed state for shipment;

   removing said evacuated tube from said containment sleeve; [and

   puncturing said evacuated tube to allow] *whereby said mattress assembly in said tube* [to] gradually [return] *returns* to an uncompressed state.

2. The method of claim 1 wherein said first end of said tube is sealed after gathering the excess material of said first end.

3. The method of claim 1 wherein said evacuating step includes gathering said second end of said tube around a vacuum, evacuating means.

4. The method of claim 1 wherein said tube is cut to said predetermined length from a continuous length of tube material.

*5. A method of packaging a mattress assembly constructed of coil springs wherein each spring is contained within an individual pocket of fabric, comprising the steps of:*

   *providing a tube of deformable material, said tube having a predetermined length;*

   *inserting a mattress assembly constructed of pocketed coil springs into said tube, said mattress assembly having a length which is less than the length of said tube, thereby defining first and second tube ends of excess material;*

   *sealing a first end of said tube;*

   *evacuating air from said tube through said second end thereby deforming said tube around said mattress assembly and causing said mattress assembly to compress;*

   *sealing said second end of said tube after evacuating said tube to a predetermined state;*

   *inserting said evacuated tube into a containment sleeve which is dimensioned and configured to retain said compressed mattress assembly in a compressed state for shipment;*

   *removing said evacuated tube from said containment sleeve; and*

   *allowing said mattress assembly in said tube to gradually return to an uncompressed state.*

Re. 36,142

<div style="display:flex">
<div>

5

6. A method of packaging a mattress assembly constructed of coil springs wherein each spring is contained within an individual pocket of fabric, comprising the steps of:

   providing a tube of deformable material, said tube having a predetermined length;

   inserting a mattress assembly constructed of pocketed coil springs into said tube, said mattress assembly having a length which is less than the length of said tube, thereby defining first and second tube ends of excess material;

   sealing a first end of said tube;

   evacuating air from said tube through said second end thereby deforming said tube around said mattress assembly and causing said mattress assembly to compress;

   sealing said second end of said tube while said tube is being evacuated to a predetermined state;

   inserting said evacuated tube into a containment sleeve which is dimensioned and configured to retain said compressed mattress assembly in a compressed state for shipment;

   removing said evacuated tube from said containment sleeve; and

   allowing said mattress assembly in said tube to gradually return to an uncompressed state.

7. A method of packaging a mattress assembly constructed of coil springs wherein each spring is contained within an individual pocket of fabric, comprising the steps of:

   providing a tube of deformable material, said tube having a predetermined length;

   inserting a mattress assembly constructed of pocketed coil springs into said tube, said mattress assembly having a length which is less than the length of said tube, thereby defining first and second tube ends of excess material;

   sealing a first end of said tube;

   evacuating air from said tube through said second end thereby deforming said tube around said mattress assembly and causing said mattress assembly to compress;

   inserting said evacuated tube into a containment sleeve which is dimensioned and configured to retain said compressed mattress assembly in a compressed state for shipment;

</div>
<div>

6

   removing said evacuated tube from said containment sleeve; and

   allowing said mattress assembly in said tube to gradually return to an uncompressed state; and

   said evacuated tube is punctured to allow said mattress assembly in said tube to gradually return to said uncompressed state.

8. A method of packaging a mattress assembly constructed of coil springs wherein each spring is contained within an individual pocket of fabric, comprising the steps of:

   providing a tube of deformable material, said tube having a predetermined length;

   inserting a mattress assembly constructed of pocketed coil springs into said tube, said mattress assembly having a length which is less than the length of said tube, thereby defining first and second tube ends of excess material;

   sealing a first end of said tube;

   evacuating air from said tube through said second end thereby deforming said tube around said mattress assembly and causing said mattress assembly to compress;

   inserting said evacuated tube into a containment sleeve which is dimensioned and configured to retain said compressed mattress assembly in a compressed state for shipment;

   removing said evacuated tube from said containment sleeve;

   allowing said mattress assembly in said tube to gradually return to an uncompressed state; and

   said containment sleeve is severed to allow said mattress assembly in said tube to gradually return to said uncompressed state.

9. The method of claim 1 wherein said evacuated tube inserted into said containment sleeve is allowed to expand within said containment sleeve.

</div>
</div>

\* \* \* \* \*

**EXHIBIT 2**

1                IN THE UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF CALIFORNIA

3                       SAN JOSE DIVISION

4

5

6     ZINUS, INC.,
      a California corporation,

7
                        Plaintiff,

8          vs.                        Case No. 07-CV-03012 PVT

9     SIMMONS BEDDING COMPANY,
      a Delaware corporation,

10    and DREAMWELL, LTD., a
      limited liability company

11    of Nevada,

12                      Defendants,
                                    /

13    AND RELATED COUNTERCLAIMS.

14

15              DEPOSITION OF SCOTT REEVES

16                      VOLUME II

17     (CONFIDENTIAL TREATMENT AS REQUESTED BY COUNSEL)

18              MONDAY, FEBRUARY 11, 2008

19                  PAGES 66 to 165

20

21

22    REPORTED BY:  LOUISE MARIE SOUSOURES, CSR NO. 3575

23                  Certified LiveNote Reporter

24

25

66

```
 1                A P P E A R A N C E S

 2

 3

 4   FOR PLAINTIFF:

 5        IMPERIUM PATENT WORKS

 6        BY:  T. LESTER WALLACE,

 7             ATTORNEY AT LAW

 8        P.O. Box 587

 9        Sunol, CA  94586

10        (925) 862-9972

11        darien@imperiumpw.com

12

13

14

15   FOR DEFENDANTS:

16        PERKINS COIE LLP

17        BY:  KENNETH WILSON,

18             ATTORNEY AT LAW

19        Four Embarcadero Center

20        Suite 2400

21        San Francisco, CA  94111-4131

22        (415) 344-7000

23        kwilson@perkinscoie.com

24

25
```

1         BE IT REMEMBERED that pursuant to Notice, and

2    on Monday, February 11, 2008, commencing at the hour of

3    9:50 a.m. thereof, at Four Embarcadero Center, San

4    Francisco, California, before me, LOUISE MARIE

5    SOUSOURES, a Certified Shorthand Reporter, there

6    personally appeared:

7                    SCOTT REEVES,

8    called as a witness by the Defendants, and who, being

9    first duly sworn, was thereupon examined and testified

10   as hereinafter set forth:

11              EXAMINATION BY MR. WILSON (CONTINUED):

12       Q.  Good morning, Mr. Reeves.

13       A.  Good morning.

14       Q.  Are you still the president of Zinus

15   Incorporated?

16       A.  Correct.

17       Q.  Do you have any other titles with Zinus

18   Incorporated?

19       A.  No.

20       Q.  Okay.  Do you recall being deposed a couple

21   months ago in this case?

22       A.  Yes.

23       Q.  Do you remember I gave you some instructions

24   about, you know, what a deposition is about, guidelines

25   for the deposition?  Do you recall that I did that at

11          Q.  Has Zinus sold inner spring Mattress-in-a-Box

12     product to walmart.com?

13          A.  Yes.

14          Q.  Has Zinus sold inner spring Mattress-in-a-Box

15     product to Wal-Mart Canada?

16          A.  Yes.

17          Q.  Has Zinus sold inner spring Mattress-in-a-Box

18     product to any entity that is not affiliated with

19     Wal-Mart?

72

⚨

2        Q.  Has Zinus ever shipped or delivered a

3    demonstration product to any entity other than Wal-Mart

4    or Wal-Mart affiliates?

5        A.  Can you help me better understand that?

6        Q.  Sure.  Have you ever shipped a box of inner

7    spring Mattress-in-a-Box product to anybody to evaluate?

8        A.  Probably so.

9        Q.  Do you have any doubt as to whether Zinus has

10   done that?

11       A.  No, we shipped our sample to other customers

12   before other than Wal-Mart and they were in a box.

73

5          When you make presentations to customers, does
6    Zinus bring a boxed product?

7          A.  Initially, but then we set -- if the meeting is
8    at our facilities, then everything is already set up.

9          If we fly to our destination, we will unpack
10   the mattress so that the buyer sees it unpacked and
11   boxed separate.

12         Q.  Can you identify customers for which Zinus has
13   taken a box and unpacked it for a customer presentation?

14         A.  Oh, Wal-Mart.

15         Q.  When you say Wal-Mart, are you referring to
16   Wal-Mart Incorporated?

17         A.  Yes.

11     Q.  Does Zinus have a -- has Zinus ever had any

12  contractual relationships with Wal-Mart?

13     A.  No, everything's been arm's length kind of

14  relationship with them.

15     Q.  Has Zinus ever entered into a written sales

16  plan with Wal-Mart?

17     A.  No.

18     Q.  Has Zinus ever entered into a written supply

19  agreement with Wal-Mart?

20     A.  There's a supply agreement that all vendors

21  have with Wal-Mart, so we have.  In fact, it's called a

22  vendor agreement.

23     Q.  Zinus has signed a written supply agreement

24  with Wal-Mart, correct?

25     A.  Yes.

81

17          Q.  Has Zinus ever done presentations for Wal-Mart
18     where it has taken the compressed mattress out of what
19     you referred to as the duffel bag in your previous
20     deposition?
21          A.  Yes.
22          Q.  How many times has Zinus done presentations
23     like that for Wal-Mart?
24          A.  I'm not sure how many.  A few times.  I did one
25     myself to senior management of Wal-Mart where I took the

84

1    mattress out of the box and cut it open across the

2    mattress sides and then it popped open and I had her lay

3    on it right away.

4        Q.  When you say you cut it open, you mean you cut

5    the plastic wrapper that the mattress was compressed in?

6        A.  Yeah.

7            MR. WALLACE:  Objection, vague, calls for a

8    legal conclusion.

9    BY MR. WILSON:

10        Q.  Let me make sure I understand what happened.

11            In the presentation that you were just

12    discussing that you personally did for Wal-Mart, you

13    removed the mattress packed in the duffel bag out of the

14    box, correct?

15        A.  Correct.

16        Q.  You then took the mattress out of the duffel

17    bag, correct?

18        A.  Correct.

19        Q.  You then cut the plastic wrapper surrounding

20    the mattress so that it could decompress, correct?

21        A.  Yeah, the way we do it is we have to -- we slit

22    the wrapper all the way across so that it can pop open

23    immediately so it's a very rapid, you know, it's eye

24    popping, it pops up right away and you can lay on it

25    right away.

85

⚲

1              So that's what we're trying to convey in a

2    presentation like that.

3        Q.  During this presentation, you allowed the

4    mattress to return to its uncompressed state, correct?

5        A.  Yes, which it does immediately.

6        Q.  When you say immediately, in that particular

7    presentation, how long did it take?

8        A.  Less than a minute.  It's just instantaneous.

86

18        Q.  Does Zinus expect people who receive or view

19   the promotional materials that Zinus creates to believe

20   the statements in those materials are truthful?

21        A.  Sure.

22        Q.  Does Zinus intend the information that it puts

23   in its promotional materials to be truthful?

24        A.  Sure.

25        Q.  Are you aware of any instance when Zinus has

92

1    circulated advertising or promotional materials that

2    contain statements that were not truthful?

3        A.  Not to my knowledge.

4        Q.  Has Zinus designed packaging for its

5    Mattress-in-a-Box product?

6        A.  Yes.

93

13      Q.  Do you care whether retail customers believe

14  the wording on the box?

15      A.  We care.

16      Q.  Does Zinus endeavor to be truthful in the

17  statements that it places on the box for its product?

18      A.  Yes, we endeavor to be truthful.

19      Q.  Are you aware of any instance in which Zinus

20  has not been truthful in the statements that it has

21  placed on the box for the inner spring Mattress-in-a-Box

22  product?

23      A.  I'm not sure I'm aware of any time that that

24  has happened.

22        Q.  In the product that you shipped to Wal-Mart
23   Stores Incorporated, has Zinus included instructions
24   inside the box?
25        A.  I believe we did.  I believe we did.

96

1        Q.   In the inner spring Mattress-in-a-Box product

2    that Zinus has supplied to walmart.com, has Zinus

3    included product instructions in the boxes?

4        A.   I'm not sure, but I believe so, but I'm not

5    sure on that.

6        Q.   And who would know the answer to that?

7        A.   Our people would.  Our people in our Pleasanton

8    office.

9        Q.   Anybody in particular?

10        A.   Bruce or our Bentonville office personnel who

11    handle Wal-Mart would know.

12        Q.   In the product that you provided to Wal-Mart

13    Canada, have there been instructions placed inside the

14    boxes?

15        A.   I don't know.

16        Q.   Have there been instructions placed inside the

17    boxes for inner spring Mattress-in-a-Box product that

18    Zinus has supplied to customers other -- actual

19    prospective customers other than Wal-Mart?

20        A.   I don't believe so, but I'm not sure.  I do not

21    believe so, though.

1      Q.  You referred earlier to a presentation that you

2    personally made to Wal-Mart stores where you took a

3    mattress out of the box, opened the packaging and

4    allowed it to be decompressed.

5           Do you recall that testimony?

6      A.  Yes.

7      Q.  Are you aware of any presentations made by

8    others at Zinus to Wal-Mart where they have taken a

9    mattress out of the box -- taken it out of the packaging

10   and allowed it to uncompress?

11     A.  There may have been a few other instances and

12   because the process is very quick, and so from the time

13   we take it out of the box to the time it's set up, it

14   just pops right up.

15          So there may have been a few, but if it was,

16   it's probably a handful of times.

17     Q.  What was your purpose in giving Wal-Mart the

18   presentation that you gave them when you took the

19   mattress out of the box and opened it?

20     A.  The purpose of my presentation was to show the

21   senior management what it would look like in-store in

22   its box, how it's pulled out of the box and how it

23   instantaneously opens up.

24          So you can -- she literally laid on it within a

25   very quick period of time, from just opening it up and

102

1    just so she could feel how comfortable it was.

2        Q.  You wanted your customer Wal-Mart to understand

3    the process of removing the box -- the mattress from its

4    packaging and allowing it to uncompress, correct?

5        A.  Correct.

6        Q.  Have --

7        A.  I want to make sure that you understand that

8    this is a process that's quick.  This is not --

9        Q.  I think you said that a number of times.

10        A.  Okay, good.  I want to make sure it's something

11    that happens quick and that's the purpose of giving a

12    presentation like that.

14      Q.   When you say the mattress expands immediately,

15   in less than a minute, does it take the mattress less

16   than a minute to fully expand to the volume that it was

17   at before it was compressed?

18      A.   Close to it.  Not exact.

19      Q.   How long does it take for the mattress to fully

20   expand to its uncompressed state?

21          MR. WALLACE:   Objection, vague.

22          THE WITNESS:   That really -- that might vary on

23   the different styles that you manufacture.

24          The current styles that we're selling, it's,

25   gosh, within a couple minutes.

104

1          But again, you can -- as soon as you open it

2     up, you'll see it pop up and you can lay on it right

3     then.

4     BY MR. WILSON:

5          Q.  Has anyone ever told you that -- strike that.

6              Has anyone ever told Zinus that it takes more

7     than an hour for the mattress to fully reexpand to its

8     uncompressed state?

9          A.  Again, that may depend on the construction of

10    the product.

11         Q.  I'm asking you regardless of the construction

12    of the product, has anybody ever advised Zinus that it

13    has taken more than an hour for an inner spring

14    Mattress-in-a-Box product to fully expand to its

15    uncompressed state?

16             MR. WALLACE:  Objection, vague.

17             THE WITNESS:  Of an inner spring mattress?

18    BY MR. WILSON:

19         Q.  Yes.

20         A.  An hour specifically?

21         Q.  I said more than an hour.

22         A.  Not on the products that we've shown to

23    Wal-Mart or walmart.com.

24         Q.  How about --

25         A.  But some cases, that may have occurred, but

1    that's if it has memory foam built on top of it, which

2    it tends to be a little slower in recovering air, but

3    the springs pop up right away.

17          Q.  Are you aware of any instance in which somebody

18     has been injured by the expansion of an inner spring

19     Mattress-in-a-Box product?

20          A.  No.

21          Q.  Are you aware of any instance in which a person

22     has been frightened by the expansion of an inner spring

23     Mattress-in-a-Box product?

24          A.  Not to my knowledge.

25          Q.  Have there been any instances in which you've

107

1    heard that customers have complained that the expansion

2    was abrupt?

3         A.  No, not to my knowledge.

4         Q.  Does Zinus maintain a customer service number

5    for its customers' customers who purchase inner spring

6    Mattress-in-a-Box products?

7         A.  Yes.

8         Q.  Has Zinus ever received calls from those

9    customers?

10        A.  Yes.

11        Q.  Does Zinus maintain any record of those calls?

12        A.  Yes.

13        Q.  What type of record?

14        A.  Who the customer is, what the issue is, and how

15   the situation needs to be resolved.

16        Q.  Have any customers ever called with concerns

17   about the speed at which the Mattress-in-a-Box product

18   returns to its uncompressed state?

19        A.  I don't know.

20        Q.  Has Zinus ever received any calls from

21   customers who don't know how to take the

22   Mattress-in-a-Box product out of the box?

23        A.  Perhaps, but I'm not sure.

24        Q.  Has Zinus ever received any calls from

25   customers who don't know how to take the

1    Mattress-in-a-Box mattress out of the plastic wrapper

2    that surrounds it?

3         A.   Perhaps, but I'm not sure.

4         Q.   Has Zinus ever received any calls from

5    customers who were unable to remove the

6    Mattress-in-a-Box mattress from either the duffel bag or

7    the fabric roll?

8         A.   I'm not sure.

9         Q.   Would the records that you have of customer

10   calls contain this information?

11        A.   They may or may not.

12        MR. WILSON:   I'd like to have marked as

13   Exhibit 213 a document bearing -- actually, no Bates

14   number on it, it's identified as Exhibit E to your

15   declaration.

16        (Exhibit No. 213 was marked.)

17   BY MR. WILSON:

18        Q.   Do you recognize this document?

19        A.   I believe so.

20        Q.   What is this document?

21        A.   I think this is the setup instructions for

22   unpacking the mattress -- setting up the mattress.

23        Q.   These are the instructions that Zinus includes

24   inside the box for its inner spring Mattress-in-a-Box

25   product, correct?

109

1      A.  Correct.

2      Q.  Does Zinus expect that customers who purchase

3  the Mattress-in-a-Box product for use will follow these

4  instructions?

5      A.  Yes.

6      Q.  Do you understand that customers who purchase

7  the product for their use will follow these

8  instructions?

9      A.  Yes.

10     Q.  Specifically, you understand that customers who

11  purchase an inner spring Mattress-in-a-Box product will

12  take the spring mattress from the box and lay it on the

13  floor, correct?

14     A.  Uh-huh, yes.

15     Q.  Zinus expects that customers will cut the outer

16  polyethylene bag along the sewing line with scissors; is

17  that right?

18     A.  Correct.

19     Q.  Zinus understands that's what customers will do

20  as well, correct?

21     A.  Correct.

22     Q.  In fact, it's true, isn't it, that in order to

23  use the Mattress-in-a-Box product for its intended

24  purpose, customers must remove the Mattress-in-a-Box

25  product from either the duffel bag or the fabric roll?

1              MR. WALLACE:  Objection, vague.

2              THE WITNESS:  I'm not sure what fabric roll is.

3    BY MR. WILSON:

4         Q.  The fabric on the swirl wrapped product.

5         A.  Oh, okay.

6              MR. WILSON:  Could you reread the question,

7    please?

8              (The record was read by the Reporter.)

9              THE WITNESS:  My confusion there was, I

10   believe, in my first deposition, you were referring to

11   it as film.

12             And I don't remember it being referred to as

13   fabric.  I'm not sure I remember that.

14             That's where I've --

15   BY MR. WILSON:

16        Q.  That's okay.  I just need an answer to the

17   question.

18             Why don't we read the question back one more

19   time so you have it firmly in mind so I can get a clean

20   answer to the question.

21             (The record was read by the Reporter.)

22             THE WITNESS:  Correct.

23   BY MR. WILSON:

24        Q.  What is the intended purpose or use of the

25   Mattress-in-a-Box product?

111

1       A.  The intended purpose is to sleep on it.

2       Q.  Zinus intends that customers will cut open the

3   vacuum sealed bag surrounding the mattress, correct?

4       A.  Correct.

5       Q.  And Zinus understands that end user customers

6   for the Mattress-in-a-Box product do, in fact, puncture

7   or sever the vacuum seal bag, correct?

8           MR. WALLACE:  Objection, compound.

9           THE WITNESS:  The consumers understand that

10  they need to cut across the entire width or length of

11  that product for -- and then remove the mattress from

12  that wrapper so that they can sleep on it.

13  BY MR. WILSON:

14      Q.  Zinus understands that customers, in fact, do

15  cut the vacuum sealed bag to be able to use the

16  mattress, correct?

17      A.  Yes, they cut it all the way across, one way or

18  the other.

19      Q.  They have to do that in order to be able to use

20  the mattress for its intended purpose, correct?

21      A.  Correct.

22      Q.  Once the vacuum sealed bag is cut, Zinus

23  intends the customer will then allow the compressed

24  mattress to fully expand to its original shape, correct?

25          MR. WALLACE:  Objection, vague.

1            THE WITNESS:  Yes.

2    BY MR. WILSON:

3        Q.  Zinus understands that customers, in fact, do

4    allow the compressed mattress to uncompress to its

5    original state, correct?

6        A.  Correct.

19          Q.  Aside from the presentation that you made for
20     Wal-Mart, where you took a mattress out of the box and
21     allowed it to uncompress, are you aware of any other
22     presentations that Zinus has made to anybody in which
23     they have taken a mattress out of the box and allowed it
24     to uncompress?
25          A.  I believe there's been a handful of

118

1    presentations given that may have -- where we may
2    have -- but I don't know if it was memory foam or if it
3    was inner spring.
4        Q.  Is it fair to say that you can't, sitting here
5    today, identify any presentations other than ones you
6    have already discussed for inner spring mattresses in
7    which the mattress was taken out of the box and pulled
8    out to uncompress?
9        A.  I can't give you a definitive truthful answer
10   on that.
11           I can say that it's -- it's a few, maybe a
12   dozen, maybe less.
13           I'm not sure.
14       Q.  And you can't identify who those presentations
15   might have been made to, correct?
16       A.  Not specifically.

119

9        Q.  Would you say that the Zinus inner spring

10   Mattress-in-a-Box product expands in an uncontrolled

11   manner?

12            MR. WALLACE:  Objection, vague.

13            THE WITNESS:  No.  No.

14   BY MR. WILSON:

15        Q.  Would you say that the inner spring

16   Mattress-in-a-Box product expands in a controlled

17   manner?

18            MR. WALLACE:  Vague.

19            THE WITNESS:  I would say that the mattress

20   rises quickly and very controlled.

21   BY MR. WILSON:

22        Q.  Has Zinus performed any internal testing on its

23   Mattress-in-a-Box products -- strike that, let me ask a

24   better question.

25            Can you think of any instance in which Zinus

120

1    has taken an inner spring Mattress-in-a-Box product out

2    of the box and performed testing on it?

3        A.  Oh, yeah.

22        Q.  You would not consider opening the Zinus

23    Mattress-in-a-Box inner spring product to be a dangerous

24    experience, correct?

25        A.  Not at all.

124

1          Q.  Aside from in the instructions that it has

2     provided in its inner spring Mattress-in-a-Box products,

3     has Zinus ever demonstrated or explained to anybody else

4     how to take the inner spring Mattress-in-a-Box product

5     out of the box and decompress it?

6          A.  You mean in a presentation?

7          Q.  In any form.

8          A.  I think I just -- I think I just answered that

9     question, where we've taken it out of the box maybe a

10    dozen times, maybe less, but we've presented the product

11    in an uncompressed manner to where we -- from compressed

12    to uncompressed.

13         Q.  Aside from those presentations that you

14    referenced earlier, have there been other instances in

15    which Zinus has explained to people how to remove the

16    inner spring Mattress-in-a-Box product from its

17    packaging and allow it to decompress?

18         A.  Maybe.  Verbally, maybe.

19         Q.  In what instances?

20         A.  Oh, I have no idea.  Could be at a trade show,

21    could be in a ballroom.  Could be you ought to see it,

22    it's really cool, but I'm not aware of.

125

25     Q.  Is it fair to say that the inner spring

156

♀

1    Mattress-in-a-Box product cannot be used for its

2    intended purpose unless it is removed from the duffel

3    bag or fabric or film roll?

4          MR. WALLACE:  Vague, and calls for a legal

5    conclusion.

6          THE WITNESS:  If your question is does it have

7    to be removed from the duffel bag or from the film wrap,

8    then I would say yes.

9    BY MR. WILSON:

10   Q.  And the Mattress-in-a-Box needs to be removed

11   from the plastic wrapper to be used for its intended

12   purpose, correct?

13   A.  Yes.

14   Q.  Mattress-in-a-Box needs to expand to its

15   uncompressed state to be able to be used?

16   A.  Correct.

17   Q.  Would you agree that those are steps that any

18   consumer intending to use the Mattress-in-a-Box product

19   as a mattress would take, whether or not they had

20   instructions?

1                  I, LOUISE MARIE SOUSOURES, duly authorized to

2        administer oaths pursuant to Section 2093(b) of the

3        California Code of Civil Procedure, do hereby certify:

4        That the witness in the foregoing deposition was by me

5        duly sworn to testify the truth in the within-entitled

6        cause; that said deposition was taken at the time and

7        place therein cited; that the testimony of the said

8        witness was reported by me and was hereafter transcribed

9        under my direction into typewriting; that the foregoing

10       is a complete and accurate record of said testimony; and

11       that the witness was given an opportunity to read and

12       correct said deposition and to subscribe the same.

13                  Should the signature of the witness not be

14       affixed to the deposition, the witness shall not have

15       availed himself or herself of the opportunity to sign or

16       the signature has been waived.

17                  I further certify that I am not of counsel, nor

18       attorney for any of the parties in the foregoing

19       deposition and caption named, nor in any way interested

20       in the outcome of the cause named in said caption.

21

22       DATED:    _____, 2008

23

24                       LOUISE MARIE SOUSOURES,
25                       CSR. NO 3575

165

**EXHIBIT 3**

# SLUMBER❶™
# Direcciones en Desempacar de colchón

LEA POR FAVOR ESTAS DIRECCIONES COMPLETAMENTE ANTES DE DESEMPACAR SU NUEVO COLCHON



1. Prepare el lugar donde su colchón será utilizado tal como una base plana para cama o "Box Spring" asegúrese de que este limpia, plana y suficientemente resistente parea soportar el peso, tal como las bases SmartBase™ o SmartBox™. Coloque la caja en su lado y quite el colchón que viene comprimido.

2. Utilizando las tijeras, corte con cuidado la cinta que mantiene el colchón apretadamente enrollado. Tenga cuidado para evitar que las tijeras corten en el plástico protector. (NO UTILICE NINGUN TIPO DE CUCHILLO). Por este momento no corte la envoltura interior, plástica y clara.

3. Con la envoltura plástica clara todavía intacta, desenrolle y despliega el colchón comprimido y colóquelo en la posición donde usted estará durmiendo.

4. Con cuidado corte la bolsa plástica clara por las orillas. El colchón comienza instantáneamente a descomprimir. Quite la bolsa.

5. El colchón está listo para ser utilizado en este mismo momento usted ya puede agregar las sabanas y las mantas. Cosméticamente, puede tomar hasta 48 horas para que la cama tome completamente a su forma original.

1

2

3-1     3-2

4

5

P 002247

Help

# Google™ Translate BETA

| **Text and Web** | **Translated Search** | **Dictionary** | **Tools** |

## Translate Text

Original text:

Cosmeticamente, puede tomar hasta 48
horas para que la cama tome
completamente a su forma original

Automatically translated text:

Cosmeticamente, can take up to 48 hours
to completely take the bed to its
original form

| Spanish to English ▼ | Translate |

⊞ Suggest a better translation

## Translate a Web Page

| http:// | Spanish to English ▼ | Translate |

Google Home - About Google Translate

©2008 Google

**EXHIBIT 4**

 **WAL★MART**
Save money. Live better.™

 **Free shipping** with
site **to** store

Sign in or create a ne
🛒 Cart ┊ My Account ┊ Track C
Registry ┊ Wish List ┊

**SEARCH**  For the Home    **FOR** [                    ] **FIND**    See all depa

You are here: Home Page > For the Home > Furniture > Bedroom Furniture > Mattresses & Accessories > Mattress Sets

# 8" TIGHT TOP SPRING MATTRESS-IN-A-BOX TWIN

★★★★★ (2 Customer Ratings)
Read reviews or write a review

🔸 **ROLLBACK**

## $179.85 - $269.86

See pulldown for each item's price

**Availability:**
• **Online - IN STOCK**




⊕ Enlarge image

Select Size
[ Select                    ▼ ]

**ADD TO CART ▸**

Add to:  ⓘ Wish List   ⓘ Registry

**Delivery Options:**
• Ship to home
  Usually takes 24 to 48 hours to
  See estimated arrival date.

**Information below:**
• Features & Specifications
• Complete the Look
• Shipping & Delivery
• Gifting Options
• 0% Interest Offer / Payment
  Options

**Complete the Look**

 ★
Sorry, photo
not available

Simmons Deep Sleep I
**$89.88 - $199.76**

 ★
Sorry, photo
not available

Simmons Beautyrest T
Spring
**$159.88 - $339.76**

⬇ See more below

## Features & Specifications

Sleep tight on this Tight Top Spring Mattress-the revolutionary Rebound Technology
mattress expands to its original shape in minutes when unpacked.

### Tight Top Pocket Spring Mattress
• Springs provide undistributed rest - even as you toss and turn, meaning better motion
  separation
• Constructed to adjust individually to your weight and body shape
• Made of heavier gauge steel coil for comfort and durability
• Soft yet durable foams designed for maximum comfort and support
• Available sizes in Twin, Full, Queen, and King
• Twin Dimensions: 75" X 39" X 8"
• Full Dimensions: 75" X 54" X 8"
• Queen Dimensions: 80" X 60" X 8"
• King Dimensions: 80" X 76" X 8"

Shipping Weight (in pounds):        52.03

| | |
|---|---|
| Product in Inches (L x W x H): | 75.0 x 39.0 x 8.0 |
| Assembled in Country of Origin: | USA and/or Imported |
| Origin of Components: | USA and/or Imported |
| Wal-Mart No.: | 001767791 |

Top of Page

## Customer Product Reviews

**Rate and review this p**

Sort by...  ▼

### Mattress in a roll, 12/31/2007
By **MysticPrincess7**, McMinnville, OR      Read all reviews by this reviewer

★★★★★

**Product Attributes:**

| | |
|---|---|
| Value for price paid: | ★★★★★ |
| Meets Expectations: | ★★★★★ |
| Features: | ★★★★★ |
| Appearance: | ★★★★★ |

Who would believe it! This came rolled up in a box and we had to let it sit for 48 hours to fully reach it's size. I was able to move it by myself. Our old mattress had deep crevices we had to sleep in (we both are on the plus side). This mattress is sooooo comfortable. It has kind of a pillow top feel without the pillow top. I don't expect it to last forever. The last time I paid $225 for a mattress it lasted us 5 years. This one will do nicely til we win the lottery and can buy a luxury one! This one will then be our new guest bed! It's so comfortable I am afraid our guests will never leave, though.

Recommends this product? **Yes**
Age: **45 - 54**
Gender: **Female**
Has owned product for: **2 - 7 weeks**
Uses product: **Every day**

**1** of **1** people found this review helpful.

**Was this review helpful to you?** Yes  No

Report inappropriate content

### Awsome value, 12/28/2007
By **deliberateshopper**, Missoula, MT      Read all reviews by this reviewer

★★★★★

**Product Attributes:**

| | |
|---|---|
| Value for price paid: | ★★★★★ |
| Meets Expectations: | ★★★★★ |

Features:          ★★★★★
Appearance:        ★★★★★

I was very skeptical of buying this product because my usual thought is that you get what you pay for. I went ahead and ordered it anyway because I knew I would not be using it that much and I did not want to spend that much money. To my surprise, this mattress is very comfortable. This is coming from a comfort snob who owns the top of the line temporpedic memory foam mattress. I would not trade my temporpedic but I would not mind spending the night on this bed if I had too. It met all of my needs and then some.

Recommends this product? **Yes**
Age: **35 – 44**
Gender: **Male**
Has owned product for: **2 - 7 weeks**
Uses product: **A few times per month**

**Was this review helpful to you?**  Yes  No

Report inappropriate content

1 - 2 of 2 reviews

Top of Page

## Complete the Look



Simmons Deep Sleep Box Spring

**$89.88 - $199.76**

The Simmons Deep Sleep Triton foundation includes a framework of Canadian spruce and welded elements.



Simmons Beautyrest Triton Box Spring

**$159.88 - $339.76**

The Simmons Beautyrest Triton foundation includes a framework of Canadian spruce and welded elements.



Spa Sensations Memory Foam Contour Pillow

**$15.88**

This memory foam contour pillow conforms and molds to your head and neck, allowing an amazingly comfortable night's sleep.

**Browse for similar items in :**

- Home Page > For the Home > Furniture > Bedroom Furniture > Mattresses & Accessories > Mattress Sets
- Home Page > For the Home > Bedding > Pillows

Top of Page

## Shipping & Delivery

**Processing time** for an item is the time from when you submit your order to when the item leaves the warehouse. You can usually find an item's processing time when you click

"See estimated arrival date" on the item page.

**Shipping time** is from when the item leaves the warehouse to when it arrives at your door. See shipping time below.

The arrival date-range of each item is determined by adding the minimum of the processing time to the minimum of the shipping time and the maximum of the processing time to the maximum of the shipping time. For instance, if you bought a music CD that took 1 to 2 business days to process before shipping and you had it sent by Standard shipping (3 to 5 business days), the CD would arrive in 4 to 9 business days.

You will usually see the estimated arrival date-range when you click "See estimated arrival date" on the item page. You will see the actual arrival date-range during checkout.

Shipping times apply to shipments in the continental United States. For shipments sent by Standard shipping to Alaska and Hawaii, add 2–4 days to the shipping time. Delivery to APO/FPO addresses takes 3 to 6 weeks.

**Please note:** Oversize items cannot be shipped to Alaska, Hawaii, U.S. protectorates and territories, or APO/FPO addresses. At this time, delivery is limited to street addresses in the 48 contiguous states. You will see the actual arrival date in checkout after you choose a shipping address.

Top of Page

## Gifting Options

The following available options may be selected during checkout:

**Gift Message:** Add a personal note that we'll include with your gift.

**Gift Receipt:** When you add other gift options, we'll include a receipt that keeps the price a secret but makes it easy to exchange or return an item.

Top of Page

## 0% Interest Offer / Payment Options

### Enjoy Great Financing!

 Make the most of your shopping with these great Wal-Mart® Discover® or Wal-Mart Credit Card financing offers:

- Minimum monthly payments required
- No interest offer applies to Walmart.com purchases over $250, and must be paid within 18 months. Offer good from January 8, 2008 through January 31, 2008.
- Purchase must be made with a Wal-Mart® Discover® or Wal-Mart® Credit Card

Offer Details and Card Application

### Other Payment Options

- Bill Me Later® — see details
- Wal-Mart Credit Card
- Wal-Mart Gift Card
- Visa, MasterCard, American Express, Discover and Wal-Mart Discover issued by U.S.

banks only*
- Debit cards (also called check cards, ATM cards or banking cards) which display a Visa or MasterCard logo on the front.

* This does not include the Wal-Mart Community and Business Card, which we are not able to accept.

We're sorry, but at this time we do not accept checks, money orders or credit cards issued by foreign (non-U.S.) banks. Please do not send cash.

Top of Page

## Pricing Policy

### About Our Prices
We strive to provide you with the lowest prices possible on Walmart.com as well as in our stores. However, sometimes a price online does not match the price in a store. Walmart.com's prices may be either higher or lower than local store prices. Our local stores do not honor Walmart.com pricing or competitor advertisements from outside of a store's local trade territory.

Top of Page

 **Don't Miss a Single Rollback or Special Offer!**

Get the Wal-Mart Wire: [Enter Your Email Addres]

[ SIGN UP ▶ ]

- More Newsletters  • Privacy Policy
Learn about new clearance items and exclusive music releases.

**ABOUT WALMART.COM**
- About Walmart.com
- Site Directory
- Sign Up for Email or RSS Feeds
- Join Our Affiliate Program
- Security & Privacy
- Terms of Use
- International Customers
- Careers at Walmart.com

**ABOUT WAL-MART STORES**
- Store Finder
- Wal-Mart Stores Info
- Wal-Mart Blog
- Wal-Mart Facts
- Wal-Mart Sustainability
- Wal-Mart Credit Cards
- Wal-Mart Associates
- Careers at Wal-Mart

**HELP**
- Online Customer Service
- Track Your Order
- Questions About Your Order
- Shipping Costs & Times
- Our Return Policy
- Return an Item
- Product Recall Info
- MSDS

© 2007 Wal-Mart Stores, Inc.

ndc-www16.walmart.com
/catalog/product.do, /catalog/fusionItem.do
/include/dynamic/tiles/templates/item/fusionItem.jsp

**EXHIBIT 5**

Case 5:07-cv-03012-PVT    Document 87-7    Filed 02/12/2008    Page 56 of 89

gradual. The American Heritage® Dictionary of the English Language: Fourth Edition. 2...    Page 1 of 2




Privacy information

**Bartleby.com**

Great Books Online    Search Dictionary    Go

Home | Subjects | Titles | Authors    Encyclopedia | Dictionary | Thesaurus | Quotations | English Usage

Reference > American Heritage® > Dictionary

‹ grad school                                                        gradualism ›

CONTENTS · INDEX · ILLUSTRATIONS · BIBLIOGRAPHIC RECORD

The American Heritage® Dictionary of the English Language: Fourth Edition.  2000.

# gradual

SYLLABICATION:   grad·u·al

PRONUNCIATION:   grăj'oo-əl

ADJECTIVE:   Advancing or progressing by regular or continuous degrees: *gradual erosion; a gradual slope.*

NOUN:   *Roman Catholic Church* **1.** The liturgical book containing the chants for the Mass. **2.** A biblical text sung between the Epistle and the Gospel of the Mass.

ETYMOLOGY:   Middle English, having steps, from Medieval Latin *graduālis*, from Latin *gradus*, step; see **grade**. N., Middle English, from Medieval Latin *graduāle*, the part of the service sung by the choir from the altar steps, gradual, from neuter sing. of *graduālis.*

OTHER FORMS:   **grad'u·al·ly** —ADVERB
              **grad'u·al·ness** —NOUN

The American Heritage® Dictionary of the English Language, Fourth Edition. Copyright © 2000 by Houghton Mifflin Company. Published by the Houghton Mifflin Company. All rights reserved.

CONTENTS · INDEX · ILLUSTRATIONS · BIBLIOGRAPHIC RECORD

‹ grad school                                                        gradualism ›

Google    Search

Case 5:07-cv-03012-PVT    Document 87-7    Filed 02/12/2008    Page 57 of 89

gradual. The American Heritage® Dictionary of the English Language: Fourth Edition. 2...    Page 2 of 2

Click here to shop the Bartleby Bookstore.

Welcome · Press · Advertising · Linking · Terms of Use · © 2008 Bartleby.com




**EXHIBIT 6**

| | |
|---|---|
| **From:** | Wilson, Kenneth (Perkins Coie) |
| **Sent:** | Thursday, January 17, 2008 11:49 PM |
| **To:** | darien |
| **Subject:** | New Summary Judgment Motion |

Darien:

I have now had a chance to analyze Zinus' most recent motion for summary judgment, on the direct infringement issues. Not surprisingly, we believe this third summary judgment motion is premature. Not only have we not gotten to claim construction yet, but Zinus (and Simmons and Dreamwell, although that's irrelevant for purposes of this motion) has not even produced its Initial Disclosure documents yet. Moreover, given the deadlines set forth in the Interim Order on Zinus' Motion for Reconsideration and the upcoming Markman deadlines, I think the schedule for the most recent summary judgment is overly ambitious, even if the relevant discovery had been provided. Accordingly, we would ask that you continue the hearing on your most recent motion by a couple of weeks.

In addition, Dreamwell must insist that Zinus provide all of the documents identified in its initial disclosures without further delay; if Zinus does not agree to move the hearing, we will need those documents by no later than next Tuesday, January 22. This would include all documents relating to Zinus' invalidity claims; all documents relating to the various manufacturing and packaging processes for the innerspring Mattress-in-a-Box product; and all communications with Wal-Mart or other customers regarding the Mattress-in-a-Box product. You also need to provide clean copies of the Exhibits to the new summary judgment motion, as the .pdf versions of at least the box labels are hard to read. We will also want any testing or other documentation relating to how quickly the mattress takes to fully expand to its uncompressed state.

Finally, since Mr. Reeves has submitted a Declaration, we will want his deposition, limited to the issues raised in Zinus' motion. We will need that deposition at least two business days before our opposition is due, so we have time to incorporate the deposition into the opposition, and the deposition needs to be held at least two das after Zinus produces the relevant documents so we will have time to review the documents in advance of the deposition. That means the deposition would need to be held on Thursday or Friday of next week, if the motion is to be kept on the current schedule. I should add that I already have a meeting scheduled for Friday afternoon that cannot be moved, so if the deposition is going to be held on Friday, it would need to start by 10:00 a.m.

Please let me know Zinus' response to these issues at your earliest convenience.

Thanks,

Ken

Kenneth B. Wilson
Perkins Coie LLP
Four Embarcadero Center, Suite 2400
San Francisco, CA 94111
Phone: 415-344-7001
Fax: 415-344-7201

**EXHIBIT 7**

**From:** darien [mailto:darien@imperiumpw.com]
**Sent:** Friday, January 18, 2008 2:25 PM
**To:** Wilson, Kenneth (Perkins Coie)
**Subject:** New Summary Judgment Motion

Ken,

Scott Reeves will be available to have his deposition taken next Friday morning starting at 9 a.m. That will give you more time to ask your questions before your other meeting on Friday afternoon. The deposition will be limited to the issues raised in Zinus' second summary judgment motion.

You asked for all of the documents listed in Zinus' initial Rule 26(a)(1) disclosures.  Those documents are listed below.

1. A copy of the prosecution history (file wrappter) of U.S. patent application serial no. 08/416,065 filed on April 4, 1995, abandoned.
2.  A copy of the prosecution history (file wrappter) of patent application serial no. 08/694,803 filed on August 9, 1996, and issued on April 22, 1997, as U.S. Patent no. 5,622,030, which claims priority to U.S. patent application serial no. 08/416,065.
3.  A copy of the prosecution history (file wrappter) of reissue patent application serial no. 08/919,655 filed on August 28, 1997, and re-issued on March 16, 1999, as U.S. Patent no. Re. 36,142 ("the '142 Patent"), which is a reissue patent of U.S. Patent no. 5,622,030.
4. Documents relating to the invalidity and unenforceability of the '142 Patent.
5. Documents and/or things relating to the non-infringement of the '142 Patent by the manufacturing process of the Mattress-in-a-Box product.
6. Documents concerning communications between Zinus and Wal-Mart relating to the Mattress-in-a-Box product.
7. Financial records of Zinus relating to the manufacture and sale of the Mattress-in-a-Box product.
8. Documents concerning communications between Zinus and defendants.
9. Documents and/or things concerning Simmons' breach of the Confidentiality and Non-Disclosure Agreement executed by Zinus and Simmons on March 30, 2007.
10. Documents and/or things concerning Zinus' use of the words "pocket coil" in commerce in the United States.

The documents under items 1-3 were produced as exhibits to Zinus' first summary judgment motion. Dreamwell is not yet entitled to the disclosures listed under item 4 because those documents are defined in the Patent Local Rules 3-3 (Preliminary Invalidity Contentions) and are not due until February 20, 2007.  In addition, Zinus will brief some of these issues according to Judge Trumbull's interim order.  The documents under items 9 and 10 concerning the "pocket coil" trademark and breach of the NDA do not relate Zinus' second summary judgment motion.  So I see no reason why these documents must be produced by next Wednesday.

So the only documents that Zinus would be producing would be those defined in items 5-8.  Zinus will produce these documents by Wednesday in pdf form.  Zinus is not willing to continue the hearing on its second summary judgment motion.

I hope this satisfies your discovery needs relating to Zinus' second summary judgment motion.

Regards,

Darien


Darien K. Wallace
Imperium Patent Works
P.O. Box 587
Sunol, CA 94586
Tel: (925) 550-5067

**From:** Wilson, Kenneth (Perkins Coie) [mailto:KWilson@perkinscoie.com]
**Sent:** Friday, January 18, 2008 12:12 AM
**To:** darien
**Subject:** New Summary Judgment Motion

Darien:

I have now had a chance to analyze Zinus' most recent motion for summary judgment, on the direct infringement issues. Not surprisingly, we believe this third summary judgment motion is premature. Not only have we not gotten to claim construction yet, but Zinus (and Simmons and Dreamwell, although that's irrelevant for purposes of this motion) has not even produced its Initial Disclosure documents yet. Moreover, given the deadlines set forth in the Interim Order on Zinus' Motion for Reconsideration and the upcoming Markman deadlines, I think the schedule for the most recent summary judgment is overly ambitious, even if the relevant discovery had been provided. Accordingly, we would ask that you continue the hearing on your most recent motion by a couple of weeks.

In addition, Dreamwell must insist that Zinus provide all of the documents identified in its initial disclosures without further delay; if Zinus does not agree to move the hearing, we will need those documents by no later than next Tuesday, January 22. This would include all documents relating to Zinus' invalidity claims; all documents relating to the various manufacturing and packaging processes for the innerspring Mattress-in-a-Box product; and all communications with Wal-Mart or other customers regarding the Mattress-in-a-Box product. You also need to provide clean copies of the Exhibits to the new summary judgment motion, as the .pdf versions of at least the box labels are hard to read. We will also want any testing or other documentation relating to how quickly the mattress takes to fully expand to its uncompressed state.

Finally, since Mr. Reeves has submitted a Declaration, we will want his deposition, limited to the issues raised in Zinus' motion. We will need that deposition at least two business days before our opposition is due, so we have time to incorporate the deposition into the opposition, and the deposition needs to be held at least two das after Zinus produces the relevant documents so we will have time to review the documents in advance of the deposition. That means the deposition would need to be held on Thursday or Friday of next week, if the motion is to be kept on the current schedule. I should add that I already have a meeting scheduled for Friday afternoon that cannot be moved, so if the deposition is going to be held on Friday, it would need to start by 10:00 a.m.

Please let me know Zinus' response to these issues at your earliest convenience.

Thanks,

Ken

Kenneth B. Wilson
Perkins Coie LLP
Four Embarcadero Center, Suite 2400
San Francisco, CA 94111
Phone: 415-344-7001
Fax: 415-344-7201

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

**EXHIBIT 8**

**From:** Wilson, Kenneth (Perkins Coie)
**Sent:** Thursday, February 07, 2008 11:53 AM
**To:** 'darien'
**Subject:** RE: New Summary Judgment Motion

Darien:

On a related note, there are a substantial number of documents relating to Zinus' pending motion that still fall within the scope of Zinus' initial disclosures but still have not been produced. In particular, I am sure there are quite a number of communications between Zinus and Wal-Mart relating to the Mattress-in-a-Box product that have not yet been produced. Actually, I don't think Zinus produced any such communications prior to our cease and desist letter. You have referenced a Sales Plan, and communications relating to a Sales Plan, but none of those documents have been produced. I am sure there are also transactional documents that have not been produced, and that would constitute communications with Wal-Mart.

There are a number of other categories of documents that are directly relevant to your motion that have not been produced and that render the motion premature. For example, promotional materials and videos created regarding the product would tend to show whether Zinus provided directions to prospective customers. Any information regarding any Wal-Mart displays of Zinus product would relate to the subject matter of Zinus' motion. Any testing of the product showing how quickly it takes for the product to fully reexpand to its uncompressed state, or advertisements or communications with customers or Wal-Mart on the subject, would also be relevant. Indeed, any documents that relate to the topics addressed in Mr. Reeves declaration should be produced, and Dreamwell should have a chance to review and make arguments relating to those documents, before the Court can properly rule on Zinus's motion.

Please let me know if Zinus will be producing any of these documents in advance of Mr. Reeves deposition, and if so, what documents will be produced and when I can expect to receive them.

Thanks,

Ken


Kenneth B. Wilson
Perkins Coie LLP
Four Embarcadero Center, Suite 2400
San Francisco, CA 94111
Phone: 415-344-7001
Fax: 415-344-7201

**From:** darien [mailto:darien@imperiumpw.com]
**Sent:** Friday, January 18, 2008 2:25 PM
**To:** Wilson, Kenneth (Perkins Coie)
**Subject:** New Summary Judgment Motion

Ken,

Scott Reeves will be available to have his deposition taken next Friday morning starting at 9 a.m. That will give you more time to ask your questions before your other meeting on Friday afternoon. The deposition will be limited to the issues raised in Zinus' second summary judgment motion.

You asked for all of the documents listed in Zinus' initial Rule 26(a)(1) disclosures. Those documents are listed below.

1. A copy of the prosecution history (file wrappter) of U.S. patent application serial no. 08/416,065 filed on April 4, 1995, abandoned.
2. A copy of the prosecution history (file wrappter) of patent application serial no. 08/694,803 filed on August 9, 1996, and issued on April 22, 1997, as U.S. Patent no. 5,622,030, which claims priority to U.S. patent application serial no. 08/416,065.
3. A copy of the prosecution history (file wrappter) of reissue patent application serial no. 08/919,655 filed on August 28, 1997, and re-issued on March 16, 1999, as U.S. Patent no. Re. 36,142 ("the '142 Patent"), which is a reissue patent of U.S. Patent no. 5,622,030.
4. Documents relating to the invalidity and unenforceability of the '142 Patent.
5. Documents and/or things relating to the non-infringement of the '142 Patent by the manufacturing process of the Mattress-in-a-Box product.
6. Documents concerning communications between Zinus and Wal-Mart relating to the Mattress-in-a-Box product.
7. Financial records of Zinus relating to the manufacture and sale of the Mattress-in-a-Box product.
8. Documents concerning communications between Zinus and defendants.
9. Documents and/or things concerning Simmons' breach of the Confidentiality and Non-Disclosure Agreement executed by Zinus and Simmons on March 30, 2007.
10. Documents and/or things concerning Zinus' use of the words "pocket coil" in commerce in the United States.

The documents under items 1-3 were produced as exhibits to Zinus' first summary judgment motion. Dreamwell is not yet entitled to the disclosures listed under item 4 because those documents are defined in the Patent Local Rules 3-3 (Preliminary Invalidity Contentions) and are not due until February 20, 2007. In addition, Zinus will brief some of these issues according to Judge Trumbull's interim order. The documents under items 9 and 10 concerning the "pocket coil" trademark and breach of the NDA do not relate Zinus' second summary judgment motion. So I see no reason why these documents must be produced by next Wednesday.

So the only documents that Zinus would be producing would be those defined in items 5-8. Zinus will produce these documents by Wednesday in pdf form. Zinus is not willing to continue the hearing on its second summary judgment motion.

I hope this satisfies your discovery needs relating to Zinus' second summary judgment motion.

Regards,

Darien

Darien K. Wallace
Imperium Patent Works
P.O. Box 587
Sunol, CA 94586
Tel: (925) 550-5067

**From:** Wilson, Kenneth (Perkins Coie) [mailto:KWilson@perkinscoie.com]
**Sent:** Friday, January 18, 2008 12:12 AM
**To:** darien
**Subject:** New Summary Judgment Motion

Darien:

I have now had a chance to analyze Zinus' most recent motion for summary judgment, on the direct infringement issues. Not surprisingly, we believe this third summary judgment motion is premature. Not only have we not gotten to claim construction yet, but Zinus (and Simmons and Dreamwell, although that's irrelevant for purposes of this motion) has not even produced its Initial Disclosure documents yet. Moreover, given the deadlines set forth in the Interim Order on Zinus' Motion for Reconsideration and the upcoming Markman deadlines, I think the schedule for the most recent summary judgment is overly ambitious, even if the relevant discovery had been provided. Accordingly, we would ask that you continue the hearing on your most recent motion by a couple of weeks.

In addition, Dreamwell must insist that Zinus provide all of the documents identified in its initial disclosures without further delay; if Zinus does not agree to move the hearing, we will need those documents by no later than next Tuesday, January 22. This would include all documents relating to Zinus' invalidity claims; all documents relating to the various manufacturing and packaging processes for the innerspring Mattress-in-a-Box product; and all communications with Wal-Mart or other customers regarding the Mattress-in-a-Box product. You also need to provide clean copies of the Exhibits to the new summary judgment motion, as the .pdf versions of at least the box labels are hard to read. We will also want any testing or other documentation relating to how quickly the mattress takes to fully expand to its uncompressed state.

Finally, since Mr. Reeves has submitted a Declaration, we will want his deposition, limited to the issues raised in Zinus' motion. We will need that deposition at least two business days before our opposition is due, so we have time to incorporate the deposition into the opposition, and the deposition needs to be held at least two das after Zinus produces the relevant documents so we will have time to review the documents in advance of the deposition. That means the deposition would need to be held on Thursday or Friday of next week, if the motion is to be kept on the current schedule. I should add that I already have a meeting scheduled for Friday afternoon that cannot be moved, so if the deposition is going to be held on Friday, it would need to start by 10:00 a.m.

Please let me know Zinus' response to these issues at your earliest convenience.

Thanks,

Ken

Kenneth B. Wilson
Perkins Coie LLP
Four Embarcadero Center, Suite 2400
San Francisco, CA 94111
Phone: 415-344-7001
Fax: 415-344-7201

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

**EXHIBIT 9**

1  Kenneth B. Wilson, Calif. Bar No. 130009
   KWilson@perkinscoie.com
2  PERKINS COIE LLP
   Four Embarcadero Center, Suite 2400
3  San Francisco, CA  94111-4131
   Telephone:  415.344.7000
4  Facsimile:  415.344.7050

5  Attorneys for Defendant
   SIMMONS BEDDING COMPANY
6  and Defendant and Counterclaimant DREAMWELL, LTD.

7

8              UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10                 SAN JOSE DIVISION

11

| | |
|---|---|
| 12  ZINUS, INC. a California Corporation,<br><br>13  Plaintiff,<br><br>14  v.<br><br>15  SIMMONS BEDDING COMPANY, a<br>Delaware corporation, and DREAMWELL,<br>16  LTD., a limited liability company of<br>Nevada,<br>17<br>Defendants.<br>18<br>19  AND RELATED COUNTERCLAIMS<br>20 | Case No. 07-CV-03012-PVT<br><br>**DREAMWELL'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO ZINUS** |

21        Pursuant to Federal Rule of Civil Procedure 34, defendant and counterclaimant

22  Dreamwell, Ltd. ("Dreamwell") hereby requests that plaintiff and counterclaim defendant Zinus,

23  Inc. ("Zinus") produce the following documents, electronically stored information and tangible

24  things for inspection and copying by Dreamwell within 30 days of service of this request and in

25  accordance with the Definitions and Instructions set forth below.  Such documents, information

26  and things shall be produced at the offices of Perkins Coie LLP, Four Embarcadero Center, Suite

27  2400, San Francisco, CA 94111.

28

1

**DEFINITIONS**

2    1.    The terms "You," and "Your" mean plaintiff Zinus, its present and former

3 divisions, subsidiaries and related entities, and all present and former employees, officers,

4 directors, agents, representatives, attorneys, or any other persons acting at its direction, under its

5 control or on its behalf.

6    2.    The term "Mattress-in-a-Box" means any product that Zinus has in the past or

7 currently designs, manufactures, packages, distributes, offers for sale, sells and/or imports under

8 the name "Mattress-in-a-Box" or any variation thereof.

9    3.    The term "'142 Patent" means U.S. Patent No. RE 36,142, and any related U.S. or

10 foreign patents or applications.

11    4.    The term "document" is used in the broadest sense of Rule 34 of the Federal Rules

12 of Civil Procedure and encompasses all manner of recordation such as hard copy, carbon copy,

13 photocopy, microfilm, microfiche and machine readable code and includes without limitation,

14 letters, copies of letters, intra-corporate communications, minutes, bulletins, specifications,

15 instructions, advertisements, literature, trademark registrations, work assignments, reports,

16 memoranda, memoranda of conversations, notes, notebooks, drafts, data sheets, work sheets,

17 contracts, memoranda of agreements, assignments, licenses, sublicenses, books of accounts,

18 orders, invoices, statements, bills, vouchers, photographs, drawings, charts, catalogues, brochures,

19 and other written materials of whatever kind known to you or in your possession or control.

20    5.    The term "communication" refers to every manner or means of disclosure or

21 transfer or exchange of information whether orally or by document and whether face to face, by

22 telephone, facsimile transmission, mail, personal delivery, electronic mail, computer

23 transmission, or otherwise.

24    6.    The term "relating to" means referring to, relating to, pertaining to, consisting of,

25 constituting, memorializing, confirming, containing, reflecting, or otherwise connected to.

26    7.    The term "person" refers to individuals, parties, associations, partnerships, firms,

27 corporations, and other business organizations or entities whether formal or informal.

28

- 2 -

1

**INSTRUCTIONS**

2     1.     These requests seek responses that are accurate as of the date they are given and

3     are continuing so that any additional information responsive to these requests that you learn at

4     any time shall timely be furnished to Dreamwell in supplemental responses.

5     2.     In responding to these requests, please furnish all documents and things known or

6     available to you, including those in the possession of your attorneys or other PERSONS directly

7     or indirectly employed or retained by YOU, including but not limited to your agents, officers,

8     employees, representatives, investigators or anyone else acting or purporting to act on your behalf

9     or under your control.

10     3.     To the extent that you withhold any document or communication in whole or in

11     part because of a claim of privilege or immunity, please provide a privilege log setting forth the

12     general nature of each document, communication, or portion thereof withheld, its subject matter,

13     and any other information necessary to explain your claim of privilege or immunity and to allow

14     a court to adjudicate the propriety of such claim.

15     4.     If you cannot respond to any request in full, please respond to the fullest extent

16     possible, explain why you cannot respond to the remainder, and describe the nature of the

17     documents, communications or things you cannot provide.

18     5.     If you object to any portion of a request, please respond to all portions of the

19     request to which you do not object.

20     6.     The words "and," "and/or," and "or" refer to both the conjunctive and disjunctive

21     meaning. The word "any" shall mean "each and every" as well as "anyone."

22

23

24

25

26

27

28

DEFENDANT'S FIRST SET OF REQUEST FOR PRODUCTION OF DOCUMENTS
07-CV-03012-PVT
65839-0001/LEGAL13794302.2

1

## REQUEST FOR PRODUCTION

2

### REQUEST FOR PRODUCTION NO. 1:

3

All documents that refer or relate to Dreamwell.

4

### REQUEST FOR PRODUCTION NO. 2:

5

All documents that refer or relate to Simmons Bedding Company, or any other Simmons

6

entity.

7

### REQUEST FOR PRODUCTION NO. 3:

8

All documents that refer or relate to the '142 Patent.

9

### REQUEST FOR PRODUCTION NO. 4:

10

All documents that refer or relate to Zinus' innerspring Mattress-in-a-Box product.

11

### REQUEST FOR PRODUCTION NO. 5:

12

All documents that refer or relate to any compressed or compressible innerspring mattress

13

product designed, developed, manufactured, assembled, packaged, tested, offered for sale, sold,

14

or otherwise distributed by Zinus.

15

### REQUEST FOR PRODUCTION NO. 6:

16

All documents that refer or relate to the function of any compressed or compressible

17

innerspring mattress product designed, developed, manufactured, assembled, packaged, tested,

18

offered for sale, sold, or otherwise distributed by Zinus.

19

### REQUEST FOR PRODUCTION NO. 7:

20

All documents that refer or relate to the design or development of any Zinus innerspring

21

Mattress-in-a-Box product.

22

### REQUEST FOR PRODUCTION NO. 8:

23

Documents sufficient to identify each person involved in the design or development of

24

any Zinus innerspring Mattress-in-a-Box product.

25

### REQUEST FOR PRODUCTION NO. 9:

26

All documents that refer or relate to research or development conducted relating to any

27

Zinus innerspring Mattress-in-a-Box product.

28

1  **REQUEST FOR PRODUCTION NO. 10:**

2        Documents sufficient to identify each person involved in research or development

3  conducted relating to any Zinus innerspring Mattress-in-a-Box product.

4  **REQUEST FOR PRODUCTION NO. 11:**

5        All documents that refer or relate to the conception of any Zinus innerspring Mattress-in-

6  a-Box product.

7  **REQUEST FOR PRODUCTION NO. 12:**

8        All documents that refer or relate to the manufacture of any Zinus innerspring Mattress-in-

9  a-Box product.

10  **REQUEST FOR PRODUCTION NO. 13:**

11        Documents sufficient to identify each person involved in the manufacture of any Zinus

12  innerspring Mattress-in-a-Box product.

13  **REQUEST FOR PRODUCTION NO. 14:**

14        All documents that refer or relate to the assembly of any Zinus innerspring Mattress-in-a-

15  Box product.

16  **REQUEST FOR PRODUCTION NO. 15:**

17        Documents sufficient to identify each person involved in the assembly of any Zinus

18  innerspring Mattress-in-a-Box product.

19  **REQUEST FOR PRODUCTION NO. 16:**

20        All documents that refer or relate to any quality control performed on any Zinus

21  innerspring Mattress-in-a-Box product.

22  **REQUEST FOR PRODUCTION NO. 17:**

23        Documents sufficient to identify each person involved in any quality control performed on

24  any Zinus innerspring Mattress-in-a-Box product.

25  **REQUEST FOR PRODUCTION NO. 18:**

26        All documents that refer or relate to the testing of any Zinus innerspring Mattress-in-a-

27  Box product.

28

- 5 -

1  **REQUEST FOR PRODUCTION NO. 19:**

2  Documents sufficient to identify each person involved in the testing of any Zinus

3  innerspring Mattress-in-a-Box product.

4  **REQUEST FOR PRODUCTION NO. 20:**

5  All documents that refer or relate to the packaging of any Zinus innerspring Mattress-in-a-

6  Box product.

7  **REQUEST FOR PRODUCTION NO. 21:**

8  Document sufficient to identify each person involved in the packaging of any Zinus

9  innerspring Mattress-in-a-Box product.

10  **REQUEST FOR PRODUCTION NO. 22:**

11  All documents that refer or relate to the conception, design or development of any process

12  or method, whether or not implemented, of manufacturing any Zinus innerspring Mattress-in-a-

13  Box product or of any step thereof.

14  **REQUEST FOR PRODUCTION NO. 23:**

15  All documents that refer or relate to research and development performed relating to any

16  process or method, whether or not implemented, of manufacturing any Zinus innerspring

17  Mattress-in-a-Box product or of any step thereof.

18  **REQUEST FOR PRODUCTION NO. 24:**

19  All documents that refer or relate to the conception, design or development of any process

20  or method, whether or not implemented, of assembling any Zinus innerspring Mattress-in-a-Box

21  product or of any step thereof.

22  **REQUEST FOR PRODUCTION NO. 25:**

23  All documents that refer or relate to research and development performed relating to any

24  process or method, whether or not implemented, of assembling any Zinus innerspring Mattress-

25  in-a-Box product or of any step thereof.

26  **REQUEST FOR PRODUCTION NO. 26:**

27  All documents that refer or relate to the conception, design or development of any process

28

- 6 -

1 or method, whether or not implemented, of packaging any Zinus innerspring Mattress-in-a-Box

2 product or of any step thereof.

3 **REQUEST FOR PRODUCTION NO. 27:**

4 All documents that refer or relate to research and development performed relating to any

5 process or method, whether or not implemented, of packaging any Zinus innerspring Mattress-in-

6 a-Box product or of any step thereof.

7 **REQUEST FOR PRODUCTION NO. 28:**

8 All documents that refer or relate to Zinus' Swirl Wrap process.

9 **REQUEST FOR PRODUCTION NO. 29:**

10 All documents that refer or relate to the conception, design or development of Zinus'

11 Swirl Wrap process.

12 **REQUEST FOR PRODUCTION NO. 30:**

13 All documents that refer or relate to research and development relating in any way to

14 Zinus' Swirl Wrap process.

15 **REQUEST FOR PRODUCTION NO. 31:**

16 All documents that constitute, refer or relate to any installation instructions, user

17 instructions, or specification sheets for any Zinus Mattress-in-a-Box product.

18 **REQUEST FOR PRODUCTION NO. 32:**

19 All documents that constitute, refer or relate to the advertising, marketing or promotion of

20 any Zinus Mattress-in-a-Box product, including but not limited to, all advertising material, press

21 releases, product announcements, marketing and promotional material, business and sales plans,

22 articles, documents and things relating to speeches, lectures or presentations, or promotional

23 videos.

24 **REQUEST FOR PRODUCTION NO. 33:**

25 Documents sufficient to identify each person involved in the advertising, marketing or

26 promotion of any Zinus Mattress-in-a-Box product, including but not limited to advertising

27 brochures or promotional videos.

28

- 7 -

1    **REQUEST FOR PRODUCTION NO. 34:**

2    Any and all versions of any pages from Zinus' Web sites, including but not limited to

3    pages from the zinus.com and zinusinternational.com domains, as well as any documents posted,

4    displayed, or otherwise made available through such Web sites.

5    **REQUEST FOR PRODUCTION NO. 35:**

6    All documents that constitute, refer or relate to any video prepared by or on behalf of

7    Zinus that relates in any way to its Mattress-in-a-Box product, including but not limited to any

8    video showing the manufacturing process, and any video showing the unpackaging or use of the

9    mattress.

10    **REQUEST FOR PRODUCTION NO. 36:**

11    All documents that constitute, refer or relate to any video prepared by or on behalf of

12    anyone other than Zinus (including but not limited to Wal-Mart Stores, Inc.) that relates in any

13    way to Zinus' Mattress-in-a-Box product, including but not limited to any video showing the

14    manufacturing process, and any video showing the unpackaging or use of the mattress.

15    **REQUEST FOR PRODUCTION NO. 37:**

16    All documents that constitute, refer or relate to the development of any packaging

17    designed or used with any Mattress-in-a-Box product, including but not limited to any carton

18    designs.

19    **REQUEST FOR PRODUCTION NO. 38:**

20    All contracts or agreements between Zinus and any entity relating to any Mattress-in-a-

21    Box product, including but not limited to, indemnification, research, development,

22    manufacturing, collaboration or license agreements.

23    **REQUEST FOR PRODUCTION NO. 39:**

24    All documents that constitute, refer or relate to any offer for sale of any Zinus innerspring

25    Mattress-in-a-Box product.

26

27

28

- 8 -

1    **REQUEST FOR PRODUCTION NO. 40:**

2           Document sufficient to identify each person involved in any offer for sale of any Zinus

3    innerspring Mattress-in-a-Box product.

4    **REQUEST FOR PRODUCTION NO. 41:**

5           All documents that constitute, refer or relate to any importation of any Zinus innerspring

6    Mattress-in-a-Box product.

7    **REQUEST FOR PRODUCTION NO. 42:**

8           Documents sufficient to identify each person involved in any importation of any Zinus

9    innerspring Mattress-in-a-Box product.

10   **REQUEST FOR PRODUCTION NO. 43:**

11          All documents that constitute, refer or relate to any delivery or shipment of any Zinus

12   innerspring Mattress-in-a-Box product.

13   **REQUEST FOR PRODUCTION NO. 44:**

14          Documents sufficient to identify each person involved in any delivery or shipment of any

15   Zinus innerspring Mattress-in-a-Box product.

16   **REQUEST FOR PRODUCTION NO. 45:**

17          All documents that refer or relate to any sale or other distribution of any Zinus innerspring

18   Mattress-in-a-Box product.

19   **REQUEST FOR PRODUCTION NO. 46:**

20          Documents sufficient to identify each person involved in any sale or other distribution of

21   any Zinus innerspring Mattress-in-a-Box product.

22   **REQUEST FOR PRODUCTION NO. 47:**

23          All documents that refer or relate to Wal-Mart Stores, Inc. or any affiliate of Wal-Mart

24   Stores, Inc (hereinafter referred to as "Wal-Mart").

25   **REQUEST FOR PRODUCTION NO. 48:**

26          All documents that refer or relate to walmart.com or any affiliate of walmart.com.

27

28

DEFENDANT'S FIRST SET OF REQUEST FOR PRODUCTION OF DOCUMENTS
07-CV-03012-PVT
65839-0001/LEGAL13794302.2

**REQUEST FOR PRODUCTION NO. 49:**

All documents that refer or relate to Wal-Mart Canada or any affiliate of Wal-Mart Canada.com.

**REQUEST FOR PRODUCTION NO. 50:**

All documents that refer or relate to any actual or prospective customer for the Zinus innerspring Mattress-in-a-Box product.

**REQUEST FOR PRODUCTION NO. 51:**

All documents that refer or relate to any instance in which Zinus removed a compressed innerspring Mattress in a Box mattress and surrounding wrapper from a box.

**REQUEST FOR PRODUCTION NO. 52:**

All documents that refer or relate to any instance in which Zinus removed a compressed innerspring Mattress-in-a-Box mattress and wrapper from its surrounding duffel bag or fabric roll.

**REQUEST FOR PRODUCTION NO. 53:**

All documents that refer or relate to any instance in which Zinus removed a compressed innerspring Mattress-in-a-Box mattress from its surrounding wrapper.

**REQUEST FOR PRODUCTION NO. 54:**

All documents that refer or relate to any instance in which Zinus allowed a compressed innerspring Mattress-in-a-Box mattress to return to its uncompressed state after removing it from its surrounding plastic wrapper.

**REQUEST FOR PRODUCTION NO. 55:**

All documents that refer or relate to any instance in which any person other than Zinus removed a compressed innerspring Mattress in a Box mattress and surrounding wrapper from a box.

**REQUEST FOR PRODUCTION NO. 56:**

All documents that refer or relate to any instance in which any person other than Zinus removed a compressed innerspring Mattress-in-a-Box mattress and wrapper from its surrounding duffel bag or fabric roll.

1    **REQUEST FOR PRODUCTION NO. 57:**

2         All documents that refer or relate to any instance in which any person other than Zinus

3    removed a compressed innerspring Mattress-in-a-Box mattress from its surrounding wrapper.

4    **REQUEST FOR PRODUCTION NO. 58:**

5         All documents that refer or relate to any instance in which any person other than Zinus

6    allowed a compressed innerspring Mattress-in-a-Box mattress to return to its uncompressed state

7    after removing it from its surrounding wrapper.

8    **REQUEST FOR PRODUCTION NO. 59:**

9         All documents that refer or relate to the manner in which or rate at which any Zinus

10   innerspring Mattress-in-a-Box mattress returns to its uncompressed state.

11   **REQUEST FOR PRODUCTION NO. 60:**

12        All documents that constitute, refer or relate to any communications between Zinus and

13   any other party relating to how to remove the innerspring Mattress-in-a-Box mattress from its

14   surrounding wrapper and/or allow the mattress to return to its uncompressed state.

15   **REQUEST FOR PRODUCTION NO. 61:**

16        All documents that constitute, refer or relate to communications between Zinus and Wal-

17   Mart.

18   **REQUEST FOR PRODUCTION NO. 62:**

19        All documents that constitute, refer or relate to any sales plan between Zinus and Wal-

20   Mart, as referenced in Zinus' Third Amended Complaint.

21   **REQUEST FOR PRODUCTION NO. 63:**

22        All documents that constitute, refer or relate to any supply agreement between Zinus and

23   Wal-Mart.

24   **REQUEST FOR PRODUCTION NO. 64:**

25        All documents that constitute, refer or relate to communications between or among Zinus

26   personnel or representatives that refer or relate to Wal-Mart.

27

28

- 11 -

1  **REQUEST FOR PRODUCTION NO. 65:**

2       All documents that constitute, refer or relate to communications between Zinus and any

3  third party that refer or relate to Wal-Mart.

4  **REQUEST FOR PRODUCTION NO. 66:**

5       All documents that constitute, refer or relate to communications between Zinus and Wal-

6  Mart that relate to Zinus' innerspring Mattress-in-a-Box product.

7  **REQUEST FOR PRODUCTION NO. 67:**

8       All documents that constitute, refer or relate to communications between Zinus and Wal-

9  Mart that relate to Dreamwell, Simmons Bedding Company, or any other Simmons entity.

10  **REQUEST FOR PRODUCTION NO. 68:**

11       All documents that constitute, refer or relate to communications between Zinus and Wal-

12  Mart that relate to the '142 Patent.

13  **REQUEST FOR PRODUCTION NO. 69:**

14       All documents that constitute, refer or relate to communications between Zinus and Wal-

15  Mart  that relate to the above-captioned litigation..

16  **REQUEST FOR PRODUCTION NO. 70:**

17       All documents that constitute, refer or relate to communications between or among Zinus

18  personnel or representatives that relate to Dreamwell, Simmons Bedding Company, or any other

19  Simmons entity.

20  **REQUEST FOR PRODUCTION NO. 71:**

21       All documents that constitute, refer or relate to communications between or among Zinus

22  personnel or representatives that relate to the '142 Patent.

23  **REQUEST FOR PRODUCTION NO. 72:**

24       All documents that constitute, refer or relate to communications between or among Zinus

25  personnel or representatives that relate to the above-captioned litigation.

26  **REQUEST FOR PRODUCTION NO. 73:**

27       All documents that constitute, refer or relate to communications between Zinus and any

28

- 12 -

1  third party, including any actual or prospective customers or end users of Zinus' products, that

2  relate to Zinus' innerspring Mattress-in-a-Box product.

3  **REQUEST FOR PRODUCTION NO. 74:**

4  All documents that constitute, refer or relate to communications between Zinus and any

5  third party that relate to Dreamwell, Simmons Bedding Company, or any other Simmons entity.

6  **REQUEST FOR PRODUCTION NO. 75:**

7  All documents that constitute, refer or relate to communications between Zinus and any

8  third party that relate to the '142 Patent.

9  **REQUEST FOR PRODUCTION NO. 76:**

10  All documents that constitute, refer or relate to communications between Zinus and any

11  third party that relate to the above-captioned litigation.

12  **REQUEST FOR PRODUCTION NO. 77:**

13  All documents that constitute, refer or relate to any patent application filed by or on behalf

14  of Zinus, in the United States or elsewhere, relating in any way to Zinus' Mattress-in-a-Box

15  product or any other compressible innerspring mattress product, including but not limited to any

16  communications with any patent office or other government body relating to such application.

17  **REQUEST FOR PRODUCTION NO. 78:**

18  All documents that constitute, refer or relate to communications or correspondence

19  between Zinus and its direct or downstream customers, purchasers, manufacturers, importers,

20  and/or distributors relating to any Zinus innerspring Mattress-in-a-Box product.

21  **REQUEST FOR PRODUCTION NO. 79:**

22  All documents that constitute, refer or relate to any communications between Zinus and its

23  direct or downstream customers, purchasers, manufacturers, importers, and/or distributors relating

24  in any way to the unpackaging and/or use any Zinus innerspring Mattress-in-a-Box product.

25  **REQUEST FOR PRODUCTION NO. 80:**

26  All documents that constitute, refer or relate to any directions or instructions provided by

27  Zinus to its direct or downstream customers, purchasers, manufacturers, importers, and/or

28

- 13 -

1  distributors relating in any way to the unpackaging and/or use any Zinus innerspring Mattress-in-

2  a-Box product.

3  **REQUEST FOR PRODUCTION NO. 81:**

4      All documents that constitute, refer or relate to any offers, purchase orders, agreements,

5  understandings, or other communications between Zinus and its direct or downstream customers,

6  purchasers, manufacturers, importers, and/or distributors that refer to, relate to, or disclaim

7  indemnification for infringement or violation of law.

8  **REQUEST FOR PRODUCTION NO. 82:**

9      Documents sufficient to identify the general corporate structure and organization of Zinus

10  and the officers and employees of Zinus, including but not limited to any organizational charts.

11  **REQUEST FOR PRODUCTION NO. 83:**

12      All documents that refer or relate to any and/or all business relationships, negotiations, or

13  activities between Zinus and other entities relating to any Zinus innerspring Mattress-in-a-Box

14  product.

15  **REQUEST FOR PRODUCTION NO. 84:**

16      All documents that constitute, refer or relate to any document retention policies or

17  practices.

18  **REQUEST FOR PRODUCTION NO. 85:**

19      All documents that constitute, refer or relate to memoranda, meeting notes, board minutes

20  and presentations relating to any Zinus innerspring Mattress-in-a-Box product.

21  **REQUEST FOR PRODUCTION NO. 86:**

22      All documents that constitute, refer or relate to any Zinus financial statements, including

23  but not limited to balance sheets, income statements, and cash flow reports.

24  **REQUEST FOR PRODUCTION NO. 87:**

25      All documents or other tangible items of any nature or sort that were identified or

26  referenced by Zinus in its Initial Disclosures.

27

28

- 14 -

1

**REQUEST FOR PRODUCTION NO. 88:**

2

All documents or other tangible items of any nature or sort requested to be identified in

3

the Interrogatories served concurrently with these Requests for Production of Documents.

4

5

Dated:  February 11, 2008

6

**PERKINS COIE LLP**

7

By _Kenneth B. Wil___

8

Kenneth B. Wilson

9

Attorneys for Defendant
SIMMONS BEDDING COMPANY

10

and Defendant and Counterclaimant DREAMWELL,
LTD.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 15 -

**EXHIBIT 10**

1   Kenneth B. Wilson, Calif. Bar No. 130009
    KWilson@perkinscoie.com
2   PERKINS COIE LLP
    Four Embarcadero Center, Suite 2400
3   San Francisco, CA 94111-4131
    Telephone: 415.344.7000
4   Facsimile: 415.344.7050

5   Attorneys for Defendant
    SIMMONS BEDDING COMPANY
6   and Defendant and Counterclaimant DREAMWELL, LTD.

7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                        SAN JOSE DIVISION

11

12   ZINUS, INC. a California Corporation,    Case No. 07-CV-03012-PVT

13                    Plaintiff,
                                              **DREAMWELL'S FIRST SET OF**
14           v.                               **INTERROGATORIES TO ZINUS**

15   SIMMONS BEDDING COMPANY, a
     Delaware corporation, and DREAMWELL,
16   LTD., a limited liability company of
     Nevada,
17
                     Defendants.
18

19   AND RELATED COUNTERCLAIMS

20

21          Pursuant to Federal Rule of Civil Procedure 33, defendant and counterclaimant

22   Dreamwell, Ltd. ("Dreamwell") hereby requests that plaintiff and counterclaim defendant Zinus,

23   Ltd. ("Zinus") answer the following interrogatories under oath within 30 days of service of this

24   request and in accordance with the Definitions and Instructions set forth below.

25

26

27

28

## DEFINITIONS

1.     The terms "You," and "Your" mean plaintiff Zinus, its present and former divisions, subsidiaries and related entities, and all present and former employees, officers, directors, agents, representatives, attorneys, or any other persons acting at its direction, under its control or on its behalf.

2.     The term "Mattress-in-a-Box" means any product that Zinus has in the past or currently designs, manufactures, packages, distributes, offers for sale, sells and/or imports under the name "Mattress-in-a-Box" or any variation thereof.

3.     The term "'142 Patent" means U.S. Patent No. RE 36,142, and any related U.S. or foreign patents or applications.

4.     The term "document" is used in the broadest sense of Rule 34 of the Federal Rules of Civil Procedure and encompasses all manner of recordation such as hard copy, carbon copy, photocopy, microfilm, microfiche and machine readable code and includes without limitation, letters, copies of letters, intra-corporate communications, minutes, bulletins, specifications, instructions, advertisements, literature, trademarks registrations, work assignments, reports, memoranda, memoranda of conversations, notes, notebooks, drafts, data sheets, work sheets, contracts, memoranda of agreements, assignments, licenses, sublicenses, books of accounts, orders, invoices, statements, bills, vouchers, photographs, drawings, charts, catalogues, brochures, and other written materials of whatever kind known to you or in your possession or control.

6.     The term "communication" refers to every manner or means of disclosure or transfer or exchange of information whether orally or by document and whether face to face, by telephone, facsimile transmission, mail, personal delivery, electronic mail, computer transmission, or otherwise.

7.     The term "relating to" means referring to, relating to, pertaining to, consisting of, constituting, memorializing, confirming, containing, reflecting, or otherwise connected to.

8.     The term "person" refers to individuals, parties, associations, partnerships, firms, corporations, and other business organizations or entities whether formal or informal.

9.     Unless otherwise indicated by the context, the term "identify" means:

1        a.      when used in connection with a document, to furnish a brief description of

2   the subject matter of the document, its title or designation, its date of preparation and distribution,

3   the name and address of the author and sender, the name and address of the person, if any, to

4   whom it was directed or to whom copies or similar documents were directed the location thereof;

5   and the present custodian;

6        b.      when used in connection with a person, to furnish a statement of the full

7   name, occupation, job title, business or function thereof, last known business and home address

8   and telephone number, place and date of incorporation, principal and other place(s) of business,

9   nature of business, all officers and other persons having knowledge of the matter with respect to

10  the business entity, executive offices of the company, its relation to you or to your goods or

11  products or other things;

12       c.      when used in connection with things, including and not limited to products,

13  devices, goods or physical things, to furnish a complete description of the thing, including its

14  common designation, its composition, its physical description, product type, any other

15  distinguishing I characteristics; the catalog, SKU, stock or other identifying number; and the

16  trademark, name, type, / grade, and any other designation customarily used to designate the item

17  and to distinguish it from others made or sold by the same or a different producer or vendor.

18                                              **INSTRUCTIONS**

19       1.      These interrogatories seek responses that are accurate as of the date they are given,

20  and are continuing so that any additional information responsive to these interrogatories that you

21  learn at any time shall be timely furnished to Dreamwell in supplemental responses.

22       2.      In responding to these interrogatories, please furnish all information known or

23  available to you, including information in the possession of your attorneys, other persons directly

24  or indirectly employed or retained by you, including but not limited to, your agents, officers,

25  employees, representatives, investigators or anyone else acting or purporting to act on your behalf

26  of or under your control.

27

28

DEFENDANT'S FIRST SET OF
INTERROGATORIES                    -3-
07-CV-03012-PVT

1  3.  If any interrogatory cannot be responded to in full, respond to the extent possible,

2 specify the reasons for the inability to respond to the remainder and state whatever information,

3 knowledge or belief you have concerning the unanswered portion.

4  4.  If a claim of privilege is made, you are requested to specify the grounds on which

5 such claim is based and to identify the information subject to the claimed privilege.

6  5.  The words "and," "and/or," and "or" refer to both the conjunctive and disjunctive

7 meaning. The word "any" shall mean "each and every" as well as "anyone."

8

9           **INTERROGATORIES**

10 **INTERROGATORY NO. 1:**

11  Describe in detail and identify all facts and documents supporting the basis for Zinus'

12 Fourth Affirmative Defense that one of more claims of the '142 Patent are invalid because the

13 '142 Patent fails to satisfy the requirements of 35 U.S.C. § 112, including any citation to the 142

14 Patent or its prosecution history.

15 **INTERROGATORY NO. 2:**

16  Describe in detail and identify all facts and documents supporting the basis for Zinus'

17 Fifth Affirmative Defense that the '142 Patent is invalid under 35 U.S.C. § 251, including any

18 citation to the 142 Patent or its prosecution history.

19 **INTERROGATORY NO. 3:**

20  Describe in detail and identify all facts and documents supporting the basis for Zinus'

21 allegation in Paragraph 34 of Zinus' Reply to Dreamwell's Counterclaims that "Dreamwell is not

22 entitled to exclusive use of the mark 'POCKET COIL' because the mark is descriptive and in

23 common use throughout the mattress industry," including all such uses of the term or mark

24 "POCKET COIL" of which Zinus is aware.

25 **INTERROGATORY NO. 4:**

26  Describe in detail and identify all facts and documents supporting the basis for Zinus'

27 allegation in Paragraph 35 of Zinus' Reply to Dreamwell's Counterclaims that "Dreamwell's

28 counterclaim for trademark infringement is barred because Dreamwell has granted an

1    uncontrolled or naked license to Simmons Bedding Company by failing to exercise any quality

2    control over Simmons Bedding Company and in doing so has abandoned its mark 'POCKET

3    COIL' and is estopped from asserting its rights as to the 'POCKET COIL' mark."

4    **INTERROGATORY NO. 5:**

5        Describe in detail and identify all facts and documents supporting the basis for Zinus'

6    allegation in Paragraph 36 of Zinus' Reply to Dreamwell's Counterclaims that "Dreamwell's

7    counterclaim for trademark infringement is barred because Dreamwell committed inequitable

8    conduct in connection with the trademark renewal of the 'POCKET COIL' mark" that renders the

9    registration of the mark "invalid and subject to cancellation."

10    **INTERROGATORY NO. 6:**

11        Describe in detail and identify all facts and documents supporting the basis for Zinus'

12    allegation in Paragraph 39 of Zinus' Reply to Dreamwell's Counterclaims that Dreamwell's

13    counterclaim for unfair business practices is barred because the manner in which Dreamwell

14    asserts California Business & Profession Code § 17200 is preempted by federal law.

15    **INTERROGATORY NO. 7:**

16        Describe in detail the facts and circumstances surrounding Zinus' first knowledge of the

17    '142 Patent, including but not limited to the person(s) who first learned of the patent, the date of

18    first knowledge, and any documents relating to such circumstances.

19    **INTERROGATORY NO. 8:**

20        Identify each specific item of confidential information that Zinus contends defendant

21    Simmons Bedding Company acquired at the Zinus factory in China, including the person who

22    disclosed such information and the form in which the information was disclosed (document, oral,

23    etc.).

24    **INTERROGATORY NO. 9:**

25        Describe in detail the factual basis for Zinus' contention that defendants have disclosed

26    and/or used Zinus confidential information, including the specific item or items of confidential

27    information that Zinus claims defendants disclosed and/or used, who disclosed and/or used the

28

1  information, when the information was disclosed and/or used, and how the information was

2  disclosed and/or used.

3  **INTERROGATORY NO. 10:**

4        Specify and quantify any damages that Zinus believes it has sustained as a result of

5  defendants' alleged misconduct, and identify any documents that Zinus believes support such a

6  contention.

7

8  Dated: February 11, 2008

9                                         **PERKINS COIE LLP**

10                                        By _____

11                                             Kenneth B. Wilson

12                                        Attorneys for Defendant
                                          SIMMONS BEDDING COMPANY
13                                        and Defendant and Counterclaimant DREAMWELL,
                                          LTD.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28